The Honorable Thomas S. Zilly

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

| | |
|---|---|
| JAMES JOHNSON, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>COSTCO WHOLESALE CORPORATION, a Washington corporation; W. CRAIG JELINEK; and RICHARD A. GALANTI,<br><br>Defendants. | No. 2:18-cv-01611-TSZ<br><br>**CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><br>CLASS ACTION<br><br>DEMAND FOR JURY TRIAL |

BRESKIN | JOHNSON | TOWNSEND <sup>PLLC</sup>
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

## **TABLE OF CONTENTS**

Page

I.      NATURE OF THE CLAIM .................................................................................1

II.     JURISDICTION AND VENUE ..........................................................................6

III.    PARTIES ..............................................................................................................7

        A.      Lead Plaintiff ...........................................................................................7

        B.      Defendants ................................................................................................7

IV.     CONFIDENTIAL WITNESSES ........................................................................8

V.      CONTROL PERSON ALLEGATIONS ...........................................................10

VI.     SUBSTANTIVE ALLEGATIONS ...................................................................11

        A.      The Nature of Costco's Business ...........................................................11

        B.      Costco's Background ..............................................................................12

        C.      Growing and Maintaining a Competitive Advantage .............................13

        D.      Costco's Drive to Keep Costs Down ......................................................15

        E.      SOX Requires Adequate Internal Controls and Directly Makes Senior
                Management Responsible For Those Controls ........................................16

        F.      The Importance of IT Controls for Public Companies ...........................21

        G.      Costco's Internal Controls Framework and Management's Obligations
                Regarding that Framework ......................................................................22

        H.      The Structure of Costco's IT Department ..............................................27

        I.      Costco's Comparatively Low SG&A and IT Spending ...........................28

        J.      Costco Failed to Provide IT with Adequate Attention and Resources
                Causing a Material Weakness in Internal Controls .................................30

                1.      Costco's IT Department was Neglected and Deprived of Resources
                        Necessary to Maintain Adequate Internal Control Processes .................31

                2.      The Deficiencies in IT Led to a Material Weakness in Costco's
                        Internal Controls, and In Particular with Regard to Change and
                        Access Management ......................................................................39

        K.      Defendants Continue to Mislead the Market About the Adequacy of
                Costco's Internal Controls Over Financial Reporting .............................46

| | L. | Defendants Begin to Reveal the Truth About The Material Weakness in Internal Controls | 46 |
| | M. | Defendants Final Revelation of the Truth About Their Internal Control Deficiencies | 48 |
| | N. | Remediation Measures Show the Severity of the Material Weakness in Internal Control and the Falsity of the Class Period Statements | 52 |
| | O. | Post-Class Period Revelations | 55 |
| VII. | | DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD | 57 |
| VIII. | | ADDITIONAL ALLEGATIONS SUPPORTING SCIENTER | 66 |
| | A. | Defendants' Actually Knew About the Material Weakness In Internal Controls Just Months Before the Class Period Even Begins | 66 |
| | B. | Defendants Had Access to Information Alerting them to the Weakness in Internal Controls | 67 |
| | C. | The Extensive Remedial Efforts Support an Inference of Scienter | 68 |
| | D. | Conscious Neglect of the IT Department Supports an Inference of Scienter | 69 |
| | E. | Defendants' SOX Certifications Support an Inference of Scienter | 70 |
| IX. | | LOSS CAUSATION | 71 |
| X. | | APPLICATION OF PRESUMPTIONS OF RELIANCE | 72 |
| XI. | | NO SAFE HARBOR | 74 |
| XII. | | CLASS ACTION ALLEGATIONS | 75 |
| COUNT I | | Violation of § 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants for Violations of Section 10(b) and Rule 10b-5 Promulgated Thereunder | 77 |
| COUNT II | | Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act | 79 |
| XIII. | | PRAYER FOR RELIEF | 81 |
| XIV. | | DEMAND FOR TRIAL BY JURY | 81 |

By and through his undersigned counsel, Fred D. Davoli ("Lead Plaintiff") brings this complaint individually, and on behalf of a class of similarly situated persons and entities, against Defendant Costco Wholesale Corporation ("Costco" or the "Company") and Defendants Richard A. Galanti and W. Craig Jelinek (together, the "Individual Defendants," and collectively with Costco, the "Defendants").

Lead Plaintiff alleges the following upon personal knowledge as to those allegations concerning Lead Plaintiff and, as to all other matters, upon the investigation of counsel, which included, without limitation: (a) review and analysis of public filings made by Costco with the U.S. Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications, including those disseminated by certain of the Defendants and other related non-parties; (c) review of news articles; (d) interviews with former employees of Costco, its affiliates, and other third parties; and (e) consultation with individuals with expertise in accounting, information technology systems, and damages.  Lead Plaintiff believes that substantial additional evidentiary support exists for the allegations herein that will be revealed after Lead Plaintiff has a reasonable opportunity to conduct discovery.

## I.    NATURE OF THE CLAIM

1.      Costco is a company that sells food and products in bulk to its members and other customers from large warehouses across the world.  Costco makes money both by selling products and by selling memberships to use these warehouses and through its website to make purchases.  Costco capitalizes on the economy of scale by purchasing products in large volumes at lower prices and then passing on the cost savings of bulk buying to its customers.

2.      Costco has been in business since the 1980s.  From the beginning, Costco was a success.  Costco seemingly had a winning formula for maintaining profitability by keeping costs low while continually growing revenue.  Costco prided itself on this formula, touting its ability to keep costs down while revenues grew year after year, even amid strong competition.  From the inception of the Company, Costco underwent incredible growth – growing from one store in

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

1983 in Washington, to 769 stores in 11 countries around the world.  Costco is an easily recognized brand with millions of loyal followers.

3. But with growth sometimes comes problems.  Starting in at least 2017—the year leading up to the Class Period (defined herein)—Costco struggled to control its costs, which it needed to do to remain competitive in the market and to return maximum value to shareholders. These struggles manifested themselves in Costco's inability to manage one of their most important infrastructure systems – its Information Technology (or "IT") function.  As a result of this failure, Costco's financial compliance function broke down causing material problems for Costco's internal controls in financial reporting and ultimately caused Defendants to issue materially false and misleading statements to the market and violate the Sarbanes-Oxley Act of 2002 ("SOX") in the process.  Pub. L. No. 107-204. H.R. 3763, 107th Cong.

4. As a public company, Costco is subject SOX, a law that was passed in 2002 in the wake of massive accounting frauds that was meant to return personal accountability to the executives of publicly traded companies.  In summary, and as more fully described herein, the law requires that as a part of a company's public filings, the CEO and CFO of a company must certify (called "SOX Certifications") that they have been involved in the process of designing, implementing, and evaluating the Company's internal controls.  These controls are critical to ensuring the reliability of the Company's public disclosures.  Thus, under SOX, the internal controls themselves are of paramount importance for any public company, and investors rely on SOX Certifications as a beacon of confidence and reliability in the accuracy of the financial metrics that get reported to the market.  As a part of the SOX Certification, the CEO and CFO attest to **_personally_** evaluating the effectiveness of the Company's internal controls - a task that cannot be delegated.

5. Like almost all public companies, Costco relies on its IT Department in large part to comply with SOX.  In particular, Costco's CEO and CFO rely on accounting and compliance software and teams so that they can affirm in SOX Certifications that there are sufficient procedures and internal controls in place for accurate financial reporting.  In fact, it is understood

that certification of compliance with SOX is indirectly a certification of the robustness of these processes as complying with a well-accepted (*i.e.*, "recognized") internal control framework.

6.     It is important for the software and the teams to be robust and for checks and controls to be in place every step of the way.  This importance is magnified by the sheer size and complexity of Costco's operations.  In 2018 alone, Costco reported revenues in the amount of more than $130 billion from its more than 760 warehouses and e-commerce operations, as well as more than $3 billion in membership fees from its more than 94 million members.  Thus, the efforts to make sure financial information is being reported accurately to the market is a huge undertaking, requiring working software, internal audits, internal checks and documentation, sufficient funding, robust training, and an effective and well managed IT team.  This significant undertaking is not optional nor a matter of business judgment: SOX compliance is federal law.

7.     The CEO and CFO of Costco signed SOX Certifications annually and quarterly, including during the Class Period, between June 6, 2018, to October 25, 2018, confirming to the market that they had a robust internal control process in place to ensure the integrity of their financial statements.  They also assured the market that the resources they were spending on their IT Department were sufficient to maintain the necessary internal controls – and that this did not change during the Class Period.

8.     However, unbeknownst to the market, Costco did not have sufficient practices and procedures in place to make sure that its financial reporting function was secure.  Numerous former employees of the Company collectively confirm that in the year and months leading up to the Class Period (and during the Class Period), Defendants systematically and consciously deprived Costco's IT Department of adequate resources and treated the department with disdain. The accounts of former employees converge to describe an attitude at the top of Costco that was hostile to the IT Department.  For example, former employees stated that spending on the IT Department was viewed as a "necessary evil" and that the IT Department was an "afterthought," a mere "cost center," and had "no oversight" and "no process."  In short, in an effort to manage costs to seem more profitable, Costco sacrificed IT – a department they saw as a waste of money,

1   resources, and time.  The IT Department, however, was more than just a "cost center," it was

2   necessary to ensure SOX Certifications were true and it was necessary to make sure there are no

3   material weaknesses in internal controls related to financial reporting.

4           9.      Former employees of Costco collectively confirm that management consciously

5   ignored the needs of the IT Department and as a result it was disorganized, lacked training,

6   lacked funding, and failed to implement governance controls as well as "access controls" and

7   "change controls" over Costco's sensitive financial information.  These "access controls" and

8   "change controls" are particularly important, as they controlled internally who could access and

9   change internal financial data that would ultimately be published to the market.  One former

10  employee stated that issues related to processes, access management, and governance controls

11  were identified as having deficiencies throughout the whole IT Department.  Another former

12  employee indicated that Costco's change management had "a lot of gaps," including incomplete

13  testing and missing approvals.  Other former employees said the Company's failure to establish

14  adequate change management processes led to unauthorized user access to Costco's IT systems.

15  Another former employee said he attended monthly meetings with Vice Presidents where he

16  raised concerns related to user access and change management process issues but nothing was

17  ever done.

18          10.     One former employee said a "baffling" number of former contractors were listed

19  in the Company's records as still having access to Costco's systems and that access for third

20  party contractors in the IT Department was tracked in a Google spreadsheet, which relied on

21  manual processes and was easy for employees to change.  Additionally, a former employee said

22  access issues were a "common occurrence" at Costco, and another explained that the access

23  issues meant the Company had to "scramble" to try and address any issues before auditors came

24  in.  These access and change control deficiencies were material weaknesses in Costco's systems

25  (**_with a "material weakness" being the most severe form of internal control deficiency_**) and

26  violated SOX.  These access and change control deficiencies were documented internally in a 50

27

1  page report by a contractor who worked performing an audit for the IT Department in 2017 – yet

2  Defendants did nothing to remedy these weaknesses.

3      11.    In addition to the 50 page report that documented these material deficiencies in

4  access and change control that existed as early as mid-2017, one former Senior Analyst at Costco

5  confirms that Defendants *actually knew* about the internal control problems in the months

6  leading into the Class Period, and that the board was kept apprised of these issues as well.  This

7  former employee said that Costco's weak internal controls "got Board attention," including

8  Defendants Jelinek and Galanti, because of the concerns over weak internal controls, and that

9  Defendants Jelinek and Galanti were involved in conversations related to a material weakness in

10  Costco's IT department beginning in February/March 2018 - *just 3 months before the Class*

11  *Period began*.  Despite this knowledge, Defendants shockingly affirmed just three months later

12  in their 3Q2018 Form 10-Q on June 6, 2018, that their internal controls over financial reporting

13  were sufficient and that there were no material weaknesses related to their financial reporting.

14      12.    Defendants' failure to dedicate adequate oversight and resources to its IT

15  Department caught up with them in a very real way.  On October 4, 2018, after the markets

16  closed, Defendants announced that Costco "expects to report a material weakness in internal

17  control[s]" for financial results reported as of September 2, 2018.  A material weakness in

18  internal controls is a deficiency, or combination of deficiencies, in internal controls such that it is

19  reasonably possible that a material misstatement of the Company's quarterly or annual reporting

20  will not be prevented or detected on a timely basis.  On that call, Defendant Galanti admitted that

21  "the controls weren't in place," "we should have done a better job," and "[the material weakness]

22  should have been fixed."  The market was rattled by this announcement with comments that

23  Costco reported a "'material weakness in internal control' that spooked investors."  Costco's

24  closing stock price dropped on this news from $231.68 on October 4, 2018, to $218.82 on

25  October 5, 2018, a drop of 5.55% on heavy volume, despite the Company beating analysts'

26  estimates for earnings per share and revenue for 4Q2018.  But the market was still unaware of

27  the full extent of the problem, with Bloomberg noting that "a company official,

1  [Defendant Galanti], was cryptic on [his] call with analysts," and another reporter noting that

2  "[i]n a *vague* statement, the warehouse indicated that the access issue involved both internal

3  employees and contractors."

4          13.     On October 26, 2018, Defendants revealed the true extent of the problem,

5  explaining that the internal control deficiencies were substantial and ***would likely take the entire***

6  ***fiscal year to fix***.  They also explained that Costco was instituting significant remedial measures

7  to deal with their material weakness in internal controls.  The remedial measures included

8  implementing (1) a compliance oversight function, (2) a training program on internal controls,

9  (3) a documentation program on internal controls, (4) enhanced risk assessment procedures and

10 controls for IT systems, and (5) a sufficient internal control review and testing plan.  The

11 significance of these remedial measures is twofold.  First, they serve as admissions by

12 Defendants that these measures were ***not*** in place during the Class Period, thus serving as

13 confirmation that Defendants SOX Certifications and other statements about internal controls

14 were false and misleading when made.  Second, they serve as corroboration that Defendants

15 were (at a minimum) deliberately reckless because they did not have these measures in place to

16 begin with.

17         14.     On this news, Costco's stock dropped again, from a closing price of  $226.40 on

18 October 25, 2018, to $218.19 on October 26, 2018, a 3.63% drop on heavy volume.  To this day,

19 Costco has not been able to remediate the issues with the material weakness in its internal

20 controls.  As a result of Defendants' fraud, Lead Plaintiff and class members suffered hundreds

21 of millions of dollars in losses.

22 **II.    JURISDICTION AND VENUE**

23         15.     This complaint alleges claims which arise under (1) Section 10(b) of the

24 Securities Exchange Act (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated

25 thereunder by the SEC, 17 C.F.R. § 240.10b-5; and (2) Section 20(a) of the Exchange Act, 15

26 U.S.C. § 78t(a).

27

16.     This court has subject matter jurisdiction over this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331.  During the Class Period, Costco was incorporated in the state of Washington, listed its stock on the NASDAQ, and maintained its global headquarters in Issaquah, Washington.  During the Class Period, both of the Individual Defendants were members of Costco's senior management.

17.     Venue is proper in this judicial district pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b).  Costco maintained its global headquarters in Issaquah, Washington, which included the Company's executive offices.  During the Class Period, each of the Individual Defendants were members of Costco's senior management.

18.     In connection with the acts alleged in this complaint, Defendants, directly, or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, interstate email communications, and the facilities of the NASDAQ.

III.    **PARTIES**

A.    **Lead Plaintiff**

19.     Lead Plaintiff Fred D. Davoli ("Lead Plaintiff") is an individual who resides in the United States.  As set forth in his PSLRA certification (*see* ECF No. 15), Lead Plaintiff purchased Costco securities during the Class Period and suffered damages as a result of the securities law violations alleged herein.

B.    **Defendants**

20.     During the Class Period, Defendant Costco was a publicly traded company, listed on the NASDAQ under the ticker COST.  It is incorporated in Washington, with its headquarters in Issaquah, Washington.  Costco sells goods out of its large warehouse stores to its members and other customers, as well as through its website.  In Fiscal Year ("FY") 2018, the Company had net sales of more than $130 billion and took in membership fees of over $3 billion.  As of its 2018 Annual Report, Costco operated 762 warehouses and employed nearly 250,000 people in countries around the world.

21.    Defendant Richard A. Galanti ("Galanti") is Costco's Chief Financial Officer, an Executive Vice President, and a member of the Board of Directors (the "Board").  Defendant Galanti started with Costco in 1984 and has served in a number of roles with Costco, including Vice President of Finance and Treasurer.  Defendant Galanti has been in his current role as CFO and Executive Vice President since October of 1993 and a member of the Board since 1995.  As a member of the Board Defendant Galanti attended the Board meetings during the Class Period.  During the Class Period, Defendant Galanti signed SEC filings and made public statements to the market about Costco's operations and compliance with SOX.

22.    Defendant Craig W. Jelinek ("Jelinek") is Costco's Chief Executive Officer, President, and a member of the Board.  He also started with Costco in 1984 and has served in a number of roles with Costco, including Executive Vice President and COO of Merchandising.  Defendant Jelinek has been in his current role as CEO since 2012 and President and a member of the Board since 2010.  As a member of the Board Defendant Jelinek attended the Board meetings during the class period.  During the Class Period, Defendant Jeninek signed SEC filings and made public statements to the market about Costco's operations and compliance with SOX.

IV.    CONFIDENTIAL WITNESSES

23.    Lead Plaintiff through its agents interviewed a number of former employees of Costco in order to investigate its claims.  Described below in this Section are seven such former employees who provided information to support the fraud alleged herein.  Based on these former employee accounts, described in Section VI(J), Lead Plaintiff believes substantial additional documentary and testimonial evidence exists to support its claims.

24.    Confidential Witness 1 ("CW 1") was employed by Costco from 2015 until September of 2018.  He[1] was a Senior Compliance Analyst at the Company's headquarters in Issaquah, Washington.  CW 1 reported to a Manager of Information Security and Governance Risk Compliance Gokol Krishnan, who reported to Manager of Information Security Compliance

---

[1] All CWs will be described and referred to in the masculine to protect their identities.

and Identity and Access Management Susan Milroy, who reported to VP of Information Security and Compliance Tim Bowersock.  Through this role in IT, CW 1 was responsible for the Company's compliance with various privacy regulatory regimes, including GDPR, Payment Card Industry Security Standards ("PCI"), the California Consumer Privacy Act, and, to a lesser extent, compliance requirements under the Health Insurance Portability and Accountability Act of 1996 ("HIPPA") and SOX.  CW 1 stated that SOX compliance was a function of the IT Department generally but the responsibility fell primarily to a single employee, Barbara Egner.

25.     Confidential Witness 2 ("CW 2") was employed by Costco from at least 2015 until mid-2018.  He was employed in the IT department at the Company's headquarters in Issaquah, Washington.  CW reported through a chain that went up to Vice President of Information Security and Compliance Tim Bowersock.  Through this role in IT, CW had insight into issues affecting IT security.

26.     Confidential Witness 3 ("CW 3") was employed by Costco as a consultant from April 2017 until the end of May 2017 at the Company's headquarters in Issaquah, Washington and reported to Jeremy Guerrero, the Manager of Global SAP[2] Platform Security and Compliance, Ryan Ladd, a Director of Global SAP Platform Services, and Dave Miller, a Global SAP Platforms and Services Manager.  CW 3 worked primarily on SAP Application Security Assessment.  Through this role in Costco's IT Department, he was primarily responsible for performing an assessment of various aspects of the Company's IT Department, including, but not limited to, Basis, Change Management, Internal Audit, Identity Access Management, and User Access Administration.

27.     Confidential Witness 4 ("CW 4") was employed by Costco as a contractor engaged for an SAP implementation project from May 2018 until November 2018 at the Company's headquarters in Issaquah, Washington and reported to Dana Cook who reported to

---

[2] SAP refers to a company that offers a wide range of business software that allow a company to track its various parts of its operations, including inventory, revenues, and change management.

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

1   Project Manager Cindi Dear.  He worked in Quality Assurance ("QA") testing and was promoted
2   to a Defect Lead in August of 2018.  Through this role in Costco's IT Department, CW 4 was
3   initially responsible for QA testing and then overseeing other workers in that area.

4         28.      Confidential Witness 5 ("CW 5") was employed by Costco as an IT Contract and
5   Vendor Manager in their IT Department from July 2017 until July 2018 at the Company's
6   headquarters in Issaquah, Washington and reported to Jill Hendrick, a Manager in Vendor and
7   Contract Management, Finance and Planning, who in turn reported to Kristian Erickson, an IT
8   Director, who in turn reported to Vice President Chris Rylance, who in turn reported to Senior
9   Vice President of Information Systems Jim Rutherford.  Through his role with Costco's IT
10  Department, CW 5 was primarily responsible for working as part of a program assessing
11  Contracts Procurement Asset Management ("CPAM"), which provided recommendations to
12  improve Costco's IT contracts procurement process.

13        29.      Confidential Witness 6 ("CW 6") was employed by Costco as a Compliance
14  Analyst from 2012 until August 2018 at the Company's headquarters in Issaquah, Washington
15  and reported to Michel Chambers, a Manager who reported to IT Director Terry Patane, who
16  reported to Tim Bowersock, a VP of Security and Compliance.  Through his role in Costco's IT
17  Department, CW 6 was primarily responsible for assessing security controls by collecting
18  evidence.

19        30.      Confidential Witness 7 ("CW 7") was employed by Costco as a Senior Business
20  Analyst from late 2014 until July of 2018 at the Company's headquarters in Issaquah,
21  Washington and reported to IT Manager Ramon Nichols who reported to IT Director Laine
22  Seeley, who in turn reported to Terry Williams, a Global Supply Chain VP.  Through his role in
23  Costco's IT Department, CW 7 was primarily responsible for working with outside consultants
24  on vetting requirements for new systems designs.

25  **V.      CONTROL PERSON ALLEGATIONS**

26        31.      The Individual Defendants, by virtue of their senior positions at Costco, directly
27  participated in the management of the Company, were directly involved in day-to-day operations

of the Company at the highest levels, and were privy to confidential, proprietary information concerning the Company and its business, operations, internal controls, growth, IT spending, financial statements, and financial condition, as alleged herein.  As set forth below, the distribution of misleading information and the failure to convey material information to the public was the result of their collective actions and inactions.

32.     Defendant Galanti signed the Company's Form 8-K filed on October 4, 2018, and both of the Individual Defendants signed Costco's 2017 Form 10-K filed on October 18, 2017, the Company's 3Q 2018 Form 10-q filed on June 6, 2018, the Company's 2018 Form 10-K filed on October 26, 2018, and the SOX Certifications accompanying those Form 10-Ks and that Form 10-Q.

33.     The Individual Defendants were aware of the deficiencies in the internal controls and that the Company was deliberately reckless in failing to provide the IT Department with adequate resources.  As the top two executives in the Company, the Individual Defendants had substantial influence and control over the spending and operations of the Company.  Through their roles at the Company and as the signatories on the Company's SOX Certifications, the Individual Defendants were personally responsible for the implementation and operation of effective internal controls related to financial reporting.

34.     Through these and other forms of participation and control, the Individual Defendants had substantial influence over Costco, the information it distributed, and the actions it engaged in.

## VI.    SUBSTANTIVE ALLEGATIONS

### A.    The Nature of Costco's Business

35.     Costco and its subsidiaries operate membership warehouses that offer members low prices on a limited selection of nationally-branded and private-label products in a wide range of merchandise categories.  Costco buys and sells many of its products in bulk, and capitalizes on an economy of scale – in other words, Costco is able to purchase products at a lower per-unit cost when they are purchased in large quantities, and passes on that bulk cost savings to its

members.  The Company endears itself to its customers through its low-frills warehouses, low prices, and popular deals in the food courts of the warehouses.

36.      Costco makes money by selling products in its warehouses and by selling memberships to individuals and companies.  The memberships allow the members to shop in the warehouses and the website.  Historically, the Company made approximately 98% of revenue from sales of its goods and 2% of its revenue from membership fees.

**B.      Costco's Background**

37.      Costco was born of the marriage between two companies - Costco and Price Club. Costco and Price Club both started out small and quickly became successful warehouse clubs. Costco in its current iteration was formed when Price Club and Costco merged in 1993, forming PriceCostco.  That year alone, PriceCostco had over 200 membership warehouses, annual sales of more than $15 billion, 18 million members, and 43,000 employees. PriceCostco officially changed its name to Costco Companies, Inc. in 1997 and assumed its current name, Costco Wholesale Corporation in 1999.  Since the merger, Costco has become the self-proclaimed "world's most successful warehouse club."  In 2018, the Company was responsible for more than $138 billion in sales revenue.[3]

38.      For the period ended February 17, 2019, Costco operated 769 warehouses worldwide: 534 in the United States (U.S.) located in 44 states, Washington, D.C., and Puerto Rico, 100 in Canada, 39 in Mexico, 28 in the United Kingdom (U.K.), 26 in Japan, 15 in Korea, 13 in Taiwan, 10 in Australia, two in Spain, and one each in Iceland and France.  The Company operates e-commerce websites in the U.S., Canada, Mexico, U.K., Korea, and Taiwan.

---

[3] The Company operates on a 52/53 week fiscal year basis, with the fiscal year ending on the Sunday closest to August 31. Fiscal 2018 is a 52-week year ending on September 2, 2018. References to the third quarters of 2018 and 2017 relate to the 12-week fiscal quarters ended May 13, 2018, and May 7, 2017, respectively. References to the first thirty-six weeks of 2018 and 2017 relate to the thirty-six weeks ended May 13, 2018, and May 7, 2017, respectively.

1

### C.    Growing and Maintaining a Competitive Advantage

2    39.    Costco operates in a highly-competitive industry driven by high revenue but tight

3    margins.  As a warehouse wholesaler, the Company maintains a no-frills culture and attracts

4    customers by keeping prices down.  Its market position and value depends on being able to

5    operate successfully on a massive scale, while keeping costs low.  The Company's efforts to

6    keep operating costs down takes many forms.  For example, the Company carries fewer unique

7    products than its competitors, and the Company maintains a leaner infrastructure that its

8    competitors.   Defendant Jelinek has boasted about furnishing his boardroom with faux-wood

9    tables and not spending on a public relations staff.  Perhaps most famously, Costco does not even

10   offer customers shopping bags.  Costco prioritizes passing savings onto its customers in the form

11   of lower prices and, therefore, corporate growth depends on increasing revenue through

12   expansion while maintaining a low-frills operation.

13   40.    The Company has grown its warehouse operations from a single location at its

14   founding in 1976 to more than 200 warehouses at the time the Costco/ Price Club merger was

15   completed in 1994.  Between 1994 and the start of the Class Period, Costco opened 528 new

16   stores representing a growth of its warehouse locations of nearly 340%.  During this same time,

17   employee headcount grew from approximately 47,000 to approximately 245,000 representing an

18   increase of over 500%.

19
20
21
22       
23
24
25

26   41.    Membership has also grown precipitously over the years.  The Company reported

27   more than 80 million members in 2015 and more than 94 million in 2018.  As noted in their 2017

Form 10-K, Costco placed an emphasis on their ability to "maintain membership loyalty" and noted that "[m]embership loyalty and growth are essential to our business model."



42.     The growth in the size and complexity of Costco's operations is also evidenced in the steady increase in the Company's net revenues.  As noted above, at the time of the merger in 1994 Costco had approximately $15 billion in annual net sales and that number had already increased to nearly $18 billion in 1995.  Over the next 20 years, the Company's annual net sales increased more than six times that number reaching more than $113 billion in 2015.  As noted above Costco reported more than $138 billion in net sales in 2018 and additionally reported more than $3 billion in revenue from membership fees.



43.     Throughout its history Costco has impressed analysts by continuing to grow while maintaining low costs.  For example, on October 1, 2015, Cowen and Company explained that it was "most encouraged that COST's market potential continues to grow as its brand awareness"

1    grows.  A February 2, 2018, report from JP Morgan indicated that "[o]n top of the expansive
2    international opportunity, COST remains a differentiated story (particularly in consumer staples)
3    with high single digit revenue growth potential."  On May 24, 2018, less than two weeks prior to
4    the start of the Class Period, Barclays stated that Costco was "operating from a position of
5    strength and has meaningfully widened the gap on share gains and execution relative to peers."

6         **D.    Costco's Drive to Keep Costs Down**

7         44.    Costco has repeatedly stated that its financial performance depends "heavily" on
8    its ability to control costs, which it strives to do through a "never ending quest for efficiency."  In
9    a presentation to the Issaquah Chamber of Commerce on April 12, 2018, Defendant Jelinek
10   noted that growth was absolutely critical to maintaining Costco's share price and keeping
11   investors happy.  However, Costco as a company was also committed to paying a higher average
12   hourly wage than its competitors and also had a very forgiving return policy.  Defendant Jelinek
13   noted that Costco historically had a difficult time convincing investors to accept its high wage-
14   related expenses, especially given the Company's focus on low-costs.  But Jelinek stated on
15   April 12, 2018, that the Company had "gotten past that because [it] has been able to grow the
16   business."  In order to maintain margins while simultaneously maintaining growth sufficient to
17   satisfy investors, however, the Company had to keep expenses down in areas other than wages
18   and product costs.  According to the Company's 2018 Form 10-K, Costco spent approximately
19   90% of its operating expenses on product costs leaving only 10% for all other operating
20   expenses, which includes Costco's famously high wages.

21        45.    Costco has several colorful examples of its extreme efforts to keep both prices
22   and costs down.  For example, Costco is known for the $4.99 rotisserie chicken.  When the price
23   of chicken feed began to rise threatening the cost of Costco's supply, rather than raise the price
24   of the rotisserie chicken, the Company decided to build a chicken plant.  The Company also
25   owns and operates two hot dog plants in order to maintain Costco's $1.50 hot dog and soda
26   combo.

27

46.    The market often referred to Costco as a "long moat" or "wide moat" company meaning that the Company's fanatical dedication to keeping down costs allowed it to build up a significant competitive advantage over other retailers.  Costco continually impressed investors by maintaining comparatively low selling, general and administrative ("SGA") spending even while competitive factors put pressure on the Company.  On March 1, 2018, Deutsche Bank Markets Research stated Costco's "competitive moat [was] under greater threat while its digital platform lags peers."  However, on March 2, 2018, Macquarie Research noted that while competitive factors had begun to create concern, Costco "continue[d] to have a wide moat around its business" given the Company's margins and other factors.  Additionally, on March 8, 2018, RBC Capital Markets noted Costco had "significant competitive moats due to their limited SKU selection and rock-bottom pricing."  On August 21, 2018, an Oppenheimer report even went so far as to say Oppenheimer "believe[d] COST has one of the most defensible moats in all of retail."  Further, on September 10, 2018, BMO Capital Markets noted that Costco's "valuation could expand as the company widens its competitive moat with a deeper digital relationship with its loyal customer base."

### E.    SOX Requires Adequate Internal Controls and Directly Makes Senior Management Responsible For Those Controls

47.    As a public Company, Costco was subject to certain financial reporting and auditing obligations.  In particular, Costco was subject to SOX which imposes specific obligations on companies and senior executives to maintain proper internal controls over financial reporting and imposes upon the CEOs and CFOs of public companies a duty to affirmatively state in a company's public filings that the Company's internal controls are adequate and that they have personally evaluated them.

48.    To understand the specific requirements imposed by SOX—and what it means to state that "internal controls" are adequate—it is helpful to understand the context in which SOX was passed.

49.     Prior to SOX, under Section 13(b)(2) of the Exchange Act (15 U.S.C.A. §
78m(b)(2)(B)), issuers of publicly registered securities were required to "devise and maintain a
system of internal accounting controls sufficient to provide reasonable assurances" that
transactions are recorded as necessary (i) to permit the preparation of proper financial statements,
(ii) to maintain accountability for assets, (iii) so that access to assets is permitted only in
accordance with management's general or specific authorization, and (iv) so that the recorded
accountability for assets is compared with actual assets at regular intervals and appropriate action
is taken with respect to any difference.

50.     On March 6, 2002, President Bush announced ten directives aimed at targeting the
accounting fraud epidemic, including the collapse of Enron.  Two of those directives are relevant
here: (a) "CEOs should personally vouch for the veracity, timeliness, and fairness of their
companies' public disclosures, including their financial statements" and (b) "[f]irms' accounting
systems should be compared with best practices, not simply against minimum standards."  The
SEC acted on these directives by proposing rules (1) requiring the CEOs and CFOs of public
companies to personally certify their financial records; and (2) requiring companies to have
systems in place to bring all relevant information concerning internal controls to the attention of
the CEO and CFO.

51.     Then, on June 25, 2002, the situation intensified as WorldCom announced that it
had overstated income by over $3 billion.  The fraud at issue in WorldCom was shockingly
simple; certain expenses were being booked as assets, rather than getting deducted from net
income.  The simplicity and magnitude of this fraud prompted Congress to finally take firm
action.  These frauds were the result of simple failures, which would have been prevented by
adequate internal controls.  Where those controls are lacking, there is nothing to prevent
employees from drastically misrepresenting the financial condition of a company.

52.     In reaction to a number of frauds of varying magnitudes, including WorldCom, Congress took action by passing SOX, which strengthened the preexisting legal obligation to maintain internal controls and reaffirmed that the failure to have such controls is ***itself*** a serious violation of the law—a violation which does not depend on whether the lack of controls resulted in financial misstatements.  Specifically, Title IV of SOX addresses the need for internal controls and enhanced financial reporting for publicly traded companies.  Public companies are subject to enhanced reporting requirements related to financial transactions, including off-balance-sheet transactions, pro-forma figures, and any stock transactions of corporate officers.  A core policy goal advanced by SOX is personal involvement of and accountability at the most senior levels of a company.

53.     Section 302 of SOX (implemented through 17 C.F.R. § 240.13a–15) requires an issuer of registered securities to "maintain disclosure controls and procedures . . . and internal control[s] over financial reporting."  The term "disclosure controls and procedures" is defined by the relevant regulation to include "controls and procedures designed to ensure that information required to be disclosed by an issuer in the reports that it files or submits under the Act is accumulated and communicated to the issuer's management, including its principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow timely decisions regarding required disclosure."  Internal control over financial reporting is defined as follows:

> The term internal control over financial reporting is defined as a process designed by, or under the supervision of, the issuer's principal executive and principal financial officers, or persons performing similar functions, and effected by the issuer's board of directors, management and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles and includes those policies and procedures that:
>
> (1) Pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets of the issuer;

(2) Provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the issuer are being made only in accordance with authorizations of management and directors of the issuer; and

(3) Provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the issuer's assets that could have a material effect on the financial statements.

54.     Thus, Section 302 imposes an affirmative obligation on a company to ensure that it has systems in place to safeguard the accuracy of its financial reporting, recorded as necessary, that receipts and expenditures are being made "only in accordance with authorizations of management and directors of the issuer," among other requirements.  Furthermore, the internal controls must be "under the supervision of, the issuer's principal executive and principal financial officers."

55.     The requirement that the existence of controls be overseen by the CEO and CFO (or equivalents) is so important to the SOX scheme, that it also requires that those officers file public certifications, known as Section 302 Certifications, or SOX Certifications, whereby these officers must *personally* attest to their role in supervising the controls and the quality of those controls through an SEC provided form.  As relevant here, the most important sections of the SEC form are as follows:

(1) "The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures . . . and internal control . . . for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

\*      \*      \*

(2) The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information. . . .

56.     In addition to these certifications, SOX also requires, through Section 404 (as implemented by 17 C.F.R. § 240.13a-15(c)), management of issuers of registered securities to "evaluate, with the participation of the issuer's principal executive and principal financial officers, or persons performing similar functions, the effectiveness, as of the end of each fiscal year, of the issuer's internal control over financial reporting." Further, the rule requires that this "evaluation" must be based on a "suitable, recognized control framework that is established by a body or group that has followed due-process procedures" in developing that framework.

57.     In partial summary, SOX affirmatively requires a company, its CEO, and its CFO to take responsibility for maintaining affirmative controls and to personally evaluate those controls on a regular basis. SOX defines those necessary controls to include procedures on limiting user access. The personal evaluation of the CEO and CFO must be conducted according

1   to "recognized" procedures (defined below in Section VI(G)), and requires them to attest to

2   having done so.

3           58.     Violation of SOX can result in significant fines and penalties regardless of

4   whether a company is found to have misstated its financial results during the relevant period.

5   Section 906 of SOX may also impose criminal penalties on executives for falsely certifying

6   compliance with SOX.  As a result, companies that are not in compliance with SOX, risk

7   financial penalties and fines and will need to expend whatever resources are necessary to

8   remediate the deficiencies.

9           **F.**    **The Importance of IT Controls for Public Companies**

10          59.     Like other public companies, Costco automated much of its sales function, which

11  rolled up into its financial reporting function.  Costco also relied on various forms of software to

12  monitor and regulate its business operations.  For example, CWs 2, 6, and 7 confirm that Costco

13  used SAP, which provides a wide range of products and software that cover an array of business

14  functions, including inventory tracking, change management, revenue management, and

15  enterprise resource planning.  Other CWs confirm that Costco used other kinds of software such

16  as Archer and ServiceNow, which are programs that support business-level governance, risk, and

17  compliance controls.

18          60.     Costco relied heavily on these programs to track sales and revenue, and therefore,

19  as a part of using and engaging this software it was important for Costco to have sufficient IT

20  controls in place.  Defendants acknowledged the importance of IT controls to Costco's business

21  operations and brand reputation.  For example, in Costco's 2017 Form 10-K, Defendants noted

22  that the failure to "maintain the privacy and security of . . . [its] business information" could

23  damage the Company's reputation with members.  Further, both the warehouse and online

24  businesses "depend[ed] upon the secure transmission of encrypted confidential information."

25  Defendants also alerted the market that a "failure to adequately update [its] existing systems and

26  implement new systems" could adversely affect the business, even going so far as to

27  acknowledge that a significant interruption in the Company's information technology systems

"could have a material adverse effect on [its] business and results of operations."  In detailing the importance of IT to its operations, Costco also assured the market that it was making significant investments in its IT Department and had adequate change management processes in place to mitigate any risk related to changes in its IT systems.

### G.     Costco's Internal Controls Framework and Management's Obligations Regarding that Framework

61.     In consultation with an accounting expert, Lead Plaintiff alleges that Costco's representations of compliance with internal controls had a specific and well understood meaning, as described in the following paragraphs in this Section.

62.     As previously noted, Costco was required to evaluate and ensure compliance with internal controls using a "recognized" framework.  The "control framework" that Costco purportedly used to evaluate internal controls and to assert compliance therewith, was known as the Internal Control – Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO Framework").  This well accepted industry framework was an expansion upon the earlier 1992 COSO Framework, and was released in substantial part to address broad changes in internal control attributable to the increased relevance and sophistication of information technology systems.

63.     The COSO Framework observes that internal controls are likely to require modification when new technology is implemented.  In its 2017 Form 10-K, Costco informed investors that it was in the process of "significant technology investments to improve or replace critical information systems and processing capabilities."  These circumstances created an adverse risk to Costco's ability to report the financial results of operations.  Costco also asserted, however, that its change management processes mitigated that risk.  Change management consists of a company's processes for adding or modifying users and devices, as well as installing or updating information technology.  In addition, it involves monitoring changes, such as when a change occurred and who made the change.

64.     Adequate controls around IT are critical to an adequate program of internal controls.  Thus KPMG, Costco's independent auditor, emphasized in publicly available guidance that management must assess the adequacy of the entity's IT personnel to design and assess IT-related internal controls.  KPMG also emphasized management's obligation to ensure the right IT personnel exist to: (1) understand and document the flow of information through IT systems, (2) identify what could go wrong, (3) design IT-related controls, (4) monitor the effectiveness of IT controls, and (5) evaluate the impact of IT deficiencies.[4]

65.     The SEC's internal controls implementation guide, SEC Release No. 33-8810, also addresses the significance of IT-related controls.  Specifically, that release states "the proper and consistent operation of automated controls or IT functionality often depends upon effective IT general controls."  Indeed, according to Costco's 2018 Form 10-K, "[i]nternal controls related to the operation of technology systems are critical to maintaining adequate internal control over financial reporting."  Consequently, the COSO Framework requires that entities evaluate the design, implementation and effectiveness of general IT controls relevant to the effective operation of the process level automated control activities.

66.     The COSO Framework identifies five components of internal control.  The first of these components relates to the overall control environment, which includes core elements such as employing competent individuals.  The second relates to the assessment of risk.  The third, is utilizing effective control activities.  The fourth requires the generation and use of quality information to assess internal controls.  The fifth relates to monitoring and evaluating internal controls.  Each of these components is based on underlying principles.  Within the 2013 COSO Framework, there are seventeen total principles, of which fourteen reflect IT considerations.

67.     One of the seventeen principles required by the COSO framework is Principle 11, which requires that "[t]he organization selects and develops general control activities over technology to support the achievement of objectives."  This principle specifically serves to

---

[4] https://frv.kpmg.us/content/dam/frv/en/pdfs/2018/R21_ICOFR_Reference_Guide.pdf

require Information Technology General Controls (ITGCs), which are used to maintain the integrity of information and security of data.  ITGCs are a particular part of a company's control activities.  Specifically, ITGCs are internal controls, such as policies and procedures that relate to access and use of IT applications.  ITGC's contribute to an entity's efforts to ensure appropriate segregation of duties has been achieved.  Segregation of duties is a key tool to reduce the risk of error or inappropriate or fraudulent actions.  As part of effective segregation of duties, ITGCs must ensure that those users who have access to financial reporting and have the ability to make changes to the financial reporting metrics ("access control" and "change control") are strictly regulated and monitored so that only the correct individuals have access to a company's financial systems.

68.     Even more specifically, Chapter 7 of the COSO Framework provides four points of focus to "highlight important characteristics relating to [Principle 11]."  Those points of focus are described below.

69.     Point of Focus 1 requires a company to "determine[] dependency between the use of technology in Business Processes and Technology General Controls," which correspondingly requires management to understand the dependencies between business processes, automated control activities, and technology general controls.  This point of focus addresses the fact that the effectiveness of process-level controls depends on ITGCs.

70.     In Release No. 33-8810, the SEC provides an example of this dependency.  The SEC's example describes the controls surrounding the formation of significant accounting estimates, which for Costco may include estimating sales returns.  Such an estimate involves process-level controls to accumulate source data such as sales activity used to develop the accounting estimate.  The effectiveness of those process-level controls, however, depends on the effectiveness of ITGCs, including what users were authorized to identify, assemble, and modify that sales data and what changes the users were authorized to make to the data collection parameters.  A deficiency in such controls could, for example, enable an IT user without knowledge of the relevant accounting requirements to implement a program change that

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

negatively impacts the aggregation of data used for the accounting estimate.  A deficiency in such a control may be exacerbated if an organization is large and sprawls into various locations across the country or the world.

71.     Point of Focus 2 requires management to "establish[] relevant technology infrastructure control activities," which relates to the selection and development of the technology infrastructure to help ensure the completeness, accuracy, and availability of data for financial reporting.  This point of focus addresses internal controls designed to ensure data used for financial reporting is complete and accurate.  Such controls are critical when data is transferred from one system to another, including, for example, data warehouses.  ITGCs must ensure that all data that should be transferred has been transferred, and conversely, that data that should not be transferred has not been transferred.  Using the example above, process-level controls may employ correct math to calculate the sales returns reserve, but if unauthorized users had implemented changes (or authorized users had implemented incorrect changes) that caused returns from certain warehouses, time periods, or product categories to be excluded (or over included), the data relied upon for financial reporting was at-risk of being incomplete or inaccurate.

72.     Point of Focus 3 requires a company to "establish[] relevant security management process control activities," which requires management to "restrict technology access rights to authorized users commensurate with their job responsibilities and to protect the entity's assets from external threats."  This point of focus most directly addresses user access controls.  User access controls govern the ability to input data, process data, maintain the integrity of data, and, ultimately allow the data to be output for financial reporting.  User access controls include considerations such as whether users have been set up appropriately based on an individual's employment status, position, and changes thereto, including which users are authorized to make such changes.  User access controls also include the adequacy of ongoing review of user authority levels, and require that information about who has the ability to access certain

information be maintained in a secure way.  Stated differently, user access controls are critical to ensure access is consistently restricted to only appropriate and authorized users.

73.     Point of Focus 4 requires a company to "establish[] relevant technology acquisition, development, and maintenance process control activities" which requires management to "select[] and develop[] control activities over the acquisition, development, and maintenance of technology and its infrastructure to achieve management's objectives."  This point of focus addresses change management.  Companies are required to have "a change management process . . . in place to track changes from initiation to final disposition."  These changes may arise from a "problem in the technology that needs to fixed" or a request from a user.  Additionally, "[t]he extent and rigor of the controls over the initiative should be sized accordingly."  The ITGCs outlined in Point of Focus 4 "also apply to the ongoing development and maintenance of technology." Similar to user-access controls, change controls also include the adequacy of ongoing review of change authority levels, and require that information about who has the ability to change certain information be maintained in a secure way.

74.     Furthermore, management is obligated to gather evidence to evaluate whether internal controls are effective.  As stated in SEC Release No. 33-8810, the evaluation considers factors such as (1) did controls operate as designed, (2) were the controls applied consistently, (3) did personnel performing controls possess the necessary authority and competence to operate the control effectively.  If a control is not designed or operating effectively, a deficiency exists that management must evaluate.

75.     ***A material weakness is the most severe form of internal control deficiency.***  As stated in SEC Release No. 33-8810, a material weakness is a deficiency, or a combination of deficiencies, in internal controls, such that it is reasonably possible that a material misstatement of a company's annual or interim financial statements will not be prevented or detected on a timely basis.  The term "reasonably possible" means the chance of the future event or events occurring are more than remote but less than likely – thus, "reasonably possible" is a stringent standard in what it requires companies to report.  As discussed below, Costco's management

1   acknowledged a material weakness existed, causing its internal controls to be ineffective as of

2   September 2, 2018.  The evidence here indicates that the material weakness stretched all the way

3   back to the start of the fiscal year, or September 2017, as confirmed by an accounting expert.

4   **H.    The Structure of Costco's IT Department**

5   76.    For a public company to have the adequate internal controls described above, a

company must have a robust and fully functioning IT Department with IT spending

commensurate with the size and complexity of a company.  IT Departments at a public company

are generally structured into different departments or functions, including; (1) development; (2)

quality assurance ("QA"); (3) security; (4) internal audit; and (5) management oversight.  The

five departments and their functions are broken out below:

a.   **The Development Group**: writes and tests software to ensure that software
     meets the requirements for the program or project.

b.   **QA**: performs independent testing on behalf of management and the business
     unit to ensure that requirements have been met.  QA also performs regression
     testing as a part of the change management process to ensure that changes to
     programs have not broken previously working software.

c.   **Security**: is tasked with ensuring that the measures and controls implemented
     meet the policies, standards, guidelines, and compliance requirements of the
     organization and are effective in meeting a company's stated control
     objectives.

d.   **Internal Audit**: ensures that the applications and controls in the IT
     Department are sufficient to maintain the business as a going concern.  As
     noted above, companies must spend and commit resources to the IT
     Department at a level commensurate with their size to maintain those
     applications and controls.  The internal audit group is charged with conducting
     audits and risk assessments on those applications and controls.

e.  **Management Oversight, or Governance**: provides a company with an additional layer of controls to ensure that all the groups within the IT Department are functioning properly and the risk posed by the department's operations are being accurately assessed and addressed.  A proper functioning management oversight committee is also designed to give the CFO and CEO confidence when signing a company's quarterly and annual SEC filings, including the certifications required pursuant to SOX.  The certifications signed pursuant to SOX are of particular importance to the CEO and CFO as they are required to personally oversee the functioning of a company's internal controls.  (See Section VI(E)).  While the CEO and CFO are able to reasonably delegate the actual design and implementation of the policies and procedures, per the certifications they sign they remain personally responsible for evaluating those controls and are ultimately responsible for the effectiveness of a company's internal controls.

I.    **Costco's Comparatively Low SG&A and IT Spending**

77.    As of the end of FY 2018, Costco spent about 90% of its operating budget on product costs and only about 10% on SG&A spending, which consists of a company's costs not related to making a product or performing a service, including IT costs and employee-related expenses like salary and benefits.  Costco has publicly acknowledged that "[b]ecause our business is operated on very low margins, modest changes in various items in the income statement, particularly merchandise costs and selling, general and administrative expenses, can have substantial impacts on net income."  Thus, Costco was incentivized to keep SG&A spend down in an effort to keep net income up.  Coupled with Costco's focus on keeping hourly wages higher than its competitors, this left only a small piece of the operating expense pie for IT spending (a subset of the SG&A spend).  Simply put, the Company needed to find a way to do more with less.

78.     In fact, SG&A as a percent of sales stands out among Costco's financial metrics as one that has not grown in any meaningful way through the Company's history.  In 1995, years before technology began to dominate both business and daily life, Costco's SG&A as a percent of net sales was just under 9%.  In 2018, when technology is all but unavoidable, Costco's SG&A as percent of net sales was barely over 10%, similar to the Company's average spending over the past five years.  For perspective, in Costco's 2018 Form 10-K, Defendants identified similar public companies as competitors, including four companies with publicly available data on SG&A spending going back at least five years[5]; (1) Amazon.com, Inc. ("Amazon"); (2) The Kroger Co. ("Kroger"); (3) Target Corp. ("Target"); and (4) Walmart Inc. ("Walmart").  Each of those companies averaged greater than 15% of SG&A as percent of net sales and Target and Walmart each averaged greater than 20%.  While over the past three years, each of those companies have increased their SG&A as a percent of net sales, Costco has inexplicably decreased that percentage.



Average SG&A as % of Sales
(2014 – 2018)

---

[5] Defendants also listed BJ's Wholesale Club Holdings, Inc.  ("BJ's").  BJ's is not included in the chart because in the only Form 10-K available the data only went back to 2016, but in the three years for which data is available BJ's SG&A was approximately 16% of net sales.

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

1

2

**J.      Costco Failed to Provide IT with Adequate Attention and Resources Causing a Material Weakness in Internal Controls**

3

79.      Despite spending less on SG&A as a percent of net sales than its competitors (and

4

by implication on IT spend), Defendants repeatedly assured the public that it had sufficient

5

internal controls to certify the reliability of its financial reporting.  For example, Defendants

6

asserted two main points in their SEC filings during the Class Period.  First, in incorporating the

7

risk language from their 2017 Form 10-K, they said that they were "currently making, and

8

[would] continue to make, significant technology investments to improve or replace critical

9

information systems and processing capabilities."  Second, the Form 10-Q also included

10

certifications from Defendants Jelinek and Galanti pursuant to SOX.  As detailed above, in

11

passing SOX, Congress reinforced the importance not only of internal controls, but also the

12

importance of senior management's involvement in ensuring the adequacy of the Company's

13

internal controls over financial reporting.  In those certifications, Defendants Jelinek and Galanti

14

each attested they were "responsible for establishing and maintaining . . . internal control over

15

financial reporting."  The Individual Defendants specifically stated that they each "designed . . .

16

or caused such internal control over financial reporting to be designed under [their] supervision."

17

Those controls were designed "to provide reasonable assurance regarding the reliability of

18

financial reporting" and the Individual Defendants attested to the effectiveness of the Company's

19

"disclosure controls and procedures" presented in the Company's quarterly and annual SEC

20

filings.  Further, the Individual Defendants also stated they had personally "[e]valuated the

21

effectiveness of the registrant's disclosure controls and procedures" presented in the Company's

22

SEC filings.

23

80.      However, despite Defendants' assurances to the contrary, Costco was not making

24

significant technology investments, nor was it developing or improving its IT systems and

25

capabilities to ensure that its internal control procedures as it relates to its financial controls were

26

adequate (as SOX requires).  Indeed, former employees of the Company collectively confirm

27

that Costco and the Individual Defendants knowingly (or at least deliberately recklessly)

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

deprived its IT Department of needed resources and oversight which led to the internal control failures that existed during the Class Period, and which Defendants revealed at the end of the Class Period.  One former Senior Analyst confirms that Defendants were aware of the internal control deficiencies as early as February/March 2018.  Common sense dictates that Defendants *should* have been aware even earlier of these failures given the former employee's accounts and the importance of internal controls.

### 1. Costco's IT Department was Neglected and Deprived of Resources Necessary to Maintain Adequate Internal Control Processes

81.     Throughout the Class Period, Defendants failed to provide the IT Department with sufficient resources to implement and maintain adequate access controls and change management programs and procedures.  As discussed in Section VI(E), access controls are physical and electronic controls that prevent unauthorized users from viewing or editing sensitive financial information.  This includes securing locations, implementing effective password controls, and monitoring of access that has been granted.  Change management procedures consist of the process for adding or modifying users and devices, as well as installing or updating IT programs and changing personnel.  Additionally, these important procedures involve monitoring changes to financial information such as when a change occurred and who made the change.  Defendants knew, or were deliberately reckless in not knowing, that they were depriving the IT Department of resources to such an extent that the department did not and could not have implemented, operated, or maintained sufficient access control and change management procedures.

82.     According to CW 1, a former Senior Compliance Analyst, there was a single Information Security Analyst responsible for collecting the required evidence for SOX compliance and submitting it to KPMG, an IS Compliance Analyst named Barbara Egner.[6]  CW 1 explained that each department had their own manager that was responsible for SOX

---

[6] A commercially available database search indicates that Egner remains employed by Costco as IS Compliance Analyst (11/1999 – Present).

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

compliance.  CW 1 said Ms. Egner worked closely with KPMG during their audits in providing

them with the evidence and access they needed.

83.    CW 1 described Ms. Egner as "super frustrated" with the SOX compliance

process because "management didn't want to listen."  CW 1 also said that Ms. Egner was left

"holding the bag" in the compliance department.  CW 1 said Ms. Egner raised critical IT

compliance issues to management, including lack of access controls and change management

procedures, but once the issue would reach Bowersock's[7] level, management would respond by

saying "can we get by?" instead of remediating the issue.  CW 1 said each audit was a "huge

administrative task" for Ms. Egner.  When management did take an interest in SOX compliance

during KPMG's audits, CW 1 said they would ask for reports within a day, which reports would

normally take a week to generate.  He said Ms. Egner spent a lot of time helping the compliance

teams who were "spread thin" working with different teams.  CW 1 noted that one of the issues

he recalled discussing with Ms. Egner was that parts of the system were okay, while "many parts

of the system were wide open."  CW 1 added that management did not give SOX compliance the

attention it deserved.

84.    According to CW 1, one result of management's unwillingness to invest in the IT

Department was that the Company ran an "antiquated" I series operating system that caused a lot

of "headaches" for IT personnel and there were fewer people that were knowledgeable on

Costco's systems, which caused issues with hiring IT personnel.  As another example, CW 1 said

projects in PCI-related compliance were run as what CW 1 referred to as "3-4 month fire drills"

in which many projects would not actually get finished.  He said once the fire drills were

complete, the department would go back to minimal staff and unrealistic deadlines.

Additionally, CW 1 said there was a lot of turnover in the IT Department and that there were

never enough compliance personnel for a company the size of Costco.

---

[7] A commercially available database search indicates that Bowersock remains employed by
Costco as VP, Information Security & Compliance & member of Office of the CIO (12/2014 –
Present).  His previous titles were VP, Office of the CIO (2013 – Present) and AVP, Information
Systems (2001 – 05/2013).

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

85.     CW 1 added that staff got burned out because of projects not being completed or cancelled due to a lack of sustained direction and focus from senior management.  He said that employees in the IT Department would work hard to meet the project deadlines "just to see it fall apart afterwards."  He said that senior management would talk about securing controls, and then lose focus on it and described the situation in the IT Department as one of peaks and valleys.  CW 1 added that management treated everything related to security as a project rather than an ongoing process.  Additionally, CW 1 noted that there were a number of oversight and governance projects to improve overall compliance in the IT Department that were not completed.  He said he was pulled from one PCI project to another because his background was in privacy security.  CW 1 also said he did not want to get involved with any SOX projects personally because it was "another program that's failing" in the department.

86.     CW 1 dealt primarily with the Company's efforts to get its IT security in compliance with the impending implementation of GDPR and the potential fine of 4% of global revenues the regulation carries with it.  CW 1 stated that when "tech solutions" were suggested by Costco's counsel, the Company's executive team would question and resist making the investment.  CW 1 added that he attended one or two meetings a week with Bowersock and PWC, who was brought in specifically to address GDPR, where internal control issues were discussed.  He said they discussed issues such as how easy it was for anyone to log into a particular system, and that the same kind of weaknesses were found throughout Costco's IT ecosystem.  CW 1 recalled issues coming up with the GDPR compliance review but senior management said security and remediation measures were "too costly" or required "too much headcount."  CW 1 assumed management was assessing what they viewed as.  He continued that he believed it would unfortunately take an IT security breach before Costco management took access controls seriously.

87.     According to CW 2, a former employee with the IT department, there was "room for improvement" in change management and access deficiencies were a common occurrence in Costco's IT department.  Specifically, CW 2 mentioned access deficiencies occurred in certain

1  areas of SAP due to a lack of controls set up in those environments.  He explained that if the

2  systems are not locked down appropriately, anyone can go in and find what they're looking

3  for.  Additionally, the culture of management at Costco was to view IT spending as a "necessary

4  evil."  CW 2 compared the Company's approach to buying insurance after the incident occurs

5  and said that management at Costco was always interested in keeping costs down when it came

6  to the IT department.  CW 2 said management's big focus was on keeping the business going and

7  security in the IT department was an "afterthought."  CW 2 said that throughout his tenure, his

8  management team tried to raise concerns about IT security.

9         88.     According to CW 3, a former consultant with Costco, IT security was an

10  afterthought at the Company.  CW 3 said that many companies, including Costco, want to push

11  out SAP as soon as they possibly can and mistakenly think security is not something they have to

12  think of up front.  CW 3 also stated the Company had "no true path on change management."  He

13  said there were "a lot of gaps" in the Company's change management, including incomplete

14  testing and missing approvals.  Additionally, as also noted by CWs 2 and 5, CW 3 indicated that

15  the Company's failure to establish adequate change management processes led to unauthorized

16  user access to Costco's IT systems.  CW 3 said it was unusual for a mature company like Costco

17  to lack change management processes, particularly related to SAP.  CW 3 said that during his

18  time with the Company, Costco was developing a change management system called ChaRM,

19  which is a change management system for SAP that validates transport requests and houses test

20  documents and approval workflow, among other capabilities.  CW 3 said that a colleague that

21  remains with Costco informed him that ChaRM had still not been implemented as of March 2019

22  as a result of pushback from management.

23         89.     CW 3 noted specifically that the Governance and Risk Compliance and the

24  internal audit team lacked "the right people for the right team."  In the case of the Governance

25  and Risk Compliance department, he said it lacked the necessary staff and communication to

26  effectively perform its function.  As to the internal audit team, CW 3 said the workers lacked a

27  sufficient understanding of the business side of the IT Department's applications and internal

controls.  CW 3 also cited the governance and risk compliance system as another area where Costco lacked the right team to support the system and the team lacked communication.  CW 3 said you cannot have a proper team if they are not communicating with one another.

90.     According to CW 4, a former contractor with Costco, he worked on the QA team, which included approximately 30 people divided into three categories; customers, vendors, and articles.  CW 4 worked on the vendor team, that also included business analysts and developers, and he was focused on migrating the "master data" to a newer SAP system called SAP S/4HANA, which he described as a "new release."  He could not recall the names of the existing systems, except he remembered that Costco had been using another SAP system called ECC.  He explained that SAP S/4HANA was a premium SAP product and was supposed to be a consolidated ERP system for Costco that would improve reporting and provide more structure. CW 4 said that Costco needed customized systems and data so their developers would write code for  SAP S/4HANA, which was tested by the QA contractors.

91.     CW 4 explained that management of these projects was organized around the Agile process and the development of the code was broken into "sprints," which was a two to four week timeframe.  CW 4 said that there was "slippage" in projects because work was often slipping from one sprint to the next, and as a result certain projects were months behind schedule – CW 4 estimated three months.  CW 4 said the completion of these "sprints" was delayed because the projects were not hitting the needed "velocity," a term of art in the Agile development process.[8]  CW 4 said that Costco lacked the proper IT resources and specifically that the Company did not have enough developers to do the work so their timelines were not achieved.  CW 4 also noted that several IT employees left either the Company or the department and this contributed to the resources problem.  One specific project CW 4 described was the supply chain project, which he said was stalled because at that time Costco cannot execute on

---

[8] In the context of the Agile system, "velocity" is a metric for tracking the progress of the project by breaking it into phases called "user stories."

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

one leg without first completing the master data project, since it was the foundation of the other projects.

92.     Further, CW 4 said his QA team had only been testing portions of the code being implemented rather than performing testing across the board, which he thought would have been better.  CW 4 said that in a typical system development lifecycle, QA was supposed to be the "last line of defense" before the system went live.  He said the development team was lacking resources and project deadlines were often missed, or the data and coding prepared by the developers was frequently incomplete or missing by the time it was supposed to be tested by CW 4's team.  CW 4 said due to the incomplete development, his team identified a number of defects in code which were "showstoppers."  He said these "showstoppers" were not resolved in a timely manner because of a lack of resources.  CW 4 said the SAP S/4HANA project was due to go live in April 2019, but the date to go live was pushed out, possibly to June 2019 or later, because of the lack of resources and missed deadlines.  Additionally, Costco had to spend more on the project because of the missed deadlines and that some of Costco's IT personnel, that were not fully dedicated to that project, had less time to work on their typical day-to-day tasks because they had to assist part-time with the SAP S/4HANA project.

93.     According to CW 5, a former IT Contract and Vendor Manager in the Company's IT Department, Costco had "no oversight" when it came to the Company's IT systems and who had access to them.  CW 5 also said the Company did not have good IT governance controls in place and the IT environment at Costco was the worst he had experienced and that was why he left the Company.  CW 5 said he attended meetings once a month with VPs from the IT Department and raised concerns regarding user access and change management process issues but nothing was ever done.  He said he was "shocked" by the lack of oversight and that "nobody cared."  CW 5 described the response from the VPs as indifference and said that no changes were made, and Costco cared more about maintaining vendor relationships than addressing the issues.

94.     CW 5 also said that many of Costco's lower level IT employees had been hired from the warehouse as a reward for many years of work at the Company.  However, CW 5 said

1   there was "no oversight" of the training of those employees or how they performed in their jobs.

2   CW 5 said the IT Department did whatever they wanted, including taking hour long lunches,

3   hour long breaks, and then staying late to accumulate overtime pay.  CW 5 added that these IT

4   employees were also "undeservingly" promoted to IT Manager roles.

5          95.     According to CW 6, a former Compliance Analyst with Costco, the culture in the

6   IT Department was "not healthy" and there was general discontent among the employees who

7   felt that management did not understand the needs of the IT Department.  CW 6 also said the

8   culture in the IT Department was one where nobody knew what direction the department or its

9   projects were going.  CW 6 also stated the Company had a negative view of the IT Department

10  and Costco internally viewed the IT Department as "just another cost center" that was "not

11  adding value."  CW 6 specifically noted that that some of the reasons for that view were that IT

12  had the highest paid employees, major projects were either not getting completed or were over

13  budget, and the IT Department had a high turnover rate.  CW 6 noted that the underlying theme

14  was money over improvements.  CW 6 also noted that the IT Department lacked direction from

15  management both broadly and as to individual projects.  Additionally, CW 6 said he heard about

16  Defendant Jelinek complaining about how much money was spent in the IT Department, the

17  number of employees it had, and that it was often over-budget with no major projects ever

18  seemingly getting done.  CW 6 said Defendant Jelinek's comments were alluded to in

19  department meetings and that he also heard about them through discussions with colleagues.

20  CW 6 also noted that he heard Defendant Jelinek wanted to fix the problem of over-spending and

21  the IT Department had to demonstrate that it was cutting costs.

22         96.     CW 6 said beginning around December 2017, during "department engagement

23  meetings," led by Vice President of Security and Compliance Tim Bowersock and attended by

24  Senior Vice President of Information Systems Jim Rutherford, it was communicated that the

25  Board was making it a "mission" for the year to reduce IT contractor headcount to reduce costs.

26  CW 6 said the contractors were "highly specialized" and there were approximately 700 to 900

27  contractors in the department at that time.  He continued that the move to reduce contractor

1  headcount was a "knee jerk reaction" to the IT Department running over budget.  CW 6 said the
2  IT Department had to "demonstrate to the Board" that they were reducing costs by cutting the
3  contractor headcount.

4       97.     Further, CW 6 described the results from the IT Department of an employee
5  satisfaction survey were "abysmal."  He added that the results of this survey prompted Defendant
6  Galanti to give a speech to the department about addressing it.  CW 6 also said that there was a
7  large exodus of IT employees near the end of his tenure in August 2018, and that he was
8  approximately the 26th employee to leave in the last three months of his employment.  He noted
9  that Costco was seeking to add SOX-related IT personnel, such as a SOX Tactical Team
10  Member, since the revelations by the Company regarding their internal controls at the end of the
11  Class Period.

12       98.     CW 6 also said it was a "gray area" as to who in Costco's IT Department was
13  responsible for internal audits which he further described as "almost an informal process of risk
14  acceptance."  Further, CW 6 noted that Costco lacked a clear process for reporting any issues
15  employees found with third party vendors including how to report these issues or who to escalate
16  them to.  Additionally, CW 6 said there were no compliance teams responsible for overseeing
17  any remediation measures that were supposed to be implemented when an issue was discovered.
18  As a result, CW 6 said some issues with vendors would get resolved while others were "left on
19  the table."

20       99.     Additionally, according to CW 7, a former Senior Business Analyst, the
21  managers, directors, and senior management of Costco did not know how to run an IT
22  project.  CW 7 noted that almost all of his projects were cancelled and the last two were put on
23  hold.  CW 7 also said his last project, which he spent two years on before leaving, were put on
24  hold at the time he left.  Their philosophy was that workers could learn what they needed to
25  know on the job.  CW 7 said that his direct report had no IT background and "certainly wasn't
26  trained" in the area of IT before starting.  CW 7 said that Costco's IT personnel were promoted
27  based on length of tenure at the Company rather than ability.  CW 7 said he left Costco because

he felt he could not get promoted based on the long-tenured employees he worked with who get promoted over him regardless of his IT experience.  CW 7 also said that annual training for lower level IT employees consisted of "basic stuff," such as how to lock one's computer and the importance of doing so when the employee was away, for example.

100.     Costco was fanatical about cutting costs and growing its business.  However, Defendants did so to the detriment of the Company's IT Department and the internal controls related to financial reporting.  Rather than sufficiently delegating and overseeing the implementation and operation of an IT Department with resources commensurate with an operation with the revenues of Costco, Defendants oversaw a department without sufficient initial security controls, without a sufficient internal IT Department, and without adequate processes to remediate issues that would inevitably arise in an operation the size of Costco.

> **2.     The Deficiencies in IT Led to a Material Weakness in Costco's Internal Controls, and In Particular with Regard to Change and Access Management**

101.     As noted above, the Company failed to provide the department with adequate resources, which led to unauthorized user access and change control management deficiencies.  The deficiencies and required remediation measures revealed that the Company failed to adequately control user access and failed to adequately restrict which users were able to make changes in its IT systems.  These issues were so pervasive in the IT Department (which was under the direct purview of the Individual Defendants per their duties under SOX) that the Individual Defendants knew or were deliberately reckless in not knowing of the material weaknesses earlier than October 2018 when they were revealed.

102.     CW 1 specifically recalled that issues related to processes, access management, and governance controls were identified as having deficiencies throughout the whole IT Department.  CW 1 said that the access controls were related to "internal" problems, people having improper access controls in relation to their jobs with the Company.  He said these issues were routinely brought up with management but said management just did not listen.  He explained that part of the problem was that Costco did not repeat oversight and audit of these

functions.  CW 1 added that the internal audit team performed spot checks in SOX and PCI for controls.  CW 1 said the Company would briefly implement governance controls and then stop. He also said there were many oversight and governance projects that Costco would begin in an effort to improve their overall IT compliance, but then the projects would abruptly end.  CW 1 said that Costco used a system called Archer[9] to manage governance issues, including SOX, but that most governance issues discovered through Archer got "squashed at the VP level."

103.    CW 1 said he felt that Costco created "their own worst enemy" with Archer because most IT people did not know it existed, despite it being the locale of most of the information relevant for SOX compliance, and the information that was supposed to be entered into Archer was not being entered.  He further explained that governance issues were entered into either Archer or ServiceNow but that Archer was the correct system and that many employees did not use it.  As an example, CW 1 said that he had been entering his project information into the ServiceNow system for the first 18 months of his employment because nobody told him that Archer existed at Costco and that he was supposed to be using it.  CW 1 described the confusion surrounding Archer as a "circle of hell" as management was supposed to handle transfers.

104.    Further, CW 1 stated that SOX controls at Costco sprawled across their entire IT ecosystem and that issues with GDPR compliance "drew light to a lot of weaker areas" in the IT department.  CW 1 said that in the build-up to the implementation of GDPR, Costco's weak internal controls "got Board attention," including Defendants Jelinek and Galanti, because of the concerns over weak internal controls, GDPR compliance, and potential SOX compliance issues. CW 1 said that because of GDPR in particular, the Board was "highly engaged" on internal control problems leading into the implementation.  CW 1 said Defendant Jelinek would have had

---

[9] RSA Archer GRC Platform is a software that supports business-level management of governance, risk management, and compliance (GRC). The Platform allows users to adapt solutions to their requirements, build new applications, and integrate with external systems without touching a single line of code.

1  to have kept the Board aware of the control weaknesses because the Board would have to

2  approve any spending to improve the IT situation.  Further, CW 1 said Costco's former internal

3  counsel Leigh Fulwood felt that GDPR was a legal issue.  She took GDPR responsibilities away

4  from IT, and the responsibilities were only returned to the department a year before

5  implementation when Fulwood was replaced by Costco's current Corporate Counsel Sara Page.

6  CW 1 also said that most tangible items associated with GDPR compliance took approximately

7  six or seven months to finish.

8       105.    Additionally, CW 1 said he was aware of several conversations at the Board level

9  about concerns related to Costco's internal controls.  He stated the Board met regarding the

10  status of GDPR about once a quarter, but that the Board was meeting with monthly frequency

11  with full implementation of GDPR coming up.  CW 1 noted the meetings increased to monthly,

12  occurring on the third or fourth Thursday in February, March, and April of 2018.  He said that

13  Defendants Jelinek and Galanti regularly attended the GDPR meetings.  CW 1 did not attend any

14  board meetings but he did prepare materials for his management team to present at some

15  meetings and was briefed on the meetings afterwards.  CW 1 said he presented data to

16  management on GDPR and SOX compliance, and management in turn created PowerPoint

17  presentations based off of the data CW 1 provided to present to the Board at those March, April,

18  and May 2018 Board meetings.  CW 1 said he heard about these meetings in March 2018 from

19  Krishnan[10] and Milroy[11], who most likely heard about it from Bowersock, who attended the

20  meetings only occasionally.  CW 1 said he believed that Defendants Jelinek and Galanti were in

21  these meetings discussing internal control problems with the Board.  CW 1 also stated that

22  Defendants Jelinek and Galanti were involved in conversations related to a material weakness in

23  Costco's IT department beginning in February/March 2018

24   

25  [10] Krishnan remains employed with Costco as a Manager, Information Security, Government Risk Compliance and a Senior Enterprise Architect.

26  [11] Milroy remains employed with Costco in Information Security Compliance and Identity and Access Management and her additional domains include Corporate Applications and eCommerce.

106.    Further, CW 1 detailed a specific user access and change management issue.  He said he retained access to Costco's eCommerce system long after he transferred to compliance.  CW 1 said he had to request his access to the eCommerce be revoked after he left the department.  He then had to "track down" management and "fight like hell" to finally get his access revoked.  CW 1 also recalled, as did other CWs, that there was a Google form that could be used to submit information when someone was transferred within Costco, and that the forms should have been added to a Google sheet,[12] and that a user administrator is then supposed to make the transfer change.  CW 1 added that since it was being done in a Google spreadsheet rather than a work flow tool, there was no way to tell if the work was ever actually done.

107.    CW 1 said another user access issue related to emails on personal cell phones.  CW 1 said that Costco did not have a Bring Your Own Device ("BYOD") policy, nor did the Company have any policy in place to revoke access to email on personal cell phones when employees would leave the Company.  CW 1 said that while he no longer gets new emails, he still has access to all of his old emails even though he left in September 2018.  He compared this to another former employer where his emails were wiped from his phone as soon as his employment was finished.

108.    According to CW 3, the Company's lack of processes in the IT Department led to workers being granted "way more access" than they should have been.  CW 3 said the Company was then left to "scramble" to try to address any issues before the auditors came in.  CW 3 further explained that the Company had an issue with "knowledge transfer" as new workers the Company was hiring in the IT Department as part of an effort to cut costs were not qualified and were not capable of handling the work.  CW 3 said that Costco prefers employees to be "home grown" and to promote from within the Company, to the extent that if you "made it past 90

---

[12] Google sheets is a part of the Google suite of online applications—other applications include the email platform "gmail" and the word processor "Google Docs."  With Google sheets anyone with access can log into a document from anywhere.  It is similar to using a spreadsheet on a program such as Microsoft excel, except that it is cloud based and online, such that it is readily accessible and editable to anyone with authorization.

days" you will never be fired and are "in like gold." Rather than firing employees, CW 3 said that Costco often moved employees to different positions or departments instead.

109.    CW 3 stated that in reference to security measures in SAP, a lack of good understanding of compliance and auditability and using junior consultants to implement the system can lead to a "real mess." CW 3 said at Costco there is "such a spider web of user access systems" that the Company uses, not just for SAP, but for all applications. He said that in order to do a true compliance check, you need to know what access people have across applications because of potential vulnerabilities.

110.    CW 3 said that during his time at Costco in mid-2017, he created a 50 page report detailing the assessments and interviews that CW 3 and his colleague performed. He said that in preparing this report, he interviewed members of nine different teams within the IT Department. CW3 said that through those interviews, it became evident to him that, from an IT security perspective, many people were not properly communicating with each other. He said that the remediation measures Costco identified in their 2018 Form 10-K sounded very similar to his recommendations in the report he submitted in May of 2017. CW 3 stated the report was delivered to his supervisors, including the Director of Global SAP Platform Services.

111.    CW 3 also noted that the remediation measures identified by Defendants in their 2018 Form 10-K were just the "tip" of what was necessary for Costco to remediate the issues in the IT Department and that the Company should have known about the issues given his findings over a year prior to October of 2018. CW 3 also stated he thought it was unusual that a company would take a year to remediate. Further, CW 3 noted he was not aware of any internal follow-up on the recommendations detailed in his report nor was he aware of a third party being brought in to remediate the issues. CW 3 also said his colleague that still worked in change management at Costco told him in October 2018 about the material weakness and the two agreed that Costco should have known about the issues given CW 3's findings more than a year prior.

112.    CW 5 said the Company's lack of formal processes led to certain third party contractors in the department having access to "everything" in Costco's system. For example,

CW 5 said contractors from ServiceNow had access to a database where they could see their competitors' bids and contracts with Costco.  CW 5 also noted that Oracle's IT contractors had "no restrictions" regarding their system access and that "a lot of vendors," including Oracle, had "full badge access" to Costco's IT facilities, rather than having access limited to the scope of their particular project.  CW 5 said this was consistent with the Company's culture in the IT Department of letting IT contractors go wherever and do whatever they wanted.

113.    According to CW 5, change management controls was one specific area affected by the lack of resources dedicated to the IT Department.  For example, he said that Costco had "no process" for handing off responsibilities when one IT employee would replace another.  Additionally, CW 5 said that Costco used Google spreadsheets "for pretty much everything," including the onboarding and offboarding of IT Department employees and who should have access to given programs.  CW 5 said the spreadsheets were "used as a repository for information about employees" and the use of spreadsheets made it too easy for someone to change the information.

114.    Further, CW 5 said that everything about the onboarding and offboarding process was manual and nothing about it was automated.  For example, it was up to the directors whose projects IT contractors were working on to have the contractor's access revoked, but that "almost never happened" and many contractors were never offboarded.  Additionally, CW 5 said the change management issues led to user access issues in that some third party IT contractors were left with access to Costco's IT systems long after their tenure ended.  CW 5 said his colleague was left with access to "everything," including "a lot of sensitive stuff" and "his logins all worked" for "at least a month" after he left Costco.  CW 5 said there were a "baffling" number of former contractors who were still listed as employees who should have access.  CW 5 said he witnessed a lack of oversight, lack of change control process, vendors unnecessarily having unlimited access to IT systems and databases, and former employees still having access to Costco's IT systems throughout his entire tenure with the Company.

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

115.     Similarly, CW 6 said that Costco handled onboarding and offboarding of contractors and tracking their access to Costco's system was done through Google spreadsheets. He said he submitted a Google form that would then be input into the Google spreadsheet as part of the onboarding process and it was up to the contractor's supervisor to "manually submit a form" to the offboarding team to terminate the contractor's access, otherwise they would stay on the system.

116.     According to CW 6, a change management issue affected the registry where most teams in the IT Department logged potential security threats.  CW 6 said that around early 2018, the management team charged with oversight of the department's internal risk registry was disbanded and there was a six month period where the department lacked a centralized team overseeing the registry.  CW 6 also said the lack of resources dedicated to the department resulted in a lack of effective and positive changes and project completions.

117.     Further, CW 6 said there was seemingly no strategy for IT or its projects and little prioritizing, resulting in a lack of effective and positive changes and project completions. Additionally, CW 6 said he had heard KPMG, who had their offices right next to Costco's internal audit department, had problems with Costco's controls and modules that held sensitive financial information after her tenure with the Company.  CW 6 said he believed that the affected modules were for employee payroll and vendor payment, which would have exposed the bank account information of employees and vendors.

118.     As detailed by the Confidential Witnesses, the IT Department suffered a litany of consequences from the lack of oversight and resources provided, or in this case not provided, by management, including the Individual Defendants.  The Individual Defendants had actual knowledge of these deficiencies at least as early as February or March 2018.  Further, Defendants should have known of these deficiencies much earlier than that as they could not have reasonably expected the IT Department to implement and maintain adequate internal controls related to financial reporting given the lack of oversight, lack of resources, and ongoing deficiencies in many different areas of the department.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

**K.      Defendants Continue to Mislead the Market About the Adequacy of Costco's Internal Controls Over Financial Reporting**

119.     Despite these deficiencies, Defendants continued to mislead the market about their internal controls.  Defendants made false statements in the 3Q2018 Form 10-Q SOX Certifications that they designed and implemented internal controls and that those internal controls worked.  They also reiterated their supposed commitment to IT spending described aboveernal system disruptions.

120.     All of these statements were false and misleading when made because (1) Defendants deprived the IT Department of the resources Costco needed to effectively detect risks and implement controls, and (2) as a result, the Company's access control and change management procedures were ineffective leading to a material weakness in internal controls related to financial reporting.

**L.      Defendants Begin to Reveal the Truth About The Material Weakness in Internal Controls**

121.     On October 4, 2018, the Company was finally forced to reckon with the consequences of deliberately neglecting its IT Department.  On that date, in a press release filed with the SEC, Defendant Galanti informed the market that Costco was unable to ascertain the "effectiveness of its internal control over financial reporting as of September 2, 2018."  The Company revealed issues related to "user access and program change-management over certain information technology systems that support the Company's financial reporting processes."  The "access issues relate to the extent of privileges afforded users authorized to access company systems."

122.     Costco revealed that it expected to report a material weakness in its internal controls related to financial reporting in its upcoming Form 10-K.  However, in reporting this expected material weakness, the Company only vaguely mentioned remediation measures, instead saying only that "efforts have begun" without providing any specifics.  Further, the Company stated "the material weakness will not be considered remediated until the applicable

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

controls operate for a sufficient period of time" and management can conclude the controls are working effectively.  The Company estimated the material weakness would not be remediated until the end of FY 2019.

123.    On October 4, 2018, the Company also held a conference call.  In response to an analyst's question about the material weakness, Defendant Galanti noted the issues related to granting access to "people within IT or contractors" and that "once they should have had that access relieved, it took a little long to do so."  Simply put, *"the controls weren't in place."*  Additionally, Defendant Galanti stated that "[i]n some of the newer systems, there was no look back ability for certain things."  Finally, Defendant Galanti conceded that as of the time of the call, the material weakness "***should have been fixed***" but was not.

124.    The market reacted accordingly to the uncertainty regarding Costco's financial controls and reporting as shares declined by $12.86 (as of close on October 5), a drop of approximately 5.55%, on high trading volume.

125.    On October 4, 2018, Bloomberg reported that Costco's "information-technology problem, which roiled its bookkeeping and sent the stock tumbling on [that day], was tied to workers getting access to financial data after they should have been cut off."  Bloomberg also noted that "a company official, [Defendant Galanti], was cryptic on [his] call with analysts."  Other reports on October 4, 2018, echoed the message.  For example, Investor Business Daily explained that Costco "posted strong Q4 earnings after the close but warned of deficiencies in its information technology related to access to financial reporting systems."  And MarketWatch reported that Costco's total sales numbers "surpassed Wall Street expectations" but that its shares fell "after the retailer said it expects to find 'material weakness' in internal controls over financial reporting when it releases its annual report."   The popular investment website "Seeking Alpha" ran an article with the headline, "Costco lower after earnings, material weakness disclosure."

126.    The publication Zacks Investment Research, a leading service tracking analyst estimates, reported that Costco beat estimates on both per share earnings and revenue, indicating

1  that Costco had outperformed expectations—and despite this its share price fell.  The following

2  chart shows the expected and actual results:

|  | Zacks Analyst Consensus | Costco's 4Q 2018 Results |
| --- | --- | --- |
| Earnings Per Share | $2.34 | $2.36 |
| Revenue | $44.40 billion | $44.41 billion |

6  127.   Reports on October 5, 2018, were similar.  Yahoo Finance reported that "despite

7  an in-line bottom-line result and the top-line narrowly beating the consensus. The warehouse

8  club raised concerns with its disclosure that it will report material weakness in its internal

9  controls."  An article in Chain Store Today, a leading retail industry publication, was headlined,

10 "Costco Q4 profit surges; reports flaw in financial controls."  The popular investment website

11 Motley Fool ran an article titled "Why Costco Stock Fell Today" which stated that investors

12 were "rattled by a potential accounting issue that the company disclosed."  The article went on to

13 explain that Costco met analyst expectations for revenue and beat analyst expectations for profit

14 per share, but stated that it had reported a "'material weakness in internal control' that spooked

15 investors."  The San Francisco Chronicle wrote that '[d]espite a strong earnings report, Costco

16 shares dropped 5.5 percent after the warehouse club said it will review past financial reports

17 because of possible deficiencies." Chanele2e,[13] published an article entitled "Costco Investigates

18 Access Control Issues Involving Financial systems."  The article, written by Joe Panettieri,

19 commented on the statements made by Defendants in their October 4, 2018 earnings call and

20 stated "[i]n a vague statement, the warehouse indicated that the access issue involved both

21 internal employees and contractors."

**M.   Defendants Final Revelation of the Truth About Their Internal Control Deficiencies**

23 128.   On the morning of October 26, 2018, Costco finally revealed the extent of the

24 material weakness; the Company's internal controls related to financial reporting were

---

[13] Chanele2e is an online publication focused on research for MSPs, cloud services providers, strategic IT service providers, resellers, VARs, integrators & channel partners.

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

ineffective for financial results reported as of September 2, 2018, which meant the material

weakness stretched all the way back to the end of the previous fiscal year.  In its Form 10-k for

FY 2018, signed by Defendants Jelinek and Galanti, Defendants revealed that they had

"identified a material weakness in internal control related to ineffective information technology

general controls (ITGCs) in the areas of user access and program change-management over

certain information technology (IT) systems that support the Company's financial reporting

processes."  The Company further revealed that the internal weakness had far-reaching effects as

the "business process controls (automated and manual) that are dependent on the affected ITGCs

were also deemed ineffective because they could have been adversely impacted."

129.    Defendants blamed the material weakness in its financial reporting on three

primary sources.  First, Defendants stated they lacked sufficient documentation to maintain an

effective change management and knowledge transfer program.  This lack of documentation

meant the Company "was overly dependent upon knowledge and actions of certain individuals

with IT expertise, which led to failures resulting from changes in IT personnel."  Second,

Defendants admitted they failed to properly train IT personnel on the importance of IT internal

controls.  Third, Defendants informed the market that the Company's risk assessment processes

were "inadequate to identify and assess changes in IT environments that could impact internal

controls over financial reporting."  The lack of documentation and efficient risk assessment

procedures was a violation under the Individual Defendants' SOX duties as they are required to

have sufficient documentation to support their assessment.

130.    Costco further described the severity of this misstatement by warning of its

potential repercussions.  Costco disclosed that there was uncertainty regarding when and if the

Company would be able to adequately remediate the issue—stating "if not remediated

appropriately or timely" that certain bad results would occur—namely, a "loss of investor

confidence" and an "advers[e] impact on [its] stock price."  Costco continued: "We are

implementing remedial measures and, ***while there can be no assurance that our efforts will be

successful***, we plan to remediate the material weakness prior to the end of fiscal 2019."  Despite

1   its matter of fact tone, this statement is astounding—Costco was informing the market that its IT

2   Department was in such disarray that it could not be sure that it would even be able to remediate

3   the problem.  Similarly, Costco warned of the dire consequences of failing to remediate, stating:

4           If we are unable to remediate the material weakness, or are
            otherwise unable to maintain effective internal control over
5           financial reporting or disclosure controls and procedures, our
            ability to record, process and report financial information
6           accurately, and to prepare financial statements within required time
            periods, could be adversely affected, which could subject us to
7           litigation or investigations requiring management resources and
            payment of legal and other expenses, negatively affect investor
8           confidence in our financial statements and adversely impact our
            stock price.
9

10          131.    Costco's Auditor, KPMG, also provided an explanation of this situation as part of

11  Costco's Form 10-K.  They stated that "because of the effect of the material weakness" Costco

12  had not "maintained effective internal control over financial reporting as of September 2, 2018

13  based on the COSO Framework.  KPMG also wrote that the "***Company's management is***

14  ***responsible for maintaining effective internal control over financial reporting and for its***

15  ***assessment of the effectiveness of internal control over financial reporting***."  This echoed the

16  Company's recognition in that same Form 10-K that "management is responsible for establishing

17  and maintaining adequate internal control over financial reporting."  KPMG also explained the

18  meaning of a "material" weakness, stating:

19          A material weakness is a deficiency, or a combination of
            deficiencies, in internal control over financial reporting, such that
20          there is a reasonable possibility that a material misstatement of the
            company's annual or interim financial statements will not be
21          prevented or detected on a timely basis.  The following material
            weakness has been identified and included in management's
22          assessment:

23          There were ineffective information technology general controls
            (ITGCs) in the areas of user access and program change-
24          management over certain information technology (IT) systems that
            support the Company's financial reporting processes.  As a result,
25          business process automated and manual controls that were
            dependent on the affected ITGCs were ineffective because they
26          could have been adversely impacted.  These control deficiencies
            were a result of: IT control processes lacked sufficient
27          documentation; insufficient knowledge and training of certain
            individuals with IT expertise; and risk-assessment processes

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

inadequate to identify and assess changes in IT environments and personnel that could impact internal control over financial reporting.

132.    KPMG also explained some of the reasons why internal controls are of such importance.  It noted generally that "a company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles."  Implicit in this statement is that a lack of internal controls means the Company cannot provide "reasonable assurance" regarding the reliability of their financial reporting.  It also explained that internal controls:

> (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.[14]

133.    Defendants also laid out some of the measures that would be necessary to remediate the material weakness in the Company's internal controls related to financial reporting.  It warned that this remediation would "result in additional technology and other expenses." The remediation actions, which are discussed in greater depth in Section VI(N), include: (i) creating and filling an IT Compliance Oversight function; (ii) developing a training program addressing ITGCs and policies, including educating control owners concerning the principles and requirements of each control, with a focus on those related to user access and change-management over IT systems impacting financial reporting; (iii) developing and maintaining documentation underlying ITGCs to promote knowledge transfer upon personnel

---

[14] A similar statement appears in the section of Costco's Form 10-K for FY 2018 titled "Management's Annual Report on Internal Control Over Financial Reporting."

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

and function changes; (iv) developing enhanced risk assessment procedures and controls related to changes in IT systems; (v) implementing an IT management review and testing plan to monitor ITGCs with a specific focus on systems supporting our financial reporting processes; and (vi) enhanced quarterly reporting on the remediation measures to the Audit Committee of the Board of Directors.

134.     Investors reacted to the news of the Company providing additional details of the severity of the material weakness in its internal controls and the many remediation steps needed to fix the material problem related to financial reporting by doubling their trading volume and driving down Costco's share price by $8.21, a drop of approximately 3.63%.

135.     Even months, later on December 10, 2018, Forbes posted an article entitled "What To Expect From Costco's Q1 Earnings," that commented on the net earnings announced in the 2018 Form 10K (issued on October 25, 2018). The article stated "The retailer reported net earnings of $2.36 per share, up 13% y-o-y. However, the stock traded down, as gross margins narrowed despite higher sales and the Company disclosed a material weakness in its internal controls."

**N.     Remediation Measures Show the Severity of the Material Weakness in Internal Control and the Falsity of the Class Period Statements**

136.     In its Form 10-K for FY 2018, filed on October 26, 2018, Costco provided a description of the expensive and widespread remediation measures it was planning to undertake. These remediation measures further revealed the severity of the failings within Costco.

137.     *__First__*, The revelation that Costco needed to create and fill an IT Compliance Oversight function revealed that such a function was previously missing (i.e., did not exist during the Class Period). Under the COSO framework the Company needed to have a "Control Environment" comprised of structures that provide the basis for carrying out internal controls across the organization. The third principle supporting the requirement of a Control Environment is management's responsibility to establish appropriate structures and authorities to achieve effective internal controls. As explained by KPMG's public guidance on internal

controls, to support this function means management must assign competent authorities across the organization to oversee functional areas such as IT.  Here, Costco neglected to involve personnel with adequate competence related to IT risks, despite the fact that IT was a core component of Costco's business and necessary for a functioning control environment.  The failure to implement an IT Compliance Oversight function prior to the end of the Class Period left Costco vulnerable to the risks associated with IT control failures and also rendered the SOX Certifications signed by the Individual Defendants during the Class Period false and misleading.

138.   ***Second***, Costco's revelation that it would need to "develop" a training program addressing internal controls and policies revealed that it lacked such a training program during the Class Period.  The absence of such a training program in earlier periods was a failure at the most basic of levels.  An effective Control Environment relies on the principle of the organization's "commitment to competence." A point of focus associated with this principle is the organization's provision of training to attract and develop sufficient competent personnel. The KPMG Reference Guide on internal controls asks, "Does the entity have programs in place (*e.g.*, mentoring, training, etc.) that demonstrate management's commitment to attract, develop, and retain competent personnel?"  The answer here, prior to the remediation effort, was no.  In failing to establish a training program, the Individual Defendants failed to satisfy the duty to create an IT Department to adequately protect internal controls imposed by SOX and thus their certifications during the Class Period were false and misleading.  Additionally, because Costco management failed to develop any training related to internal controls, IT personnel were allowed to engage in activities that created a reasonable possibility that a material misstatement would occur.

139.   ***Third***, Costco's revelation that it would be "developing and maintaining documentation underlying ITGCs to promote knowledge transfer upon personnel and function changes," revealed that it previously lacked such documentation.  Chapter 4 of the COSO Framework states, "[e]ffective documentation assists in capturing the design of internal control and communicating the who, what, when, where, and why of internal control execution and

creates standards and expectations of performance and conduct." KPMG's public guidance uses even stronger language, stating: "Management's documentation plays a critical role in supporting management's assertion about internal control over financial reporting. Sufficient, appropriate documentation is a requirement in the COSO Framework and specifically discussed in the SEC Staff guidance." Furthermore, SEC Release No. 33-8810, stated that "Management is responsible for maintaining evidential matter, including documentation, to provide reasonable support for its assessment [of internal controls]." In fact, this same SEC release identifies management's documentation of controls as an "integral part" of the basis to support management's assertions regarding the effectiveness of controls. Yet, Costco's remediation necessitated the ***creation*** of documentation related to internal controls to meet this most basic requirement of effective SOX, thus rendering the certifications signed by the Individual Defendants during the Class Period false and misleading. This remediation evidenced a massive gap in Costco's practices, which would have affected other forms of compliance as well. That is, Costco management could not have offered appropriate training related to internal controls prior to the time that it created documentation of those internal controls. Nor could Costco's management adequately assess the risk related to changes in IT systems without documentation. Similarly, the Individual Defendants and the Audit Committee could not effectively oversee Costco's internal controls when the core internal controls did not exist or had not been documented.

140. ***Fourth***, Costco's need to "develop enhanced risk assessment procedures and controls related to changes in IT systems" reveals the insufficiency of their prior risk assessment procedures. KPMG's guidance states that identifying relevant risks to financial reporting is "an essential component of [internal control over financial reporting] because failure to understand the likely sources of misstatements increases the possibility of a material misstatement in the financial statements." In fact, one of the principles underlying the Risk Assessment component of the COSO Framework is: "The organization identifies and assesses changes that could significantly impact the system of internal control." According to KPMG, this principle is

"required to be met in order [for management] to conclude that [internal control over financial reporting] is effective." Yet, here again, despite the fact that Costco was in the process of making significant changes to its IT systems, Costco's internal controls were inadequate to assess the risk associated with such changes. Moreover, because Costco management could not have an adequate ability to assess the risks caused by such changes, Costco failed to have adequate controls in place to respond to those risks. Costco's failure to have basic controls in place meant the Individual Defendants' SOX Certifications were false and misleading because the Individual Defendants could not sufficiently assess the effectiveness of the Company's controls without adequate risk assessment procedures.

141. ___Fifth___, Costco's need to implement an "IT management review and testing plan to monitor ITGCs with a specific focus on systems supporting [its] financial reporting processes" reveals that it lacked such management review and testing prior to this remediation. This remediation expands on the actions described above to highlight that Costco management also failed to have appropriate review controls in place to monitor its ITGCs. Here again, the absence of such controls prior to the commencement of remediation was a basic lapse by Costco – and rendered its SOX Certifications false. For example, KPMG's guidance states that "[m]anagement should pay particular attention to documenting the…design and operating effectiveness of management review controls." Similarly, KPMG summarizes the SEC's guidance on this issue as requiring management to "identify the risks to reliable financial reporting prior to identifying controls and monitoring them for effectiveness." Thus, while the overall shortcomings in Costco's internal controls and procedures were glaring, the specific technical weaknesses were obscured by the decision to not satisfy its duty to implement a review or testing plan prior to the remediation.

## O.    Post-Class Period Revelations

142. Even a full quarter after revealing the material weakness in the Company's internal controls, Defendants were still scrambling to correct the issue leaving investors to guess

1    as to the effectiveness of the Company's internal control and subsequent financial reporting.

2    Defendants also discussed the financial impact on Costco's IT spend.

3        143.    On December 13, 2018, Defendants held a conference call to discuss its first

4    quarter 2019 results.  In response to a question from an analyst about Costco's expenses,

5    Defendant Galanti admitted that "on the IT side, we've got a heck of a lot going on."

6        144.    Additionally, on December 20, 2018, Costco filed with the SEC its first quarter

7    results in a Form 10-Q.  The Form 10-Q again informed investors that Costco's "disclosure

8    controls and procedures were not effective . . . due to a material weakness in internal control over

9    financial reporting," and that the remediation of the weakness was still not completed.

10        145.    Analysts took note of the continued weakness in Costco's internal controls related

11   to financial reporting.  On December 24, 2018, Argus published a research report highlighting

12   this risk.  Under a section titled "Management & Risks," Argus noted that Costco "reported a

13   material weakness in internal control in its annual report because of insufficient controls over

14   user access and management of program changes."  The report further noted that Costco would

15   need to remediate deficiencies in its controls related to "access to certain financial and reporting

16   systems."

17        146.    Additionally, on March 13, 2019, Costco filed with the SEC its second quarter

18   results in a Form 10-Q.  The Form 10-Q again informed investors that Costco's "disclosure

19   controls and procedures were not effective . . . due to a material weakness in internal control over

20   financial reporting," and that the remediation of the weakness was still not completed.

21        147.    On March 15, 2019, Corporate Watchdog Report published a report noting the

22   continued material weakness in Costco's controls.

23

24

25

26

27

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

1

2

## VII. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

3        148.    During the Class Period, Defendants made numerous materially false and

4  misleading statements and omissions.[15]

5        149.    The gravity of the misstatements detailed in this Section is partially demonstrated

6  by the substantial market reactions to the revelation of the truth.  This reaction was sensible, *inter

7  alia*, because the fraud concealed: (a) that Costco would need to undertake a vast effort and

8  expend significant resources to transform its IT Department into one that would be capable of

9  supporting the necessary internal controls; (b) that there was significant risk that Costco's

10 reporting data would be inaccurate, especially until the issue was fully remediated, which risk

11 could reasonable cause investors to discount their valuation of the Company; (c) that Costco

12 could be subject to governmental or regulatory action regarding its internal controls and

13 treatment of data, especially in an environment where inadequate data security can result in

14 massive fines, such as fines up to 4% of revenue under the GDPR; and (d) it revealed a serious

15 risk that Costco's low cost operating model was a house of cards—*e.g.*, that it was able to

16 maintain SG&A spend of 10% of net sales (whereas its competitors were in the range of 15-

17 20%) only because it cut corners in critical functions and that its fast-paced growth was not

18 accompanied by a sustainable investment in critical controls.[16]

19        150.    Costco made each of the statements described in this Section because they were

20 filed by or on Costco's behalf with the SEC.  Each of the Individual Defendants had ultimate

21 control of the SEC filings described in this Section and this control is demonstrated, among other

22 ways, because: (1) the Individual Defendants signed each of the SEC filings; (2) as Costco's

23

24 [15] The statements that are ***bolded and italicized*** in this section are statements alleged to be false or misleading.

25

26 [16] To the extent that any false statement in this section is representing a matter of opinion or is qualified as expressing a fact as to the speakers present understanding, that statement is false because defendants knew, or were reckless in not knowing, of the internal control deficiencies by no later than March 2018, and because any such statement could not be supported by a credible factual basis, given the condition of Costco's IT Department.  (See Section VIII).

27

CEO and CFO, Defendants Jelinek and Galanti had direct control over what Costco said in public filings—especially in filings requiring his direct knowledge and involvement and as important as those described in this Section; (3) as Costco's CEO and CFO, Defendants Jelinek and Galanti were required to have direct knowledge of and involvement in the SOX Certifications they each signed; (4) the Individual Defendants are members of the Board, and therefore were in control of what Costco said in formal public filings—especially in filings as important as those described in this Section; and (5) the ultimate control of the Individual Defendants is further established by their involvement in the very activity described in these statements.

151.    Despite the Company's knowledge (by at least March 2018) of the material weaknesses in internal controls that affected their financial reporting, Defendants made false and misleading statements and omissions in the 3Q2018 Form 10-q published on June 6, 2018, about their compliance with SOX, the effectiveness of their internal controls, and their contributions to their IT Department.  The 3Q2018 Form 10-q was signed by Defendants Jelinek and Galanti.

152.    The 3Q2108 Form 10-q stated the following:

Item 4—Controls and Procedures

***As of the end of the period covered by this Quarterly Report on Form 10-q, we performed an evaluation under the supervision and with the participation of management, including our Chief Executive Officer and Chief Financial Officer, of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities and Exchange Act of 1934 (the Exchange Act)).  Based upon that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that, as of the end of the period covered by this Quarterly Report, our disclosure controls and procedures are effective.***

***There have been no changes in our internal control over financial reporting (as defined in Rules 13a-15(f) or 15d-15(f) of the Exchange Act) during our most recently completed fiscal quarter that have materially affected or are reasonably likely to materially affect our internal control over financial reporting.***

153.    This statement was false and misleading because, as discussed more fully in Section VI(J) and later admitted by Defendants themselves (See Sections VI(L) – (O)),

Defendants' internal controls and procedures were **not** effective as of this date of this statement. In fact, at the time this statement was made, Costco had a material weakness in internal controls over financial reporting (with a "material weakness" being the most severe form of internal control deficiency).  As explained herein, that material weakness included ineffective information technology general controls ("ITGCs") in the areas of user access and program change-management over certain IT systems that support the Company's financial reporting processes.  As a result, business process controls that were dependent on the affected ITGCs were ineffective because they could have been adversely impacted.  These control deficiencies were a result of the fact that: Defendants consciously failed to adequately supervise and fund the IT Department to ensure that sufficient internal controls were both established and evaluated; IT control processes lacked sufficient documentation; IT personnel lacked sufficient knowledge and training; and risk-assessment processes were inadequate to identify and assess risks related to changes in IT environments and personnel that could impact internal control over financial reporting.  As discussed in Section VIII, Defendants knew (or were deliberately reckless in not knowing) by no later than March 2018 of the material deficiencies in internal controls as they relate to financial reporting.

154.    The 3Q2018 Form 10-Q also included two SOX Certifications.  Defendants Jelinek and Galanti each signed their respective SOX Certifications and certified the following statement:[17]

> I [●] certify that:
>
> I have reviewed this Quarterly Report on Form 10-q of Costco Wholesale Corporation ("the registrant");
>
> 2)    Based on my knowledge, *this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report*;

---

[17] This qualifies as two separate statements – one made by Defendant Jelinek and one made by Defendant Galanti.

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

3)   ***Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;***

4)   The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

***Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;***

***Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;***

***Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and***

***Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and***

5)   ***The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):***

***All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and***

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

1

2

*Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.*

3

4

155.    These statements were false and misleading because the Form 10-q contained untrue statements of material fact as it relates to internal controls over financial reporting, Defendants failed to design sufficient internal controls over financial reporting, and Defendants failed to evaluate the effectiveness of these controls.  As discussed more fully in Section VI(J), and later admitted by Defendants themselves (See Sections VI(L) – (O)), Defendants' internal controls and procedures were **not** effective as of this date of this statement.  In fact, at the time this statement was made, Costco had a material weakness in internal controls over financial reporting (with a "material weakness" being the most severe form of internal control deficiency).  As explained herein, that material weakness included ineffective information technology general controls ("ITGCs") in the areas of user access and program change-management over certain IT systems that support the Company's financial reporting processes.  As a result, business process controls that were dependent on the affected ITGCs were ineffective because they could have been adversely impacted.  These control deficiencies were a result of the fact that: Defendants consciously failed to adequately supervise and fund the IT Department to ensure that sufficient internal controls were both established and evaluated; IT control processes lacked sufficient documentation; IT personnel lacked sufficient knowledge and training; and risk-assessment processes were inadequate to identify and assess risks related to changes in IT environments and personnel that could impact internal control over financial reporting.  Moreover, despite knowing by no later than March 2018 about these deficiencies in internal controls (or being deliberately reckless in not knowing), Defendants failed to disclose all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting.  (See Section VIII).

156.    The 3Q2018 Form 10-q also included two Certifications Pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. Defendants

Jelinek and Galanti each signed these respective certifications and certified the following statement:[18]

> In connection with the Quarterly Report of Costco Wholesale Corporation (the Company) on Form 10-q for the quarter ended May 13, 2018, as filed with the Securities and Exchange Commission (the Report), I, [] certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:
>
> (1) The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and
>
> (2) ***The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.***

157.    This statement was false and misleading because it did not present "in all material respects the financial condition" of the Company.  As discussed more fully in Section VIII, and later admitted by Defendants themselves (See Sections VI(L) – (O)), Defendants' disclosure controls and procedures over financial reporting (which necessarily effects the "financial condition" of the Company) were **not** effective as of this date.  In fact, at the time this statement was made, Costco had a material weakness in internal controls over financial reporting (with a "material weakness" being the most severe form of internal control deficiency).  As explained herein, that material weakness included ineffective information technology general controls ("ITGCs") in the areas of user access and program change-management over certain IT systems that support the Company's financial reporting processes.  As a result, business process controls that were dependent on the affected ITGCs were ineffective because they could have been adversely impacted.  These control deficiencies were a result of the fact that: Defendants consciously failed to adequately supervise and fund the IT Department to ensure that sufficient internal controls were both established and evaluated; IT control processes lacked sufficient documentation; IT personnel lacked sufficient knowledge and training; and risk-assessment processes were inadequate to identify and assess risks related to changes in IT environments and

---

[18] This qualifies as two separate statements – one made by Defendant Jelinek and one made by Defendant Galanti.

personnel that could impact internal control over financial reporting.  As discussed in Section VIII, Defendants knew (or were deliberately reckless in not knowing) by no later than March 2018 of the material deficiencies in internal controls as they relate to financial reporting.

158.    In the 3Q2018 Form 10-q, Defendants also stated: "In addition to the other information set forth in the Quarterly Report on Form 10-q, you should carefully consider the factors discussed in Part I, Item 1A, "Risk Factors" in our Annual Report on Form 10-k, for the fiscal year ended September 3, 2017."  Thus, the 3Q2018 Form 10-q incorporated the "Risk Factors" in the Form 10-k for 2017 by reference.  The Form 10-k for 2017 was signed by both Defendants Jelinek and Galanti.

159.    In the 3Q2018, Form 10-q Defendants further stated; "***There have been no material changes in our risk factors from those disclosed in our [2017] Annual Report on Form 10-k.***"  One of the Risk Factors in the Company's 2017 Form 10-K, stated that the Company was "***currently making and will continue to make, significant technology investments to improve or replace critical information systems and processing capabilities."***

160.    These statement were false and misleading because as of the time the Form 3Q2018 incorporated this statement from the 2017 Form 10-K by reference (June 6, 2018), Defendants were not "currently making" or continu[ing] to make" the significant technology investment necessary to safeguard their internal controls over financial reporting.  As discussed more fully in Section VIII, and later admitted by Defendants themselves (See Sections VI(L) – (O)), Defendants' disclosure controls and procedures over financial reporting (which necessarily affects the "financial condition" of the Company) were **not** effective as of this date.  In fact, at the time this statement was made, Costco had a material weakness in internal controls over financial reporting (with a "material weakness" being the most severe form of internal control deficiency).  As explained herein, that material weakness included ineffective information technology general controls ("ITGCs") in the areas of user access and program change-management over certain IT systems that support the Company's financial reporting processes.  As a result, business process controls that were dependent on the affected ITGCs were

ineffective because they could have been adversely impacted.  These control deficiencies were a result of the fact that: Defendants consciously failed to adequately supervise and fund the IT Department to ensure that sufficient internal controls were both established and evaluated; IT control processes lacked sufficient documentation; IT personnel lacked sufficient knowledge and training; and risk-assessment processes were inadequate to identify and assess risks related to changes in IT environments and personnel that could impact internal control over financial reporting.  As discussed in Section VIII, Defendants knew (or were deliberately reckless in not knowing) by no later than March 2018 of the material deficiencies in internal controls as they relate to financial reporting.

161.    On October 4, 2018, Defendants began to reveal the truth about the material weakness in internal controls.  On October 4, 2018, Costco issued a Form 8-K for the Fourth Quarter and Fiscal Year 2018.  Defendant Galanti signed the Form 8-K.  Attached as an exhibit to the Form 8-K was a Press Release dated October 4, 2018.  The Press Release stated:

> While the Company is still completing its assessment of the effectiveness of its internal control over financial reporting as of September 2, 2018, in its upcoming fiscal 2018 Annual Report on Form 10-k, it expects to report a material weakness in internal control. ***The weakness relates to general information technology controls in the areas of user access and program change-management over certain information technology systems that support the Company's financial reporting processes. The access issues relate to the extent of privileges afforded users authorized to access company systems.*** As of the date of this release, there have been no misstatements identified in the financial statements as a result of these deficiencies, and the Company expects to timely file its Form 10-k.
>
> ***Remediation efforts have begun; the material weakness will not be considered remediated  until the applicable controls operate for a sufficient period of time and management has concluded, through testing, that these controls are operating effectively.  The Company expects that the remediation of this material weakness will be completed prior to the end of fiscal year 2019.***

162.    On that same day, October 4, 2018, at 9 pm GMT Defendants Galanti and Jelinek participated in an earnings call with analysts.  On that call Defendant Galanti made the following statements:

A last topic, as was noted in this afternoon's press release, we plan to report in our Form 10-k the material weakness in internal control related to general IT controls. ***These controls relate to internal user access and program change management over a certain of our IT systems that relate to our financial reporting processes.*** I can tell you that there have been no misstatements identified in the financial statement as a result of the deficiencies, and we expect to timely file our Form 10-k.

***In terms of remediation, remediation efforts have begun, but material weakness will not be considered remediated until the applicable controls operate for a sufficient period of time and we can conclude through testing that the controls are operating effectively.  We expect that the remediation of the material weakness will be completed prior to the end of fiscal 2019.***

Well, keep in mind, first of all, that we feel comfortable, and we feel that our -- ultimately, our auditors feel comfortable.  We wouldn't have expressed the level of comfort we did in the press release about the time that there's no mistake [there's the timing that] we filed on time, including the K. ***The issues had to do with internal user access, so people within IT or contractors and when somebody who may have had access to something they should have and sometimes that they -- once they should have had that access relieved, it took a little too long to do so.  So the controls weren't in place.  We should have done a better job.  We went back as far as we could and looked back as far as we could in some systems for the entire fiscal year, which is what you want to do.  In some of the newer systems, there was no look back ability for certain things. I can tell you with all the look backs that we have done and then our outside help has done has found no issues whatsoever in terms of misstatements or breaches.  So that's what we can tell you.  But we can't be more positive than that until we release the Form 10-K. And as -- and so I don't want to belittle it.  We should have -- it should have been fixed, but it was internal to us, not external. And we'll go from there.***

163.    These statement made on October 4, 2018, were false and misleading because despite the fact that Defendants began to reveal the material weakness in internal controls, they failed to disclose the full extent of the problems with access controls and change controls.  They also failed to reveal precisely what caused the problems (described in paragraph 160), and failed to disclose to the market the full extent of the significant remediation measures that would have to be instituted to correct these material deficiencies in internal controls.

164.    Defendants finally revealed the true extent of the problem and the significant remediation efforts required to fix.  Then, on October 26, 2018 in their Form 10-K.  *See* Section

1   VI(M).  On this news, the stock dropped from a closing price of $226.40 on the prior day to

2   $218.19—a 3.63% drop on heavy volume of 3,995,362 shares.

3   **VIII.   ADDITIONAL ALLEGATIONS SUPPORTING SCIENTER**

4   165.    As described below, the Individual Defendants had actual knowledge that the

5   statements and omissions made by them were false and misleading, or acted with deliberate

6   reckless disregard for the truth or falsity of those statements and omissions.  The Individual

7   Defendants' knowledge of, or deliberately reckless disregard for the truth, is demonstrated by

8   admissions and substantial direct and circumstantial evidence supporting a strong inference of

9   scienter.

10   **A.     Defendants' Actually Knew About the Material Weakness In Internal
            Controls Just Months Before the Class Period Even Begins**

11   166.    The Individual Defendants knew, or were at least deliberately reckless in not

12   knowing, of the material weakness in their internal controls related to financial reporting by at

13   least March 2018, and not October 2018 as they revealed.

14   167.    As noted by CW 1, the Board became "highly engaged" on internal control

15   problems leading into the Class Period as a result of the build-up to the implementation to

16   GDPR.  CW 1 said the issues with GDPR compliance "drew light" to other areas of weakness in

17   the IT Department.  In fact, CW 1 said that Defendant Jelinek would have had to keep the Board

18   informed of control weaknesses because the Board would have to approve any spending required

19   to improve the IT situation.  CW 1 said he presented data to management on GDPR and SOX

20   compliance, and management in turn created PowerPoint presentations based off of the data CW

21   1 provided to present to the Board at those March, April, and May 2018 Board meetings.

22   Additionally, CW 1 said both Individual Defendants, in their roles as board members,

23   participated in conversations related to material weaknesses in the IT Department in February or

24   March of 2018.  CW 1 also said that Defendant Jelinek was involved in "several conversations"

25   related to a weakness in Costco's internal controls in February or March of 2018.  Further, CW 1

26   said the Board began having monthly, rather than the usual quarterly, meetings with full

27

implementation of GDPR coming up, and that Defendants Jelinek and Galanti regularly attended these meetings.

168.     That the Individual Defendants had Board materials detailing weaknesses in the IT Department, regularly attended Board meetings where weaknesses in the Company's internal controls were discussed, and discussed material weaknesses in the IT Department at least as early as March 2018 shows that the Individual Defendants knew or were deliberately reckless in not knowing of material weaknesses in Costco's internal controls when assuring the market of the adequacy of those controls on June 6, 2018.

**B.     Defendants Had Access to Information Alerting them to the Weakness in Internal Controls**

169.     In addition to those materials prepared for Board meetings discussed in Section VIII(A), the Defendants had access to reports and data detailing the weaknesses in Costco's internal controls.

170.     CW 3 explained that he performed interviews of nine different teams within the IT Department and generated a 50-page report detailing the assessments and interviews, which report was delivered to the Director of Global SAP Platform services.  He said that the remediation issues Costco identified in their 2018 Form 10-K sounded very similar to the recommendations in his 50 page report.  He also noted that the remediation efforts identified in the Form 10-K were just the "tip" of what was necessary to remediate the issues in the IT Department, and that the Company should have known about the issues given his findings over a year prior to October 2018.  Accordingly, as CEO and CFO the Individual Defendants easily could have accessed this data.

171.     Furthermore CW 1 explained that SOX governance issues were entered into one of two systems—one was called Archer and another was called ServiceNow.  As CEO and CFO the Individual Defendants easily could have accessed this data.

172.     Additionally, Defendants had access to information insofar as many of the inadequate practices were plainly visible to anyone within the Company.  For example, CW 5

describes that Costco used Google sheets for "pretty much everything" including for tracking information on the onboarding and offboarding of IT employees—and that they were used as a "repository for information about employees." CW 6 similarly stated that supervisors had to "manually submit a form" to the offboarding team to terminate the contractor's access, otherwise they would stay in the system. As CW 1 explained, because this was being done in a Google spreadsheet rather than a work flow tool, there was no way to tell if it was ever actually done. This was obviously an insufficient process for a company of the scale of Costco and it was readily visible to the Defendants.

**C.      The Extensive Remedial Efforts Support an Inference of Scienter**

173.    That Costco's internal controls required such drastic remediation measures further shows Defendants knew or were deliberately reckless in not knowing of the material weakness in their internal controls related to financial reporting. Rather than personally ensuring the implementation and maintenance of effective internal controls (as they were required to do), the Individual Defendants oversaw an underfunded IT Department rife with access control and change management problems. Defendant Galanti even went so far as admitting in Costco's 4Q2018 earnings call on October 4, 2018, that the material weakness "should have been fixed" prior to the date of the call and explained: "[T]he controls weren't in place . . . We should have done a better job."

174.    On October 25, 2018, Defendants disclosed to the market the extensive measures that would be required to remediate the material weakness in their internal controls related to financial reporting. Defendants revealed that Costco's IT Department; (1) lacked a compliance oversight function; (2) lacked a training program to educate employees on ITGCs, (3) lacked a sufficient documentation program for ITGCs; (4) lacked sufficient risk assessment procedures and controls related to IT systems; and (5) lacked a sufficient ITGC review and testing plan. The fact that the IT Department ***lacked*** these basic and important safeguards supports that Defendants acted with knowledge (or were deliberately reckless) when they signed their SOX Certification and made other statements concerning the efficacy of these internal controls.

175.     The fact that these controls were lacking is a *prima facie* showing that Defendants made false and misleading statements or omissions with scienter.  Defendants could not have possibly designed and evaluated effective internal controls, and then certified as to the effectiveness of those same controls during the Class Period, when these controls never existed in the first place.  Defendants admitted that these controls only came into being at the end of the Class Period, ***after*** the material weakness was announced.

**D.      Conscious Neglect of the IT Department Supports an Inference of Scienter**

176.     Costco's conscious neglect of its IT Department further supports an inference of Defendants' scienter.  As explained in Section (See Section VI(J)), the accounts of the former employees combine to paint a picture of an IT Department in complete shambles as a result of being systematically deprived of attention and resources.

177.     Confidential witnesses collectively confirm that (1) management did not want to spend on IT and IT lacked necessary resources  (CWs 1, 2, 3, and 6); (2) security features were built in afterwards (CWs 1, and 3); Costco used antiquated IT systems (CW1) and failed to update change management systems (CW 3); (3) Costco lacked appropriate staff for Governance Risk and Compliance (CW 3) and for other departments (CW 4); (4) Costco lacked appropriate training and oversight (CWs 1, 2, 3, 5, 6, and 7); and (5) as a result, access control and change management were serious problems for the IT Department (CWs 1, 2, 3, 5, and 6).

178.     As corroboration of the former employees who stated that Defendants did not want to spend the necessary funds on the IT Department, the Individual Defendants allocated significantly less of their spending on IT than did their competitors.

179.     Simply put, an IT Department systematically deprived of resources and attention would not be able to maintain adequate internal controls.  Importantly, Defendants could not have performed even the most basic of evaluations using IT systems without knowing, or being deliberately reckless in not knowing, of the fundamental weakness in the Company's internal controls.

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

E.     **Defendants' SOX Certifications Support an Inference of Scienter**

180.     By signing the SOX Certifications the Individual Defendants asserted they

maintained a certain level of involvement or supervision over the Company's internal controls.

However, given the state of the Company's IT Department, any level of involvement or

evaluation of the IT Department would have revealed the glaring deficiencies in internal

controls.  As a result, the Defendants knew or were deliberately reckless in not knowing of the

access control and change management issues in the IT Department prior to June 6, 2018, when

Defendants assured the market their internal controls were adequate and there had been no

material changes to risks identified in their 2017 Form 10-K.

181.     Rather than failing to spot a rounding error in accounting software, or some other

similarly minor deficiency, the Individual Defendants oversaw, and asserted that they personally

evaluated, an IT Department, that by their own admission on October 26, 2018, completely

lacked an IT compliance oversight function, lacked a training program addressing ITGCs, lacked

documentation underlying ITGCs, lacked sufficient risk assessment procedures and controls, and

lacked an IT management review and testing plan to monitor ITGCs.

182.     While the CEO and CFO are allowed to delegate the actual implementation and

daily oversight of the internal controls under SOX, they are not allowed to delegate the

evaluation of those operations.  Even a cursory evaluation of Costco's IT Department prior to the

filing of the Company's 3Q2018 Form 10-Q would have revealed the glaring deficiencies in

access control and change management sprawling throughout the IT Department.

183.     Additionally, in fulfilling their duty to evaluate the Company's internal controls

and sign a certification attesting to the adequacy of those controls quarterly and annually, the

Individual Defendants would require some form of regular reports, and/or a review of the

controls put in place over financial reporting.  If the Individual Defendants were receiving

regular reports on the state of the controls that existed in the IT Department, or reviewing the

controls put in place for financial reporting they would have known, or been deliberately reckless

in not knowing, of the department-wide weaknesses and the material weakness in access control

1   and change control functions.  If the Individual Defendants were not receiving some form of

2   regular reports and/or not conducting a review of the controls put in place over financial

3   reporting then they knowingly, or at the very least, were deliberately reckless when they misled

4   the market in claiming that they designed and implemented internal controls over financial

5   reporting under SOX.

6   **IX.    LOSS CAUSATION**

7        184.   During the Class Period, as detailed herein, Defendants engaged in a knowingly,

8   or deliberately, reckless course of conduct that artificially inflated the price of Costco's securities

9   and operated as a fraud or deceit on Class Period purchasers of Costco's securities by failing to

10  reveal and misrepresenting the adverse facts detailed herein.  Later, when Defendants' prior

11  misrepresentations and fraudulently reckless course of conduct were revealed to the market, the

12  price of Costco's securities declined significantly as the prior artificial inflation was released

13  from the Company's share price.

14       185.   As a result of their purchases of Costco's securities during the Class Period, Lead

15  Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal

16  securities laws.  Defendants' false and misleading statements had the intended effect and caused

17  Costco's common stock to trade at artificially inflated levels throughout the Class Period, closing

18  at $197.66 per share on June 6, 2018 (the first day of the Class Period), closing at a high of

19  $244.21 per share on September 11, 2018, and then falling to $218.19 per share at closing on

20  October 26, 2018.

21       186.   By concealing from investors, the adverse facts detailed herein, Defendants

22  presented a misleading picture of Costco's business and internal controls.  As Defendants began

23  to reveal these adverse facts to the market, the price of Costco's securities fell dramatically.

24  From the day of the partial revelation of the truth, on October 4, 2018, to close the following day,

25  Costco's stock dropped from a closing price of $231.68 to $218.82—a 5.55% drop on heavy

26  volume of 7,379,026 shares.  On the date of the second revelation, October 26, 2018, Costco's

27  stock dropped from a closing price of $226.40 on the prior day to $218.19—a 3.62% drop on

heavy volume of 3,995,362 shares.  This decline removed the artificial inflation from the price of Costco's stock, causing economic loss to investors who had purchased Costco's securities during the Class Period.

187.    The decline in the price of Costco's securities following these revelations was a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market.  The timing and magnitude of the price declines in Costco's securities and market reactions to the news negate any inference that the loss suffered by Lead Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

188.    The economic loss, *i.e.*, damages, suffered by Lead Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme and course of conduct to artificially inflate the price of Costco's securities and the subsequent material decline in the value of Costco's securities when Defendants' prior misrepresentations and omissions and other fraudulent conduct were revealed.

## X.    APPLICATION OF PRESUMPTIONS OF RELIANCE

189.    To the extent that reliance is an element of their claims, Lead Plaintiff and the Class members are entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah* v. *United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact where there was a duty to reveal material information.

190.    To the extent that reliance is an element of their claims, Lead Plaintiff and the Class members are also entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market theory:

(a)    Costco common stock was actively traded on the NASDAQ, an informationally efficient market, throughout the Class Period;

(b)    Costco stock traded at high volumes during the Class Period;

(c)    Costco filed an annual report and quarterly financial reports with the SEC;

(d)     Costco communicated with public investors by means of established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public revelations, such as communications with the financial press, securities analysts, and other similar reporting services;

(e)     the market reacted promptly to public information disseminated by Costco, for example, the market price of Costco stock decreased by 5.5% On October 5, 2018, when the possibility of a material weakness in the Company's internal controls related to financial reporting was announced, and again decreased by 3.63% on October 26, 2018, when Costco finally revealed the extent of the material weakness in internal controls;

(f)     Costco stock was covered by numerous securities analysts employed by major brokerage firms who wrote reports that were publicly available and entered the public marketplace;

(g)     the material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Costco's securities;

(h)     without knowledge of the misrepresented or omitted material facts alleged herein, Lead Plaintiff and other Class members purchased Costco's securities between the time Defendants misrepresented or failed to reveal material facts and the time the true facts began to be revealed; and

(i)     Options in Costco's stock were actively traded in an informationally efficient market based on the value of Costco and the price of its common stock, which traded on the NASDAQ, an informationally efficient market, throughout the Class Period.

1    **XI.    NO SAFE HARBOR**

2         191.    The statutory safe harbor provided by the PSLRA for forward-looking statements

3    under certain circumstances does not apply to any of the materially false and misleading

4    statements and omissions alleged herein.

5         192.    ***First***, Defendants' statements and omissions alleged to be false and misleading

6    relate to historical facts or existing conditions, and omissions are not protected by the statutory

7    safe harbor.  Defendants' false and misleading statements and omissions alleged herein are not

8    forward-looking because such statements: (1) relate to historical or current fact; (2) implicate

9    existing conditions; and (3) do not contain projections of future performance or future objective.

10   To the extent that any of the alleged false and misleading statements and omissions might be

11   construed to touch on future intent, they are mixed statements of present facts and future intent

12   and are not entitled to safe harbor protection with respect to the part of the statement that refers

13   to the present.

14        193.    ***Second***, any purported forward-looking statements were not accompanied by

15   meaningful cautionary language because any risks that Defendants warned of had already come

16   to pass, and any cautionary language did not mention important factors of similar significance to

17   those actually realized.  Additionally, to the extent Defendants included any cautionary language,

18   such language was not meaningful because any potential risks identified by Defendants had

19   already manifested.  To the extent Defendants included any cautionary language, it was not

20   precise and did not relate directly to any forward-looking statements at issue.  Defendants'

21   cautionary language was boilerplate and did not change during the Class Period, despite the fact

22   that conditions had materially changed.

23        194.    ***Third***, to the extent that there were any forward-looking statements that were

24   identified as such, Defendants are liable because, at the time each of those forward-looking

25   statements were made, the speaker knew the statement was false when made.

26

27

BRESKIN | JOHNSON | TOWNSEND <sup>PLLC</sup>
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

1    **XII.    CLASS ACTION ALLEGATIONS**

2        195.    Lead Plaintiff brings this federal securities class action pursuant to Rule 23 of the

3    Federal Rules of Civil Procedure on behalf of himself and all persons and entities that purchased

4    Costco securities during the period from June 6, 2018 through October 25, 2018, inclusive (the

5    "Class Period") and were damaged thereby, except as excluded below (the "Class").

6        196.    Excluded from the Class are: (i) Defendants; (ii) members of the immediate

7    family of any Individual Defendant; (iii) any person who was an officer or director of Costco

8    during the Class Period; (iv) any firm, trust, corporation, or other entity in which Defendants

9    have, has, or had a controlling interest; and (v) the legal representatives, affiliates, heirs,

10   successor-in-interest, or assignees of any such excluded person, including Costco's employee

11   retirement and/or benefit plan(s) and their participants or beneficiaries, to the extent they made

12   purchases through such plan(s).

13       197.    The Class members are so numerous that joinder of all members is impracticable.

14   During the Class Period, Costco had more than 435 million common shares outstanding, which

15   shares were actively traded on the NASDAQ.

16       198.    While the exact number of Class members is unknown to Lead Plaintiff at this

17   time, and can only be ascertained through appropriate discovery, it is likely that the proposed

18   Class numbers in the thousands and is geographically widely dispersed.  Record owners and

19   other Class members may be identified from records maintained by Costco and may be notified

20   of the pendency of this action by mail, using a form of notice similar to that customarily used in

21   securities class actions.

22       199.    Lead Plaintiff's claims are typical of the claims of the Class members.  All the

23   Class members were similarly affected by Defendants' conduct in violation of the Exchange Act

24   as alleged herein.

25       200.    Lead Plaintiff will fairly and adequately protect the interests of the Class

26   members.  Lead Plaintiff has retained counsel competent and experienced in class and securities

27   litigation.

201.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Common questions of law and fact exist as to all Class members, and predominate over any questions solely affecting individual Class members.  The questions of law and fact common to the Class include, without limit:

(a)     whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period contained material misrepresentations;

(c)     whether the Defendants' statements omitted material facts that Defendants had a duty to reveal;

(d)     whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(e)     whether Defendants acted knowingly or deliberately recklessly in issuing false and misleading financial statements;

(f)     whether the price of Costco securities during the Class Period was artificially inflated because of Defendants' conduct complained of herein;

(g)     whether reliance may be presumed pursuant to the fraud-on-the-market doctrine and/or the presumption of reliance afforded by *Affiliated Ute Citizens of Utah* v. *United States*, 406 U.S. 128 (1972);

(h)     whether the individuals were controlling persons of Costco; and

(i)     whether and to what extent the Class members suffered losses due to Defendants' fraudulent conduct.

202.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because, among other things, joinder of all Class members is impracticable.  Furthermore, because the damages suffered by the individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for

members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

**Violation of § 10(b) of the Exchange Act and Rule 10b-5**
**Promulgated Thereunder Against All Defendants**
**for Violations of Section 10(b) and Rule 10b-5 Promulgated Thereunder**

203.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

204.    This Count is asserted against all Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

205.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or deliberately recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Lead Plaintiff and the other Class members; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Costco securities; and (iii) cause Lead Plaintiff and other Class members to purchase or otherwise acquire Costco securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

206.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Costco securities.  Such reports, filings, releases and statements were

1    materially false and misleading in that they failed to reveal material adverse information and

2    misrepresented the truth about Costco.

3    207.    By virtue of their positions at Costco, the Individual Defendants had actual

4    knowledge of the materially false and misleading statements and material omissions alleged

5    herein and intended thereby to deceive Lead Plaintiff and the other Class members, or, in the

6    alternative, the Individual Defendants acted with deliberately reckless disregard for the truth in

7    that they failed or refused to ascertain and reveal such facts as would reveal the materially false

8    and misleading nature of the statements made, although such facts were readily available to the

9    Individual Defendants.  Said acts and omissions of the Defendants were committed willfully or

10   with reckless disregard for the truth.  In addition, each Individual Defendant knew or recklessly

11   disregarded that material facts were being misrepresented or omitted as described above.

12   208.    Additional information showing that Defendants acted knowingly or with

13   deliberately reckless disregard for the truth is peculiarly within Defendants' knowledge and

14   control.  As the senior managers and/or directors of Costco, the Individual Defendants had

15   knowledge of the details of Costco's internal affairs.

16   209.    The Individual Defendants are liable both directly and indirectly for the wrongs

17   complained of herein.  Because of their positions of control and authority, the Individual

18   Defendants were able to and did, directly or indirectly, control the content of the statements of

19   Costco.  As officers and/or directors of a publicly-held company, the Individual Defendants had

20   a duty to disseminate timely, accurate, and truthful information with respect to Costco's

21   businesses, operations, future financial condition and future prospects.  As a result of the

22   dissemination of the aforementioned false and misleading reports, releases and public statements,

23   the market price of Costco securities were artificially inflated throughout the Class Period.  In

24   ignorance of the adverse facts concerning Costco which were concealed by Defendants, Lead

25   Plaintiff and the other Class members purchased or otherwise acquired Costco securities at

26   artificially inflated prices and relied upon the price of the securities, the integrity of the market

27

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

1   for the securities and/or upon statements disseminated by Defendants, and were damaged

2   thereby.

3        210.    During the Class Period, Costco securities were traded on an active and efficient

4   market.  Lead Plaintiff and the other Class members, relying on the materially false and

5   misleading statements described herein, which the Defendants made, issued or caused to be

6   disseminated, or relying upon the integrity of the market, purchased or otherwise acquired

7   Costco securities at prices artificially inflated by Defendants' wrongful conduct.  Had Lead

8   Plaintiff and the other Class members known the truth, they would not have purchased or

9   otherwise acquired said securities, or would not have purchased or otherwise acquired them at

10  the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff

11  and the Class, the true value of Costco securities was substantially lower than the prices paid by

12  Plaintiff and the other Class members.  The market price of Costco securities declined sharply

13  upon public revelation of the facts alleged herein to the injury of Lead Plaintiff and Class

14  members.

15       211.    By reason of the conduct alleged herein, Defendants knowingly or deliberately

16  recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-

17  5 promulgated thereunder.

18       212.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff

19  and the other Class members suffered damages in connection with their respective purchases,

20  acquisitions and sales of Costco securities during the Class Period, upon the revelation that

21  Costco had been disseminating misrepresented financial statements to the investing public.

22                                    **COUNT II**

23                        **Against the Individual Defendants**
                    **for Violations of Section 20(a) of the Exchange Act**

24       213.    Lead Plaintiff repeats and realleges each and every allegation contained in the

25  foregoing paragraphs as if fully set forth herein.

26

27

214.    During the Class Period, the Individual Defendants participated in the operation and management of Costco, and conducted and participated, directly and indirectly, in the conduct of the Costco's business affairs.  The Individual Defendants knew the adverse non-public information about Costco's misstatements because of their senior positions at the Company.

215.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information, and to correct promptly any public statements issued by Costco which had become materially false or misleading.

216.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Costco disseminated in the marketplace during the Class Period concerning the misrepresentations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Costco to engage in the wrongful acts complained of herein.  The Individual Defendants therefore, were "controlling persons" of Costco within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Costco securities.

217.    Each of the Individual Defendants, therefore, acted as a controlling person of Costco.  By reason of their senior management positions and/or being directors of Costco, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Costco to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Costco and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other Class members complain.

218.    By reason of the above conduct, the Individual Defendants and/or Costco are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

1   XIII.   **PRAYER FOR RELIEF**

2          **WHEREFORE**, Lead Plaintiff respectfully prays for judgment against the Defendants as

3   follows:

4          A.     Determining that this action is a proper class action maintained under Rule 23 of

5   the Federal Rules of Civil Procedure, certifying Lead Plaintiff as class representative, and

6   appointing Levi & Korsinsky, LLP as class counsel pursuant to Rule 23(g);

7          B.     Determining and declaring that Defendants violated the Exchange Act by reason

8   of the acts and omissions alleged herein;

9          C.     Awarding Lead Plaintiff and the Class compensatory damages against all

10  Defendants, jointly and severally, in an amount to be proven at trial together with interest

11  thereon;

12         D.     Awarding Lead Plaintiff and the Class their reasonable costs and expenses

13  incurred in this action, including but not limited to attorneys' fees and costs incurred by

14  consulting and testifying expert witnesses; and

15         E.     Granting such other and further relief as this Court may deem just and proper.

16  XIV.   **DEMAND FOR TRIAL BY JURY**

17         Lead Plaintiff hereby demands a trial by jury of all issues so triable.

18

19  Dated: April 16, 2019                    Respectfully submitted,

20                                            BRESKIN JOHNSON TOWNSEND PLLC

21                                            By:  /s/ Roger Townsend

22                                               Roger Townsend, WSBA #25525
                                                 1000 Second Avenue, Suite 3670
23                                               Seattle, WA 98104
                                                 Tel:  (206)652-8660
24                                               rtownsend@bjtlegal.com

25                                               *Local Counsel*

26                                               LEVI & KORSINSKY, LLP (Trial Counsel)
                                                 Eduard Korsinsky*
27                                               55 Broadway, 10th Floor

New York, NY 10006
Tel: (212) 363-7500
Fax: (212) 363-7171
Email:ek@zlk.com

Nicholas I. Porritt*
Adam M. Apton*
Adam C. McCall*
1101 30th St. NW, Suite 115
Washington, D.C. 20007
Tel: (202) 524-4290
Fax: (202) 333-2121
Email: nporritt@zlk.com
Email: aapton@zlk.com
Email: amccall@zlk.com
*Pro hac vice applications forthcoming

*Attorneys for Plaintiff and Lead Counsel for the Class*

LABATON SUCHAROW LLP

By:  /s/  Carol C. Villegas

Carol C. Villegas
Jake Bissell-Linsk*
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Email:    cvillegas@labaton.com
Email:    jbissell-linsk@labaton.com
*Pro hac vice application forthcoming

*Additional Attorneys for Lead Plaintiff and the Class*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

**CERTIFICATE OF SERVICE**

I certify that, on the date stamped above, I caused this document to filed with the Clerk of the Court using the CM/ECF system, which will serve all parties by emailing notice of filing to their counsel of record.

/s/ *Carol C. Villegas*
Carol C. Villegas

CONSOLIDATED AMENDED COMPLAINT
Nos. 2:18-cv-01611-TSZ

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660