The Honorable Thomas S. Zilly

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| JAMES JOHNSON, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>COSTCO WHOLESALE CORPORATION, a Washington corporation; W. CRAIG JELINEK; and RICHARD A. GALANTI,<br><br>Defendants. | No. 2:18-cv-01611-TSZ<br><br>**CORRECTED SECOND CONSOLIDATED AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>CLASS ACTION<br><br>DEMAND FOR JURY TRIAL |



BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104 Tel: 206-652-8660

# TABLE OF CONTENTS

Page


I. NATURE OF THE CLAIM ........ 1

II. JURISDICTION AND VENUE ........ 10

III. PARTIES ........ 11

A. Lead Plaintiff ........ 11

B. Defendants ........ 11

C. The Office of the CIO ........ 12

IV. CONFIDENTIAL WITNESSES ........ 13

V. CONTROL PERSON ALLEGATIONS ........ 15

VI. SUBSTANTIVE ALLEGATIONS ........ 16

A. The Nature of Costco's Business ........ 16

B. Costco's Background ........ 17

C. Growing and Maintaining a Competitive Advantage ........ 17

D. Costco's Drive to Keep Costs Down ........ 20

1. Costco's E-Commerce Expansion ........ 21

2. Costco's Below Average SG&A Spend ........ 22

E. SOX Requires Adequate Internal Controls and Directly Makes Senior Management Responsible For Those Controls ........ 24

F. The Importance of IT Controls for Public Companies ........ 30

G. Costco's Internal Controls Framework and Management's Obligations Regarding that Framework ........ 31

1. COSO Framework ........ 31

2. Components and Principles of Internal Controls Under the COSO Framework ........ 34

H. The Structure of Costco's IT Department ........ 44

I. Costco's Other Internal Control Red Flags ........ 45

J. Costco Failed to Provide IT with Adequate Attention and Resources Causing a Material Weakness in Internal Controls ........ 48




BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104 Tel: 206-652-8660

1. Costco's IT Department was Neglected and Deprived of Resources Necessary to Maintain Adequate Internal Control Processes....................49

2. The Deficiencies in IT Led to a Material Weakness in Costco's Internal Controls, In Particular with Regard to Change and Access Management..........................................................................................60

3. The Negative Information Concerning Poor IT Controls and a Weak Risk Environment Flowed Up and Was Available to Defendants; Defendants' Message Back was to Downplay IT Security And Focus on Business and Growth Instead..............................69

K. Defendants Mislead the Market About the Adequacy of Costco's Internal Controls Over Financial Reporting..........................................................76

L. Defendants Begin to Reveal the Truth About The Material Weakness in Internal Controls ..........................................................................................76

M. Defendants' Final Revelation of the Truth About Their Internal Controls Deficiencies..........................................................................................79

N. Remediation Measures Show the Severity of the Material Weakness in Internal Controls and the Falsity of the Class Period Statements..........................83

O. Post-Class Period Revelations ..........................................................................86

VII. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD.....................................................87

VIII. ADDITIONAL ALLEGATIONS SUPPORTING SCIENTER.......................................94

A. Knowledge and Duties to Investigate ..................................................................94

1. The Individual Defendants Had Oversight Duties Imposed by COSO..........................................................................................95

2. Defendants' Conscious Neglect of the IT Department Supports a Strong Inference of Scienter ..........................................................97

3. Heightened Attention was Required Upon Disbanding the Risk Management Department..........................................................97

4. Red Flags Due to Legal and Regulatory Issues .......................................98

5. Implementation of GDPR Alerted Defendants to Problems with Change Management and User Access Controls......................................99

6. Defendants Recognized SOX Deficiencies in Internal Emails................100

7. Costco's Expansion Into E-Commerce Imposed Heightened Duties ......100

8. Quarterly Review Obligations .............................................................100

9. The Individual Defendants Admitted to Evaluating Costco's Disclosure Controls and Internal Controls over Financial Reporting......101

B. Available Information Regarding the Impermissible Condition of Costco's IT Department......102

1. The Obviously Problematic State of the IT Department......102

2. The Remediation Measures Showcase the Obvious Deficiencies......103

3. Access to Information and Reports about the Deficiencies......104

C. Additional Allegations Related to Corporate Scienter......106

IX. LOSS CAUSATION......108

X. APPLICATION OF PRESUMPTION OF RELIANCE......109

XI. NO SAFE HARBOR......111

XII. CLASS ACTION ALLEGATIONS......112

COUNT I Violation of § 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants for Violations of Section 10(b) and Rule 10b-5 Promulgated Thereunder......114

COUNT II Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act......117

XIII. PRAYER FOR RELIEF......118

XIV. DEMAND FOR TRIAL BY JURY......118



BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104 Tel: 206-652-8660

By and through his undersigned counsel, Fred D. Davoli ("Lead Plaintiff") brings this complaint individually, and on behalf of a class of similarly situated persons and entities, against Defendant Costco Wholesale Corporation ("Costco" or the "Company") and Defendants W. Craig Jelinek and Richard A. Galanti (together, the "Individual Defendants," and collectively with Costco, the "Defendants").

Lead Plaintiff alleges the following upon personal knowledge as to those allegations concerning Lead Plaintiff and, as to all other matters, upon the investigation of counsel, which included, without limitation: (a) review and analysis of public filings made by Costco with the U.S. Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications, including those disseminated by certain of the Defendants and other related non-parties; (c) review of news articles; (d) interviews with former employees of Costco, its affiliates, and other third parties; and (e) consultation with individuals with expertise in accounting, information technology systems, and damages. Lead Plaintiff believes that substantial additional evidentiary support exists for the allegations herein that will be revealed after Lead Plaintiff has a reasonable opportunity to conduct discovery.

## I. NATURE OF THE CLAIM

1. Costco is a retailer that sells food and products in bulk to its members and other customers from large warehouses across the world. Costco makes money both by selling products, and by selling memberships to use these warehouses and purchase products through its website. Costco capitalizes on the economy of scale by purchasing products in large volumes at lower prices and then passing on the cost savings of bulk buying to its customers. A vital part of Costco's business model is keeping the Company's costs to a bare minimum to maintain gross margins.

2. Costco has been in business since the 1980s. Costco seemingly had a winning formula for maintaining profitability by keeping costs low while continually growing revenue. Costco prided itself on this formula, touting its ability to keep costs down while revenues grew



BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104 Tel: 206-652-8660

year after year, even amid strong competition. From the inception of the Company, Costco underwent incredible growth – growing from one store in 1983 in Washington, to 762 stores in 11 countries around the world in 2018. Costco is an easily recognized brand with millions of loyal followers. In addition to its warehouses, Costco now offers products through its website, increasing, without making "any significant investment," the unique products it offers by 500% in 2018 alone, to approximately 10,000. One thing that has remained a constant for Costco, however, is that the Company spends significantly less of its total revenue on operating expenses than its competitors, while simultaneously, and famously, paying higher wages than those competitors.

3. Costco's growth created problems. Starting in at least 2017—the year leading up to the Class Period (defined in Section XII)—Costco struggled to control its costs as the business continued to expand into new areas. According to one former employee, Costco's focus was to "grow, grow, grow" to make revenue numbers. These struggles manifested themselves in Costco's inability to manage one of its most important infrastructure systems—its Information Technology ("IT") function, with that same employee saying the IT department lacked the "personnel, technology, know-how, and focus" to handle Costco's operations. As a result of this failure, Costco's financial compliance function broke down, causing material problems for Costco's internal controls over financial reporting, and ultimately caused Defendants to issue materially false and misleading statements to the market, including in certifications made pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"). Pub. L. No. 107-204. H.R. 3763, 107th Cong. By the end of the Class Period, Defendants had disclosed that they could not ensure the accuracy of their financial reporting for the entire Fiscal Year 2018. Additionally, Defendants disclosed the remediation measures necessary to correct the material weakness, which revealed to the market that Costco's internal controls were severely lacking in fundamental ways. These remediation measures were correcting deficiencies that had been brought to the Defendants' attention throughout the years prior to the Class Period.

4. As a public company, Costco is subject to SOX, a law that was passed in 2002 in the wake of massive accounting frauds that was meant to return personal accountability to the executives at the highest levels of publicly traded companies. In summary, and as more fully described herein, the law requires that as a part of a company's public filings, the CEO and CFO of a company must certify that they have been involved in the process of designing, implementing, and evaluating the company's internal controls ("SOX Certifications"). These controls are critical to ensuring the reliability of the company's public disclosures. Thus, under SOX, the internal controls themselves are of paramount importance for any public company, and investors rely on SOX Certifications as a beacon of confidence and reliability in the accuracy of the financial metrics that get reported to the market. As a part of the SOX Certification, the CEO and CFO attest to ***personally*** evaluating the effectiveness of the company's internal controls – a task that cannot be delegated. An integral part of the CEO and CFO's evaluations are periodic internal audits, and, while not required to sign the SOX Certifications, the CIO is also an integral part of the audit process.

5. Like almost all public companies, Costco relies on its IT department, and thus the CIO and the members of his office, in large part to comply with SOX. In particular, Costco's CEO and CFO rely on accounting and compliance software and teams so that they can affirm in SOX Certifications that there are effective procedures and internal controls in place to ensure accurate financial reporting. In fact, it is understood that certification of compliance with SOX is indirectly a certification of the robustness of these processes as complying with a well-accepted (*i.e.*, "recognized") internal control framework. Defendants' obligations under the Internal Control – Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO Framework") are detailed below. The COSO Framework requires management to set a "tone at the top" of the organization that prioritizes ensuring effective internal controls and adequately staffing and training the IT department. Additionally, the COSO Framework tasks the Board of Directors ("Board"), including the Individual Defendants, with a litany of monitoring obligations related to the Company's internal controls.

Notably, according to a former employee from Costco's IT department during the Class Period, Defendant Jelinek approved the budget, a budget which only provided for an understaffed and underfunded IT department.

6. At Costco, the IT department fell under the supervision of Chief Information Officer ("CIO") Paul Moulton and the Office of the CIO. As confirmed by former employees, SVP of Information Systems Jim Rutherford and VP of Information Security Tim Bowersock both reported directly to CIO Moulton, were members of the Office of the CIO, and met regularly with employees in the IT department. Additionally, Bowersock and one of his direct reports attended the quarterly meetings of the Board's Audit Committee. Further, CIO Moulton met almost weekly with Defendant Jelinek to discuss the IT department. Notably, according to a former employee in Costco's IT department, "everything IT-wise" went through CIO Moulton.

7. The importance of the IT department to the Company's internal controls is magnified by the size and complexity of Costco's operations. In 2018 alone, Costco reported revenues in the amount of nearly $140 billion from its more than 760 warehouses and e-commerce operations, as well as more than $3 billion in membership fees from its more than 94 million members, all while rapidly expanding its e-commerce operations. Thus, the efforts to make sure financial information is being reported accurately to the market, whether quarterly or annually, is a huge undertaking for a company in Costco's position, requiring working software, internal audits, internal checks and documentation, sufficient funding, robust training, an effective and well-managed IT team, and the direct attention of the Company's top executives. This significant undertaking is not optional, nor a matter of business judgment: compliance with the SOX legal regime is federal law.

8. In light of all this, the Individual Defendants signed SOX Certifications quarterly and annually, including during the Class Period, from June 7, 2018 through October 25, 2018 inclusive, confirming to the market that they conducted a comprehensive evaluation of Costco's internal controls and that Costco had complied with their obligations under the COSO Framework to ensure the integrity of their financial statements. They also assured the market


BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104 Tel: 206-652-8660

that the Company had effective internal controls over the Company's financial reporting such that the Company was able to ensure that the information was accurate. Most importantly, these SOX Certifications communicated to the market that the Individual Defendants had personally reviewed the effectiveness of the Company's internal controls.

9. However, unbeknownst to the market but known to Defendants, Costco did not have sufficient practices and procedures in place to make sure that its financial reporting function was secure. Numerous former employees of the Company collectively confirm that in the years and months leading up to the Class Period (and during the Class Period), Defendants reinforced the Company's growth-first culture, and systematically and consciously deprived Costco's IT department of adequate resources. The accounts of former employees converge to describe an attitude at the top of Costco that was hostile to the IT department, and one that consistently prioritized growth, to the detriment of the IT department. For example, former employees stated that spending on the IT department was viewed as a "necessary evil," and that the IT department was an "afterthought," a mere "cost center," and had "no oversight" and "no process." Another former employee said that Costco spent significantly less than the industry average of its IT budget on security, a budget which had to be approved by Defendant Jelinek. In short, in an effort to manage costs to seem more profitable, Costco sacrificed IT – a department Costco's management saw as a waste of money, resources, and time. The IT department, however, was more than just a "cost center;" it was necessary to ensure SOX Certifications were true (despite Costco tasking only a single employee with collecting evidence for the SOX audits), and it was necessary to make sure there were no material weaknesses in internal controls related to financial reporting.

10. Given that former employees of Costco collectively confirm that the IT department was disorganized, lacked training, and lacked funding, it is no surprise that Costco had substantial deficiencies regarding governance, access, and change management controls. Access and change management controls are particularly important, as they control who could access and change internal financial data that would ultimately be published to the market. For


BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104 Tel: 206-652-8660

example, one former employee was able to embezzle nearly $300,000 over the course of at least five years by logging false accounting entries – something that should be impossible with properly functioning internal controls. Another former employee stated that issues related to processes, access management, and governance controls were identified as having deficiencies ***throughout the whole IT department***. In addition to the meetings between members of the Office of the CIO noted above, another former employee said he attended once a month meetings with vice presidents ("VPs") where he raised concerns related to user access and change management process issues, but nothing was ever done. Former employees also said the Company's failure to establish adequate change management processes led to unauthorized user access to Costco's IT systems.

11. One former employee said a "baffling" number of former contractors were listed in the Company's records as still having access to Costco's systems, and that some contractors were never offboarded at all. Additionally, access for employees and third party contractors in the IT department were tracked in spreadsheets, which relied on manual processes and were easy for employees to change, or for required changes to fail to be made. Another former employee described the average Costco employee as having hundreds of group associations, while in a typical company that number was only around 40 or 50. Additionally, a former employee said access issues were a "common occurrence" at Costco, and another explained that the access issues meant the Company had to "scramble" to try and address any issues before auditors came in. These access and change management control deficiencies represented a material weakness in Costco's internal controls (***with a "material weakness" being the most severe form of internal control deficiency***).

12. Another former employee discussed proposed solutions for Costco's change management and user access issues that Defendants failed to implement in the years leading up to the Class Period; at least one proposed solution was approved directly by CIO Moulton. Yet, despite the fact that the former employee said those proposed solutions would have prevented the material weakness in internal controls Defendants disclosed at the end of the Class Period,

neither of those strategies were ever implemented. Another former employee described a failed attempt by Defendant Jelinek in early 2017 to prompt action from employees on SOX compliance issues, but Defendant Jelinek gave up after four or five emails without anything being done or following up any further. Defendant Jelinek gave up despite knowledge of actual SOX compliance issues, evidencing a clear failure in setting a "tone at the top" to prioritize effective internal controls. These access and change control deficiencies were also documented internally in a 50-page report by a contractor who performed an audit for the IT department in 2017—yet Defendants did nothing to remedy these weaknesses. In addition to the 50-page report that documented these material deficiencies in access and change control that existed as early as mid-2017, prior to and throughout the Class Period, Defendants also had easy access to databases that logged internal controls issues.

13. Defendants were given plenty of reasons to carefully evaluate the available information about the IT department in the months and years leading up to, and during the Class Period. Among those reasons were: (a) the Individual Defendants' personal and non-delegable obligations under the COSO framework and regime established by SOX; (b) the Individual Defendants' awareness of the highly-risky shoestring budget Costco's IT department was operating on; (c) the Individual Defendants' awareness that the IT risk management department was disbanded in mid-2017; (d) the Individual Defendants' awareness that, even before the Class Period, the weak condition of the IT department lead to regulatory actions leading to multi-million dollar settlements and over a hundred million dollars in remedial activity, and that the weak controls enabled an embezzlement scheme to take place within Costco; (e) that problems with change management and user access were known by the Individual Defendants, due to the discussion of those issues as part of GDPR implementation; (f) that Defendant Jelinek had emailed internally about SOX compliance issues in early 2017; and (g) that Costco's expansion into e-commerce carried heighted risks requiring additional oversight.

14. Upon any meaningful review into the IT department (except perhaps one that was deliberately reckless), the Individual Defendants would have seen the obviously problematic

condition of the department—including its use of "antiquated" technology, manual processes, the transparently inappropriate use of "google sheets" for "for pretty much everything," including the onboarding and off boarding of IT department employees and who should have access to given programs, and which included a "baffling" number of former contractors who were still listed as employees who should have access. Additionally, as detailed below, they would have seen that Costco ***lacked*** even basic components of COSO compliant IT programs, such as a compliance oversight function and a training program to educate employees on ITGCs. These were not merely *deficient*, but were (by Costco's own later admission) simply not in place at all. Other core aspects of the program were deficient, including a sufficient documentation program for ITGCs, sufficient risk assessment procedures and controls related to IT systems, and a sufficient ITGC review and testing plan. Defendants also had access to several readily available reports and data sources that would have detailed the compliance issues that they were ultimately required to disclose.

15. One former Senior Analyst at Costco confirms that Defendants ***actually knew*** about the internal control problems in the months leading into the Class Period, and that the Board was kept apprised of these issues as well. This former employee said that Costco's weak internal controls "got Board attention," including Defendants Jelinek and Galanti, because of the concerns over weak internal controls, and that Defendants Jelinek and Galanti were involved in conversations related to a material weakness in Costco's IT department beginning in February/March 2018 - ***just 3 months before the Class Period began***.

16. Despite this knowledge, Defendants shockingly, and deliberately recklessly, affirmed just three months later in their 3Q2018 Form 10-Q on June 6, 2018, that their internal controls over financial reporting were effective, and that there were no material weaknesses related to those controls

17. Defendants' failure to dedicate adequate oversight and resources to its IT department caught up with them in a very real way. On October 4, 2018, after the markets closed, Defendants announced that Costco "expects to report a material weakness in internal


BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104 Tel: 206-652-8660

control[s]" for financial results reported as of September 2, 2018. A material weakness in internal controls is a deficiency, or combination of deficiencies, in internal controls such that it is reasonably possible that a material misstatement of the Company's quarterly or annual reporting will not be prevented or detected on a timely basis. On that call, Defendant Galanti admitted that "the controls weren't in place," "we should have done a better job," and "[the material weakness] should have been fixed." The market was rattled by this announcement, and responded with comments that Costco reported a "'material weakness in internal control' that spooked investors." Costco's closing stock price dropped on this news from $231.68 on October 4, 2018, to $218.82 on October 5, 2018, a drop of 5.55% on heavy volume, despite the Company beating analysts' estimates for earnings per share and revenue for 4Q2018. But the market was still unaware of the full extent of the problem and what it would take to fix, with Bloomberg noting that "a company official, [Defendant Galanti], was cryptic on [his] call with analysts," and another reporter noting that "[i]n a ***vague*** statement, the warehouse indicated that the access issue involved both internal employees and contractors."

18. On October 26, 2018, Defendants revealed the true extent of the problem, explaining that the internal control deficiencies were substantial and ***would likely take the entire fiscal year to fix***. They also explained that Costco was instituting significant remedial measures to deal with its material weakness in internal controls. The remedial measures included implementing: (1) a compliance oversight function; (2) a training program on internal controls; (3) a documentation program on internal controls; (4) enhanced risk assessment procedures and controls for IT systems; and (5) a sufficient internal control review and testing plan. The significance of these remedial measures is twofold. First, they serve as admissions by Defendants that these measures were ***not*** in place during the Class Period, thus serving as confirmation that Defendants' SOX Certifications and other statements about internal controls were false and misleading when made. Second, as noted above, they serve as corroboration that Defendants were (at a minimum) deliberately reckless in signing the SOX Certifications because they did not have these measures in place to begin with. In other words, Defendants were not in

a position to make a few tweaks to their existing controls, they had to develop and implement fundamental ITGCs and related programs from scratch.

19. On this news, Costco's stock dropped again, from a closing price of $226.40 on October 25, 2018, to $218.19 on October 26, 2018, a 3.63% drop on heavy volume. Notably, it took Costco a full fiscal year to remediate the material weakness in its internal control over financial reporting. As a result of Defendants' fraud, Lead Plaintiff and Class members suffered hundreds of millions of dollars in losses.

## II. JURISDICTION AND VENUE

20. This complaint alleges claims which arise under (1) Section 10(b) of the Securities Exchange Act (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5; and (2) Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

21. This Court has subject matter jurisdiction over this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331. During the Class Period, Costco was incorporated in the state of Washington, listed its stock on the NASDAQ, and maintained its global headquarters in Issaquah, Washington. During the Class Period, both of the Individual Defendants were members of Costco's senior management.

22. Venue is proper in this judicial district pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b). Costco maintained its global headquarters in Issaquah, Washington, which included the Company's executive offices. During the Class Period, each of the Individual Defendants were members of Costco's senior management.

23. In connection with the acts alleged in this complaint, Defendants, directly, or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, interstate email communications, and the facilities of the NASDAQ.

## III. PARTIES

### A. Lead Plaintiff

24. Lead Plaintiff Fred D. Davoli ("Lead Plaintiff") is an individual who resides in the United States. As set forth in his PSLRA certification (*see* ECF No. 15), Lead Plaintiff purchased Costco securities during the Class Period and suffered damages as a result of the securities law violations alleged herein.

### B. Defendants

25. During the Class Period, Defendant Costco was a publicly traded company, and it's common stock was listed on the NASDAQ under the ticker COST. It is incorporated in Washington, with its headquarters in Issaquah, Washington. Costco sells goods out of its large warehouse stores to its members and other customers, as well as through its website. In Fiscal Year ("FY") 2018, encompassing the Class Period, the Company had net sales of more than $130 billion and took in membership fees of over $3 billion. As of its 2018 Annual Report, Costco operated 762 warehouses and employed nearly 250,000 people in countries around the world. In FY 2019, Costco had net sales of nearly $150 billion and took in membership fees of more than $3 billion. As of its 2019 Annual Report, Costco operated 782 warehouses and employed more than 250,000 people in countries around the world.

26. Defendant W. Craig Jelinek ("Jelinek") is Costco's Chief Executive Officer, President, and a member of Costco's Board of Directors ("the Board"). He started with Costco in 1984 and has served in a number of roles with Costco, including Executive Vice President and COO of Merchandising. Defendant Jelinek has been in his current role as CEO since 2012 and President and a member of the Board since 2010. As a member of the Board, Defendant Jelinek attended the Board meetings during the Class Period. During the Class Period, Defendant Jeninek signed SEC filings and made public statements to the market about Costco's operations and compliance with SOX.

27. Defendant Richard A. Galanti ("Galanti") is Costco's Chief Financial Officer, an Executive Vice President, and a member of the Board. Defendant Galanti started with Costco in

1984 and has served in a number of roles with Costco, including Vice President of Finance and Treasurer. Defendant Galanti has been in his current role as CFO and Executive Vice President since October of 1993, and a member of the Board since 1995. As a member of the Board, Defendant Galanti attended the Board meetings during the Class Period. During the Class Period, Defendant Galanti signed SEC filings and made public statements to the market about Costco's operations and compliance with SOX. As CFO, Galanti would have attended audit committee meetings and participated in the audit process at Costco.

**C. The Office of the CIO**

28. Paul G. Moulton is Costco's Chief Information Officer and an Executive VP. Moulton has been in that role since 2010 and was promoted from his role as Executive VP of Information Systems. Moulton reported directly to Defendant Galanti. In his role as CIO, Moulton is responsible for all of the technology and information systems of Costco. Additionally, as CIO, Moulton, and his office, would have been heavily involved in the SOX audit process. Moulton was listed as an "executive officer" of Costco in the Company's 2019 Annual Report.

29. James W. Rutherford is a Senior Vice President of Information Systems with Costco, and has been in that role since July 2016. In that role, Rutherford attended meetings for Costco's IT department, and reported directly to CIO Moulton. Additionally, Rutherford was responsible for reviewing and approving all change management requests.

30. Tim Bowersock is a VP of Information Security and Compliance with Costco, and, according to his LinkedIn profile, "a member of the Office of the CIO." In his role as a member of the Office of the CIO, Bowersock reported directly to the CIO Moulton, met with Defendant Jelinek monthly to discuss the IT budget, and attended the audit committee meetings on a quarterly basis. As VP of Information Security and Compliance, Bowersock is responsible for the IT department's risk management function.



BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104 Tel: 206-652-8660

## IV. CONFIDENTIAL WITNESSES

31. Lead Plaintiff through his agents interviewed a number of former employees of Costco in order to investigate his claims. Described below in this Section are eight such former employees who provided information to support the fraud alleged herein. Based on these former employee accounts, described in Section VI(J), Lead Plaintiff believes substantial additional documentary and testimonial evidence exists to support his claims.

32. Confidential Witness 1 ("CW 1") was employed by Costco from 2015 until September of 2018. He[1] was a Senior Compliance Analyst at the Company's headquarters in Issaquah, Washington. CW 1 reported to a Manager of Information Security and Governance Risk Compliance Gokol Krishnan, who reported to Manager of Information Security Compliance and Identity and Access Management Susan Milroy, who reported to VP of Information Security and Compliance Tim Bowersock. Through this role in IT, CW 1 was responsible for the Company's compliance with various privacy regulatory regimes, including GDPR, Payment Card Industry Security Standards ("PCI"), the California Consumer Privacy Act, and, to a lesser extent, compliance requirements under the Health Insurance Portability and Accountability Act of 1996 ("HIPPA") and SOX. CW 1 stated that SOX compliance was a function of the IT department generally but the responsibility fell primarily to a single employee, Barbara Egner.

33. Confidential Witness 2 ("CW 2") was employed by Costco from at least 2015 until mid-2018. He was employed in the IT department at the Company's headquarters in Issaquah, Washington. CW 2 reported through a chain that went up to Bowersock. Through this role in IT, CW 2 had insight into issues affecting IT security.

34. Confidential Witness 3 ("CW 3") was employed by Costco as a consultant from April 2017 until the end of May 2017 at the Company's headquarters in Issaquah, Washington

---

[1] All CWs will be described and referred to in the masculine to protect their identities.



BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104 Tel: 206-652-8660

and reported to Jeremy Guerrero, the Manager of Global SAP[2] Platform Security and Compliance, Ryan Ladd, a Director of Global SAP Platform Services, and Dave Miller, a Global SAP Platforms and Services Manager. CW 3 worked primarily on SAP Application Security Assessment. Through this role in Costco's IT department, he was primarily responsible for performing an assessment of various aspects of the Company's IT department, including, but not limited to, Basis, Change Management, Internal Audit, Identity Access Management, and User Access Administration.

35. Confidential Witness 4 ("CW 4") was employed by Costco as a contractor engaged for an SAP implementation project from May 2018 until November 2018 at the Company's headquarters in Issaquah, Washington and reported to Dana Cook who reported to Project Manager Cindi Dear. He worked in Quality Assurance ("QA") testing and was promoted to a Defect Lead in August of 2018. Through this role in Costco's IT department, CW 4 was initially responsible for QA testing and then overseeing other workers in that area.

36. Confidential Witness 5 ("CW 5") was employed by Costco as an IT Contract and Vendor Manager in their IT department from July 2017 until July 2018 at the Company's headquarters in Issaquah, Washington and reported to Jill Hendrick, a Manager in Vendor and Contract Management, Finance and Planning, who in turn reported to Kristian Erickson, an IT Director, who in turn reported to Vice President Chris Rylance, who in turn reported to Rutherford. Through his role with Costco's IT department, CW 5 was primarily responsible for working as part of a program assessing Contracts Procurement Asset Management ("CPAM"), which provided recommendations to improve Costco's IT contracts procurement process.

37. Confidential Witness 6 ("CW 6") was employed by Costco as a Compliance Analyst from 2012 until August 2018 at the Company's headquarters in Issaquah, Washington,

---

[2] SAP refers to a company that offers a wide range of business software that allow a company to track its various parts of its operations, including inventory, revenues, and change management.

and reported to Michel Chambers, a Manager who reported to IT Director Terry Patane, who reported to Bowersock. Through his role in Costco's IT department, CW 6 was primarily responsible for assessing security controls by collecting evidence.

38. Confidential Witness 7 ("CW 7") was employed by Costco as a Senior Business Analyst from late 2014 until July of 2018 at the Company's headquarters in Issaquah, Washington and reported to IT Manager Ramon Nichols who reported to IT Director Laine Seeley, who in turn reported to Terry Williams, a Global Supply Chain VP. Through his role in Costco's IT department, CW 7 was primarily responsible for working with outside consultants on vetting requirements for new systems designs.

39. Confidential Witness 8 ("CW 8") was employed by Costco in their IT department throughout the Class Period, in architecture roles throughout his tenure. He worked 2-3 levels below the Office of CIO in multiple departments. Given his position at Costco, CW is aware that Bowersock and CIO Moulton were advised on information security, compliance and risk management issues. As part of his role, CW also identified risks and provided remediation activities.

## V. CONTROL PERSON ALLEGATIONS

40. The Individual Defendants, by virtue of their senior positions at Costco, directly participated in the management of the Company, were directly involved in day-to-day operations of the Company at the highest levels, and were privy to confidential, proprietary information concerning the Company and its business, operations, internal controls, growth, IT spending, financial statements, and financial condition, as alleged herein. As set forth below, the distribution of misleading information and the failure to convey material information to the public was the result of their collective actions and inactions.

41. Defendant Galanti signed the Company's Form 8-K filed on October 4, 2018, and both of the Individual Defendants signed Costco's 2017 Form 10-K filed on October 18, 2017, the Company's 3Q 2018 Form 10-Q filed on June 6, 2018, the Company's 2018 Form 10-K filed

on October 26, 2018, and the SOX Certifications accompanying those Form 10-Ks and that Form 10-Q.

42. The Individual Defendants knew that the Company was deliberately reckless in failing to provide the IT department with adequate resources, were aware of the deficiencies in the internal controls, and were at least deliberately reckless in not knowing that these deficiencies rose to the level of a material weakness. As the top two executives in the Company, the Individual Defendants had substantial influence and control over the spending and operations of the Company. Through their roles at the Company and as the signatories on the Company's SOX Certifications, the Individual Defendants were personally responsible for the implementation and operation of effective internal controls related to financial reporting.

43. Through these and other forms of participation and control, the Individual Defendants had substantial influence over Costco, the information it distributed, and the actions it engaged in.

## VI. SUBSTANTIVE ALLEGATIONS

### A. The Nature of Costco's Business

44. Costco and its subsidiaries operate membership warehouses that offer members low prices on a limited selection of nationally-branded and private-label products in a wide range of merchandise categories. Costco buys and sells many of its products in bulk, and capitalizes on the economy of scale—in other words, Costco is able to purchase products at a lower per-unit cost when they are purchased in large quantities, and passes on that bulk cost savings to its members. The Company endears itself to its customers through its no-frills warehouses, low prices, and popular deals in the food courts of the warehouses.

45. Costco makes money by selling products in its warehouses and by selling memberships to individuals and companies. The memberships allow the members to shop in the warehouses and through the website. Historically, the Company has made approximately 98% of revenue from sales of its goods and 2% of its revenue from membership fees.

**B. Costco's Background**

46. Costco was born of the marriage between two companies—Costco and Price Club. Costco and Price Club both started out small and quickly became successful warehouse clubs.

47. Costco in its current iteration was formed when Price Club and Costco merged in 1993, forming PriceCostco. That year alone, PriceCostco had over 200 membership warehouses, annual sales of more than $15 billion, 18 million members, and 43,000 employees. PriceCostco officially changed its name to Costco Companies, Inc. in 1997, and assumed its current name, Costco Wholesale Corporation in 1999. Since the merger, Costco has become the self-proclaimed "world's most successful warehouse club." In 2018, the Company was responsible for more than $138 billion in sales revenue.[3]

48. For the period ended November 24, 2019, Costco operated 785 warehouses worldwide: 546 in the United States (U.S.) located in 44 states, Washington, D.C., and Puerto Rico, 100 in Canada, 39 in Mexico, 29 in the United Kingdom (U.K.), 26 in Japan, 16 in Korea, 13 in Taiwan, 11 in Australia, two in Spain, and one each in Iceland, France, and China. The Company operates e-commerce websites in the U.S., Canada, Mexico, U.K., Korea, Taiwan, and Japan.

**C. Growing and Maintaining a Competitive Advantage**

49. Costco operates in a highly-competitive industry driven by high revenue but tight margins. As a warehouse wholesaler, the Company maintains a no-frills culture and attracts customers by keeping prices down. Its market position and value depend on being able to operate successfully on a massive scale, while keeping costs low. The Company's efforts to keep operating costs down takes many forms. For example, the Company carries fewer unique

---

[3] The Company operates on a 52/53 week fiscal year basis, with the fiscal year ending on the Sunday closest to August 31. Fiscal 2018 is a 52-week year ending on September 2, 2018. References to the third quarters of 2018 and 2017 relate to the 12-week fiscal quarters ended May 13, 2018, and May 7, 2017, respectively. References to the first thirty-six weeks of 2018 and 2017 relate to the thirty-six weeks ended May 13, 2018, and May 7, 2017, respectively.

products than its competitors, and the Company maintains a leaner infrastructure than its competitors—Defendant Jelinek has boasted about furnishing his boardroom with faux-wood tables and not spending on a public relations staff. Perhaps most famously, Costco does not even offer customers shopping bags. Costco prioritizes passing savings onto its customers in the form of lower prices and, therefore, corporate growth depends on increasing revenue through expansion while maintaining a no-frills operation.

50. The Company has grown its warehouse operations from a single location at its founding in 1976 to more than 200 warehouses at the time the Costco/Price Club merger was completed in 1994. Between 1994 and the start of the Class Period, Costco opened 528 new stores, representing a nearly 340% growth of its warehouse locations. During this same time, employee headcount grew from approximately 47,000 to approximately 245,000 representing, an increase of over 500%.






51. Membership has also grown precipitously over the years. The Company reported more than 80 million members in 2015 and more than 94 million in 2018. As noted in their 2017 Form 10-K, Costco placed an emphasis on their ability to "maintain membership loyalty" and noted that "[m]embership loyalty and growth are essential to our business model."




52. The growth in the size and complexity of Costco's operations is also evidenced in the steady increase in the Company's net revenues. As noted above, at the time of the merger in 1994, Costco had approximately $15 billion in annual net sales, and that number had already increased to nearly $18 billion in 1995. Over the next 20 years, the Company's annual net sales increased more than six times that number, reaching more than $113 billion in 2015. As noted above Costco reported more than $138 billion in net sales in 2018 and additionally reported more than $3 billion in revenue from membership fees.





BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104 Tel: 206-652-8660

53. Throughout its history Costco has impressed analysts by continuing to grow while maintaining low costs. For example, on October 1, 2015, Cowen and Company explained that it was "most encouraged that COST's market potential continues to grow as its brand awareness" grows. A February 2, 2018, report from JP Morgan indicated that "[o]n top of the expansive international opportunity, COST remains a differentiated story (particularly in consumer staples) with high single digit revenue growth potential." On May 24, 2018, less than two weeks prior to the start of the Class Period, Barclays stated that Costco was "operating from a position of strength and has meaningfully widened the gap on share gains and execution relative to peers."

**D. Costco's Drive to Keep Costs Down**

54. Costco has repeatedly stated that its financial performance depends "heavily" on its ability to control costs, which it strives to do through a "never ending quest for efficiency." In a presentation to the Issaquah Chamber of Commerce on April 12, 2018, Defendant Jelinek noted that growth was absolutely critical to maintaining Costco's share price and keeping investors happy. However, Costco as a company also had higher than average salary expenses and a generous return policy. Defendant Jelinek noted that Costco historically had a difficult time convincing investors to accept its high wage-related expenses, especially given the Company's focus on low-costs. But Defendant Jelinek stated on April 12, 2018, that the Company had "gotten past that because [it] has been able to grow the business." In order to maintain margins while simultaneously maintaining growth sufficient to satisfy investors, however, the Company had to keep expenses down in areas other than wages and product costs. According to the Company's 2018 Form 10-K, Costco spent approximately 90% of its operating expenses on product costs, which left only 10% for all other operating expenses, which includes Costco's famously high wages and employee benefit costs.

55. The market often referred to Costco as a "long moat" or "wide moat" company, meaning that the Company's fanatical dedication to keeping down costs allowed it to build up a significant competitive advantage over other retailers. Costco continually impressed investors by maintaining comparatively low selling, general and administrative ("SGA") spending even while


BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104 Tel: 206-652-8660

competitive factors put pressure on the Company. On March 1, 2018, Deutsche Bank Markets Research stated Costco's "competitive moat [was] under greater threat while its digital platform lags peers." However, on March 2, 2018, Macquarie Research noted that while competitive factors had begun to create concern, Costco "continue[d] to have a wide moat around its business" given the Company's margins and other factors. Additionally, on March 8, 2018, RBC Capital Markets noted Costco had "significant competitive moats" due to their business model. On August 21, 2018, an Oppenheimer report even went so far as to say Oppenheimer "believe[d] COST has one of the most defensible moats in all of retail." Further, on September 10, 2018, BMO Capital Markets noted that Costco's "valuation could expand as the company widens its competitive moat with a deeper digital relationship with its loyal customer base."

56. As noted above, Costco has less room to cut costs than its competitors due to its high labor and benefits costs, and as noted below the tiny portion of its budget available for expenses not related to product costs.

### 1. Costco's E-Commerce Expansion

57. On March 8, 2018, Guggenheim Securities, LLC issued an analyst report titled "COST - 2Q, February Strong But Compares Get Tougher and Valuation Is Full—Neutral," which warned of a potential slowdown in Costco's year-on-year sales comparisons, but also noted that if the Company's "ongoing efforts around value, fresh food, and e-commerce are successful, the slowdown could be modest." Additionally, on April 12, 2018, Wells Fargo Securities, LLC issued an analyst report for Wells Fargo Securities, LLC titled "COST: Robust Sales Momentum Continues," which stated that Wells Fargo saw "headwinds brewing for Costco," and that "[m]omentum looked poised to decelerate." Notably, one cause for Wells Fargo's concern was that "ramping digital investments by traditional retailers are causing e-commerce concerns to creep into the picture."

58. The Company's belated expansion into e-commerce strained its antiquated and disorganized IT department. While "Costco ha[d] been slow to embrace e-commerce," as of the spring of 2018, the Company "ha[d] started to take it seriously." Additionally: "Costco


BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104 Tel: 206-652-8660

executives have started to view e-commerce as a necessary component of the company." However, despite the competitive pressures, the fact that executives saw e-commerce as a "necessary component" of the Company's operations, and that between April 2018 and October 2018 alone, Costco increased the number of SKUs available online by approximately 500% (from approximately 2,000 to around 10,000), the Company still has not "invest[ed] significantly in e-commerce operations."

### 2. Costco's Below Average SG&A Spend

59. As of the end of FY 2018, Costco spent about 90% of its operating budget on product costs and only about 10% on SG&A spending, which consists of a company's costs not related to making a product or performing a service, including IT costs and employee-related expenses like salary and benefits. Costco has publicly acknowledged that "[b]ecause our business is operated on very low margins, modest changes in various items in the income statement, particularly merchandise costs and selling, general and administrative expenses, can have substantial impacts on net income." Thus, Costco was incentivized to keep SG&A down in an effort to keep net income up. Coupled with Costco's continued high wage expense, this left only a small percentage of operating expenses for IT spending (a subset of the SG&A spend).

60. More specifically, using information provided by Costco, CWs and conservative assumptions, the following chart shows how little of the SG&A budget was available for IT:

| Expense Type | **Expense Amount** |
|---|---|
| Full-Time Non-IT Wages | $6.36 billion[4] |
| Part-Time Non-IT Wages | $2.52 billion[5] |

[4] According to the Company's 2018 Form 10-K, Costco employed 245,000 individuals in 2018; 143,000 full-time and 102,000 part-time. It is known that only about 1,600 of the employees were in the IT department—and one can make the conservative assumption that all of them worked full time. Approximately 90% of Costco's employees are paid hourly, and according to Defendant Galanti, as of October 2018 Costco paid an average hourly wage of $22.50. Presumably, the 10% of Costco workers that are paid a salary are paid at least as well as the average hourly employees and presumably the average full-time employee works 50 weeks each year. Based on those inputs, full-time employees cost the Company about $6.36 billion, calculated at 141,400 (full-time employees outside the IT department is 143,000 - 1,600 = 141,400) x ($22.50/hr x 40 hrs/wk x 50 wks/yr).

| | |
|---|---|
| Health Benefits for Non-IT Employees | $3.22 billion[6] |
| Leases | $0.27 billion[7] |
| **Total** | $12.38 billion |
| Reported SG&A Expense | $13.88 billion |
| **Remaining** | $1.50 billion |

61. According to Computer Economics, a publication that provides metrics on IT management, retailers typically spend between 1.2% to 3% of their total revenue on IT expenses, with larger companies in the industry typically spending towards the higher end of the range. For Costco, 1.2% of total revenue in 2018 was $1.7 billion—meaning that even if the **entire** remaining SG&A budget went to the IT department, Costco would be about $198 million short of the bottom of the range for its industry's IT spending. And this assumes that it was spending **nothing** on all other employment costs, including 401(k) contributions, marketing, advertising and promotional costs, insurance costs, legal costs, regulatory settlements, office supplies, utilities, credit and debit card processing fees, and any other operating or employment expenses not related to product cost. The overwhelmingly likely inference here, is that Costco was funding its IT department at far below the industry average, a point that is corroborated by the CWs referenced herein.

62. In fact, SG&A as a percent of sales stands out among Costco's financial metrics as one that has not grown in any meaningful way through the Company's history, despite consistently rising wages. In 1995, years before technology began to dominate both business and

[5] Costco has disclosed that part-time employees at Costco work between 20 and 24 hours per week, and assuming that each employee worked at the middle of that range, and using the same assumptions as in the prior footnote, it can be estimated that Costco spent $2.52 billion on its 102,000 part-time employees, calculated at 102,000 x ($22.50/hr x 22 hrs/wk x 50 wks/yr).

[6] According to the Kaiser Family Foundation, the average annual cost for an employer-sponsored healthcare plan in 2018 was $19,616. According to the Seattle Times, Costco's employee healthcare plans "leads the retail industry." Costco pays 90% of its employees' annual premiums and offers health insurance to its part-time employees for an annual cost of approximately $17,654 per employee. Assuming that three-quarters of the Company's employees enroll in Costco's health insurance plan, the benefit cost would be approximately $3.22 billion, calculated at ((245,000 employees - 1,600 IT employees) x .75) x $17,654/yr.

[7] Disclosed on Costco's 2018 annual report.

daily life, Costco's SG&A as a percent of net sales was just under 9%. In 2018, when technology is all but unavoidable, Costco's SG&A as percent of net sales was barely over 10%, similar to the Company's average spending over the past five years. For perspective, in Costco's 2018 Form 10-K, Defendants identified similar public companies as competitors, including four companies with publicly available data on SG&A spending going back at least five years; (1) Amazon.com, Inc. ("Amazon"); (2) The Kroger Co. ("Kroger"); (3) Target Corp. ("Target"); and (4) Walmart Inc. ("Walmart").[8] Each of those companies averaged greater than 15% of SG&A as percent of net sales and Target and Walmart each averaged greater than 20%. While over the past three years, each of those companies have increased their SG&A as a percent of net sales, Costco has inexplicably decreased that percentage.




### E. SOX Requires Adequate Internal Controls and Directly Makes Senior Management Responsible For Those Controls

63. As a public company, Costco was subject to certain financial reporting and auditing obligations. In particular, Costco was subject to SOX, which imposes specific

[8] Defendants also listed BJ's Wholesale Club Holdings, Inc. ("BJ's"). BJ's is not included in the chart because in the only Form 10-K available the data only went back to 2016, but in the year prior to 2018 for which data is available BJ's SG&A spending was approximately 16% of net sales.


BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104 Tel: 206-652-8660

obligations on companies and senior executives to maintain proper internal controls over financial reporting, and imposes upon the CEOs and CFOs of public companies a duty to affirmatively state in a company's public filings that the company's internal controls are adequate and that they have personally evaluated them. Additionally, the CIO plays an important role in the information-gathering and audit functions to ensure the CEO and CFO have adequate information.

64. To understand the specific requirements imposed by SOX—and what it means to state that "internal controls" are adequate—it is helpful to understand the context in which SOX was passed.

65. Prior to SOX, under Section 13(b)(2) of the Exchange Act (15 U.S.C.A. § 78m(b)(2)(B)), issuers of publicly registered securities were required to "devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances" that transactions are recorded as necessary: (i) to permit the preparation of proper financial statements; (ii) to maintain accountability for assets; (iii) so that access to assets is permitted only in accordance with management's general or specific authorization; and (iv) so that the recorded accountability for assets is compared with actual assets at regular intervals and appropriate action is taken with respect to any difference.

66. On March 6, 2002, President Bush announced ten directives aimed at targeting the accounting fraud epidemic, including the collapse of Enron. Two of those directives are relevant here: (a) "CEOs should personally vouch for the veracity, timeliness, and fairness of their companies' public disclosures, including their financial statements" and (b) "[f]irms' accounting systems should be compared with best practices, not simply against minimum standards." The SEC acted on these directives by proposing rules (1) requiring the CEOs and CFOs of public companies to personally certify their financial records; and (2) requiring companies to have systems in place to bring all relevant information concerning internal controls to the attention of the CEO and CFO.



BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104 Tel: 206-652-8660

67. Then, on June 25, 2002, the situation intensified as WorldCom announced that it had overstated income by over $3 billion. The fraud at issue in WorldCom was shockingly simple; certain expenses were being booked as assets, rather than getting deducted from net income. The simplicity and magnitude of this fraud prompted Congress to finally take firm action. These frauds were the result of simple failures, which would have been prevented by adequate internal controls. Where those controls are lacking, there is nothing to prevent employees from drastically misrepresenting the financial condition of a company.

68. In reaction to a number of frauds of varying magnitudes, including WorldCom, Congress took action by passing SOX, which strengthened the preexisting legal obligation to maintain internal controls and reaffirmed that the failure to have such controls is ***itself*** a serious violation of the law—***a violation which does not depend on whether the lack of controls resulted in financial misstatements***. Specifically, Title IV of SOX addresses the need for internal controls and enhanced financial reporting for publicly traded companies. Public companies are subject to enhanced reporting requirements related to financial transactions, including off-balance-sheet transactions, pro-forma figures, and any stock transactions of corporate officers. A core policy goal advanced by SOX is personal involvement of and accountability at the most senior levels of a company.

69. Section 302 of SOX (implemented through 17 C.F.R. § 240.13a–15) requires an issuer of registered securities to "maintain disclosure controls and procedures . . . and internal control[s] over financial reporting." The term "disclosure controls and procedures" is defined by the relevant regulation to include "controls and procedures designed to ensure that information required to be disclosed by an issuer in the reports that it files or submits under the Act is accumulated and communicated to the issuer's management, including its principal executive and principal financial officers, or persons performing similar functions, as appropriate to allow


BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104 Tel: 206-652-8660

timely decisions regarding required disclosure." Internal control over financial reporting is defined as follows:

> The term internal control over financial reporting is defined as a process designed by, or under the supervision of, the issuer's principal executive and principal financial officers, or persons performing similar functions, and effected by the issuer's board of directors, management and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles and includes those policies and procedures that:
>
> (1) Pertain to the maintenance of records that in reasonable detail accurately and fairly reflect the transactions and dispositions of the assets of the issuer;
>
> (2) Provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the issuer are being made only in accordance with authorizations of management and directors of the issuer; and
>
> (3) Provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use or disposition of the issuer's assets that could have a material effect on the financial statements.

70. Thus, Section 302 imposes an affirmative obligation on a company to ensure that it has systems in place to safeguard the accuracy of its financial reporting, recorded as necessary, that receipts and expenditures are being made "only in accordance with authorizations of management and directors of the issuer," among other requirements. Furthermore, the internal controls must be "under the supervision of, the issuer's principal executive and principal financial officers."

71. The requirement that the existence of controls be overseen by the CEO and CFO (or equivalents) is so important to the SOX regime, that it also requires that those officers file public certifications, known as Section 302 Certifications, or SOX Certifications, whereby these officers must ***personally*** attest to their role in supervising the controls and the quality of those

controls through an SEC-provided form. As relevant here, the most important sections of the SEC form are as follows:

> (1) "The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures . . . and internal control . . . for the registrant and have:
>
> (a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;
>
> (b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;
>
> (c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and
>
> *  *  *
>
> (2) The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):
>
> (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information. . . .


BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104 Tel: 206-652-8660

72. In addition to these certifications, SOX also requires, through Section 404 (as implemented by 17 C.F.R. § 240.13a-15(c)), management of issuers of registered securities to "evaluate, with the participation of the issuer's principal executive and principal financial officers, or persons performing similar functions, the effectiveness, as of the end of each fiscal year, of the issuer's internal control over financial reporting." Further, the rule requires that this "evaluation" must be based on a "suitable, recognized control framework that is established by a body or group that has followed due-process procedures" in developing that framework.

73. In partial summary, SOX affirmatively requires a company, its CEO, and its CFO to take responsibility for maintaining affirmative controls and to personally evaluate those controls on a regular basis. SOX defines those necessary controls to include procedures on limiting user access. The personal evaluation of the CEO and CFO must be conducted according to "recognized" procedures (detailed below in Section VI(G)(1)), and requires them to attest to having done so.

74. Violation of SOX can result in significant fines and penalties regardless of whether a company is found to have misstated its financial results during the relevant period. Section 906 of SOX may also impose criminal penalties on executives for falsely certifying compliance with SOX. As a result, companies that are not in compliance with SOX risk financial penalties and fines and will need to expend whatever resources are necessary to remediate the deficiencies.

75. On March 2, 2004, in the wake of the passing of SOX, Gartner Research published an article from three of its associates on CSO Online titled "How CIOs Should Prepare for Sarbanes-Oxley." That article noted that "IT is the backbone of the financial processes that the law regulates," and that the "CIO will play a critical role in achieving compliance." Those associates further noted that "CIOs should expect to participate extensively in the audit process, usually as a member of a compliance committee." Notably, that article also stated that "CIOs should document changes to systems that potentially change the financial process of internal controls, and report these changes to the CFO, CEO and risk management or compliance


BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104 Tel: 206-652-8660

committee." This strongly supports the inference that the Individual Defendants were kept informed regarding the risk Costco's IT department faced. By late 2004, to promote accountability, some larger companies were having their CIOs sign the SOX certifications along with the CEO and CFO, though Costco did not take this step.

76. Those expectations have not changed, as noted by software consulting firm Fresh Service, which includes compliance with SOX as one of the CIO's responsibilities. Additionally, in a blog for plainID.com, Gal Helmski noted that CIOs "must deal with an increasingly heavy compliance burden," including SOX. Notably, Costco's external auditor, KPMG listed the CIO as a party who may be a "key stakeholder" in the company's internal control over financial reporting program, along with the CEO, CFO, and an internal audit and/or SOX team. Additionally, PWC noted that "CIOs are expected to find new ways to serve their businesses and lower the costs of technology—all while managing new risks that arise." In meeting these challenges, challenges which Moulton felt to an extreme degree given Costco's business model, IT's internal audit functions are "uniquely positioned to add value and support the CIOs through identifying risks early."

**F. The Importance of IT Controls for Public Companies**

77. Like other public companies, Costco automated much of its sales function, which rolled up into its financial reporting function. Costco also relied on various forms of software to monitor and regulate its business operations. For example, former employees confirm that Costco used SAP, which provides a wide range of products and software that cover an array of business functions, including inventory tracking, change management, revenue management, and enterprise resource planning. Other CWs confirm that Costco used other kinds of software such as Archer and ServiceNow, which are programs that support business-level governance, risk, and compliance controls.

78. Costco relied heavily on these programs to track sales and revenue, and therefore, as a part of using and engaging this software, it was important for Costco to have effective IT controls in place. Defendants acknowledged the importance of IT controls to Costco's business


BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104 Tel: 206-652-8660

operations and brand reputation. For example, in Costco's 2017 Form 10-K, Defendants noted that the failure to "maintain the privacy and security of . . . [its] business information" could damage the Company's reputation with members. Further, both the warehouse and online businesses "depend[ed] upon the secure transmission of encrypted confidential information." Defendants also alerted the market that a "failure to adequately update [its] existing systems and implement new systems" could adversely affect the business, even going so far as to acknowledge that a significant interruption in the Company's information technology systems "could have a material adverse effect on [its] business and results of operations." In detailing the importance of IT to its operations, Costco also assured the market that it was making significant investments in its IT department and had adequate change management processes in place to mitigate any risk related to changes in its IT systems.

## G. Costco's Internal Controls Framework and Management's Obligations Regarding that Framework

79. In consultation with an accounting expert, Lead Plaintiff alleges that Costco's representations of compliance with internal controls had a specific and well understood meaning, as described in the following paragraphs in this Section.

### 1. COSO Framework

80. As previously noted, Costco was required to evaluate and ensure compliance with internal controls using a "recognized" framework. The "control framework" that Costco purportedly used to evaluate internal controls, and to assert compliance therewith, was known as the COSO Framework. This well accepted industry framework was an expansion upon the earlier 1992 COSO Framework, and was released in substantial part to address broad changes in internal control attributable to the increased relevance and sophistication of information technology systems. COSO defines internal control as "a process, effected by an entity's board of directors, management, and other personnel, designed to provide reasonable assurance regarding the achievement of objectives relating to operations, reporting, and compliance." According to COSO, that definition is meant to emphasize that effective internal control is not


BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104 Tel: 206-652-8660

just about processes, "but about people and the actions they take at every level of an organization to effect internal control." Notably, "the board and senior management establish the tone for the organization concerning the importance of internal control and the expected standards of conduct across the entity. Further, in highlighting the importance of documentation to effective internal controls, the COSO Framework states: "***In cases where management asserts to regulators, shareholders, or other third parties on the design and operating effectiveness of its system of internal control, management has a higher degree of responsibility.***"

81. The COSO Framework observes that internal controls are likely to require modification when new technology is implemented. In its 2017 Form 10-K, filed on October 17, 2017, Costco informed investors that it was in the process of "significant technology investments to improve or replace critical information systems and processing capabilities." These circumstances created an adverse risk to Costco's ability to report the financial results of operations. Costco also asserted, however, that its change management processes mitigated that risk. Change management consists of a company's processes for adding or modifying users and devices, as well as installing or updating information technology. In addition, it involves monitoring changes, such as when a change occurred and who made the change.

82. Adequate controls around the IT department are critical to an effective program of internal controls. Thus KPMG, Costco's independent auditor, emphasized in publicly available guidance that management must assess the adequacy of the entity's IT personnel to design and assess IT-related internal controls. KPMG also emphasized management's obligation to ensure the right IT personnel exist to: (1) understand and document the flow of information through IT systems; (2) identify what could go wrong; (3) design IT-related controls; (4) monitor the effectiveness of IT controls; and (5) evaluate the impact of IT deficiencies.

83. The SEC's internal controls implementation guide, SEC Release No. 33-8810, also addresses the significance of IT-related controls. Specifically, that release states "the proper and consistent operation of automated controls or IT functionality often depends upon effective IT general controls." Indeed, according to Costco's 2018 Form 10-K, "[i]nternal controls related


BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104 Tel: 206-652-8660

to the operation of technology systems are critical to maintaining adequate internal control over financial reporting." Consequently, the COSO Framework requires that entities evaluate the design, implementation and effectiveness of general IT controls relevant to the effective operation of the process level automated control activities. Under the COSO Framework, "management retains ultimate responsibility for meeting the requirements for an effective system of internal control," even for processes it has delegated internally, or to third parties.

84. The COSO Framework identifies five components necessary for effective internal control. The first of these components relates to the overall control environment, which includes core elements such as employing competent individuals. The second relates to the assessment of risk. The third, is utilizing effective control activities. The fourth requires the generation and use of quality information to assess internal controls. The fifth relates to monitoring and evaluating internal controls. Each of these components is based on underlying principles. While the entire COSO Framework is applicable to Costco (and to what Defendants knew or were deliberately reckless in not knowing) in 3Q2018, certain portions of particular relevance are described in further detail herein. The graphic below demonstrates the interconnected nature of the components of the COSO Framework to all areas of an entity's operations.



### 2. Components and Principles of Internal Controls Under the COSO Framework

#### (a) Control Environment

85. Within the COSO Framework, a control environment "is defined by the standards, processes, and structure that guide people at all levels in carrying out their responsibilities for internal control and making decisions." The control environment is comprised of: (1) the integrity and ethical values of the organization; (2) the Board of Directors' ability to carry out its oversight responsibilities; (3) the organizational structure and assignment of authority and responsibility; (4) the process for attracting, developing, and retaining competent individuals; and (5) the rigor around performance measures, incentives, and rewards to drive accountability for performance.

86. A company's control environment is influenced by a number of factors, including ***the entity's history***, values, market, and ***the competitive and regulatory landscape***. According to the COSO Framework, the Board of Directors and senior management, which includes the Office of the CIO, "***establish the tone at the top*** regarding the importance of internal control including expected standards of conduct," and it is incumbent upon management to set and reinforce the expectations at various levels of the organization. A company's control environment "has a pervasive impact on the overall system of internal control."

87. Principle 1 of the COSO Framework relates to the control environment and requires the organization to "demonstrate a commitment to integrity and ethical values." COSO provides four Points of Focus for achieving that objective: (1) set the tone at the top; (2) establish standards of conduct; (3) evaluate adherence to the standards of conduct; and (4) address deviations in a timely manner. The "tone at the top" is influenced by the Board and management's operating style and personal conduct, attitudes towards risks, and the level of formality in the organization. It is incumbent upon management to reinforce that tone "at the various levels of the organization," and promote accountability throughout the organization. The "tone at the top" is measured by the degree to which senior management communicates and


BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104 Tel: 206-652-8660

applies the company's expectations, and is "fundamental to the functioning of an internal control system. Regarding establishing standards of conduct, those standards must be regularly communicated and reinforced" to all levels of the organization. In evaluating adherence to those standards, the company must evaluate individuals and teams to ensure as part of a systematic process for escalation and resolution of exceptions. Additionally, the COSO Framework requires deviations from the expected standards to be "addressed in a timely and consistent manner."

88. Principle 3 of the COSO Framework also relates to the control environment, and requires management, with Board oversight, to establish "structures, ***reporting lines***, and appropriate authorities and responsibilities in the pursuit of objectives." The COSO Framework provides three Points of Focus for achieving that objective: (1) consider all structures of the entity; (2) establish reporting lines; and (3) define, assign, and limit authorities and responsibilities. In addressing the structures of the entity, management must be aware of the fact that "[o]rganizational structures evolve as the nature of the business evolves," and must also "evaluate the lines of reporting so that responsibilities are carried out and ***information flows as needed***." Additionally, regarding establishing reporting lines, "reporting lines and communication channels must be clear to enable accountability over operating units and functional areas." Further, regarding the assignment of authorities and responsibilities, the Board, which for Costco includes the Individual Defendants, must "stay informed," while senior management, which also includes the Individual Defendants and CIO in this case, is "ultimately responsible" for defining, assigning, and limiting authorities and responsibilities within the organization. The COSO Framework also notes limiting authority, something Costco utterly failed to do during the Class Period, is necessary so that, among other reasons, duties are segregated to reduce the risk of inappropriate conduct, and ***technology is leveraged as appropriate to facilitate the definition and limitation of roles and responsibilities***.

89. Principle 4 of the COSO Framework requires that "the organization demonstrate a commitment to attract, develop, and retain competent individuals," to accomplish the organization's objectives. The COSO Framework provides four Points of Focus for achieving



BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104 Tel: 206-652-8660

that objective: (1) the organization must establish policies and procedures to reflect the level of required competence; (2) the Board and management must evaluate competence across the organization and "act as necessary to address shortcomings"; (3) the organization must provide the "training needed to attract, develop, and retain sufficient and competent personnel"; and (4) senior management and the Board must "develop contingency plans for assignment of responsibility important for internal control." Regarding policies and procedures, the organization must develop a basis for evaluation and, as particularly relevant here, have a "[m]eans to react dynamically to change." As to training, the organization must enable individuals to develop the appropriate competencies, and "tailor training based on roles and needs." In addition to hiring competent individuals, the organization also has an obligation to assign competent individuals appropriately.

90. Principle 5 of the COSO Framework requires the organization to "hold[] individuals accountable for their internal control responsibilities." The COSO Framework provides five Points of Focus for achieving that objective, one of which is particularly relevant here in that management and the Board must enforce accountability through structures, authorities, and responsibilities. The Board must "hold the chief executive officer accountable for understanding the risks faced by the entity in establishing the requisite system of internal control to support the achievement of the entity's objectives." The CEO and and other members of senior management are responsible for "designing, implementing, conducting, and periodically assessing the structures, authorities, and responsibilities needed to establish accountability for internal control ***at all levels of the organization***."

**(b) Risk Assessment**

91. Within the COSO Framework, risk assessment "forms the basis for determining how risks will be managed," and risk is defined as "the possibility that an event will occur and adversely affect the achievement of objectives." Notably, risk assessment "requires management to consider the impact of possible changes in the external environment and within its own business model that may render internal control ineffective." Further, risk often increases "when



BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104 Tel: 206-652-8660

management implements change." Risk tolerance is expressed in different ways for different categories of objectives, and "when considering financial reporting, risk tolerance is typically expressed in terms of materiality."

92. Principle 6 of the COSO Framework requires the organization to specify "objectives with sufficient clarity to enable the identification and assessment of risks relating to objectives." Chapter 6 of the COSO Framework provides different Points of Focus for different objectives, including for external financial reporting and compliance objectives. There are three Points of Focus related to establishing external financial reporting objectives relevant here that require the company to: (1) comply with applicable accounting standards; (2) consider materiality in financial statement presentation; and (3) reflect underlying transactions and events to show qualitative characteristics and assertions. Additionally, there are two Points of Focus that require a company's compliance objectives to reflect external laws and regulations, which are to "***establish the minimum standards of conduct***," and the company must also consider tolerances for risk. Under the COSO Framework, "responsibility and accountability for risk identification and analysis processes reside with management." Further, a risk with a higher likelihood of "occurrence and/or the potential of a significant impact . . . typically results in considerable attention." For example, in a company like Costco that experienced significant internal control issues both in the IT department and elsewhere, the risk that those controls were ineffective should have received considerable attention during each review.

93. Principle 8 of the COSO Framework requires an organization to consider the potential for fraud in assessing risk. Chapter 6 of the COSO Framework provides four Points of Focus, two of which are particularly relevant here: (1) consider various types of fraud, such as fraudulent reporting; and (2) assess opportunities for fraud, including ***the altering of an entity's reporting records***.

**(c) Control Activities**

94. Within the COSO Framework, control activities "are the actions established through policies and procedures that help ensure that management's directives to mitigate risks

to the achievement of objectives are carried out," and are performed at all levels of the entity. For example, according to the COSO Framework "an on-line retailer's controls over the security of its information technology affect the processing of accurate and valid transactions with consumers, the protection of consumers ' confidential credit card information, and the availability and security of its website." In the case of online retailers like Costco, ***"control activities are necessary to support the reporting, compliance, and operations objectives."***

95. Principle 11 of the COSO Framework requires that "[t]he organization selects and develops general control activities over technology to support the achievement of objectives." This principle specifically serves to require Information Technology General Controls ("ITGCs"), which are used to maintain the integrity of information and security of data. Specifically, ITGCs are internal controls, such as policies and procedures that relate to access and use of IT applications. ITGCs contribute to an entity's efforts to ensure appropriate segregation of duties has been achieved. Segregation of duties is a key tool to reduce the risk of error or inappropriate or fraudulent actions. As part of effective segregation of duties, ITGCs must ensure that those users who have access to financial reporting and have the ability to make changes to the financial reporting metrics ("access control" and "change control") are strictly regulated and monitored so that only the correct individuals have access to a company's financial systems.

96. Even more specifically, Chapter 7 of the COSO Framework provides four Points of Focus to "highlight important characteristics relating to [Principle 11]." Those Points of Focus are described below.

97. Point of Focus 1 requires a company to "determine[] dependency between the use of technology in Business Processes and Technology General Controls," which correspondingly requires management to understand the dependencies between business processes, automated control activities, and technology general controls. This Point of Focus addresses the fact that the effectiveness of process-level controls depends on ITGCs.

98. In Release No. 33-8810, the SEC provides an example of this dependency. The SEC's example describes the controls surrounding the formation of significant accounting estimates (*e.g.*, estimating sales returns). Such an estimate involves process-level controls to accumulate source data such as sales activity used to develop the accounting estimate. The effectiveness of those process-level controls, however, depends on the effectiveness of ITGCs, including what users were authorized to identify, assemble, and modify that sales data and what changes the users were authorized to make to the data collection parameters. A deficiency in such controls could, for example, enable an IT user without knowledge of the relevant accounting requirements to implement a program change that negatively impacts the aggregation of data used for the accounting estimate. A deficiency in such a control may be exacerbated if an organization is large and sprawls into various locations across the country or the world.

99. Point of Focus 2 requires management to "establish[] relevant technology infrastructure control activities," which relates to the selection and development of the technology infrastructure to help ensure the completeness, accuracy, and availability of data for financial reporting. This Point of Focus addresses internal controls designed to ensure data used for financial reporting is complete and accurate. Such controls are critical when data is transferred from one system to another, including, for example, data warehouses. ITGCs must ensure that all data that should be transferred has been transferred, and conversely, that data that should not be transferred has not been transferred. Using the example above, process-level controls may employ correct math to calculate the sales returns reserve, but if unauthorized users had implemented changes (or authorized users had implemented incorrect changes) that caused returns from certain warehouses, time periods, or product categories to be excluded (or over included), the data relied upon for financial reporting was at-risk of being incomplete or inaccurate.

100. Point of Focus 3 requires a company to "establish[] relevant security management process control activities," which requires management to "restrict technology access rights to authorized users commensurate with their job responsibilities and to protect the entity's assets

from external threats." This Point of Focus most directly addresses user access controls. User access controls govern the ability to input data, process data, maintain the integrity of data, and, ultimately allow the data to be output for financial reporting. User access controls include considerations such as whether users have been set up appropriately based on an individual's employment status, position, and changes thereto, including which users are authorized to make such changes. User access controls also include the adequacy of ongoing review of user authority levels, and require that information about who has the ability to access certain information be maintained in a secure way. Stated differently, user access controls are critical to ensure access is consistently restricted to only appropriate and authorized users.

101. Point of Focus 4 requires a company to "establish[] relevant technology acquisition, development, and maintenance process control activities" which requires management to "select[] and develop[] control activities over the acquisition, development, and maintenance of technology and its infrastructure to achieve management's objectives." This Point of Focus addresses change management. Companies are required to have "a change management process . . . in place to track changes from initiation to final disposition." These changes may arise from a "problem in the technology that needs to be fixed" or a request from a user. Additionally, "[t]he extent and rigor of the controls over the initiative should be sized accordingly." The ITGCs outlined in Point of Focus 4 "also apply to the ongoing development and maintenance of technology." Similar to user access controls, change controls also include the adequacy of ongoing review of change authority levels, and require that information about who has the ability to change certain information be maintained in a secure way.

102. Furthermore, management is obligated to gather evidence to evaluate whether internal controls are effective. As stated in SEC Release No. 33-8810, the evaluation considers factors such as: (1) did controls operate as designed; (2) were the controls applied consistently; and (3) did personnel performing controls possess the necessary authority and competence to operate the control effectively. If a control is not designed or operating effectively, a deficiency exists that management must evaluate.

**(d) Information and Communication**

103. Within the COSO Framework: "Information is necessary for the entity to carry out internal control responsibilities to support the achievement of its objectives." The COSO Framework defines communication as "the continual, iterative process of providing, sharing, and obtaining necessary information," and internal communication is "the means by which information is disseminated throughout the organization, ***flowing up, down, and across the entity***." Additionally, internal communication "***enables personnel to receive a clear message from senior management that control responsibilities must be taken seriously***." The information and communication component of the COSO Framework "supports the functioning of all components of internal control," including communicating the "tone at the top" referenced above.

104. Principle 14 of the COSO Framework requires an organization to "internally communicate information . . . necessary to support the functioning of internal control." Chapter 8 of the COSO Framework provides four Points of Focus highlighting important characteristics of the principle, two of which are particularly relevant here: (1) communicate internal control information to enable personnel to understand and carry out their internal control responsibilities; and (2) communication between management and the board of directors "so that both have information needed to fulfill their roles" related to internal control. In communicating internal control information within the organization, it is up to senior management to communicate the internal control objectives "clearly through the organization" so that everyone understands their individual roles. Senior management must send a clear message to personnel that "their internal control responsibilities must be taken seriously," and must also "take timely action that is consistent with such communication to reinforce the message conveyed." It is also incumbent on senior management to "provide[] the board with information needed to exercise its oversight responsibility for internal control." Further, the "frequency and level of detail of the communication between management and the board must be sufficient to" enable the Board to

understand the results of management's assessments and "enable the board of directors to respond to indications of ineffective internal control in a timely manner."

**(e) Monitoring Activities**

105. Within the COSO Framework, monitoring requires "[o]ngoing evaluations, separate evaluations, or some combination of the two . . . to ascertain whether each of the five components of internal controls . . . is present and functioning." Those findings must then be reviewed against established criteria, "and deficiencies are communicated to management and the board of directors as appropriate." Notably, monitoring "provides valuable support for assertions of the effectiveness of the system of internal control." One important reason for monitoring is that "controls may become less effective or obsolete, may no longer be deployed in the manner in which they were selected or developed, or may be deemed insufficient to support the achievement of the new or updated objectives."

106. Principle 16 of the COSO Framework requires an organization to "select[], develop[], and perform[] ongoing and/or separate evaluations to ascertain whether the components of internal control are present and functioning." Chapter 9 of the COSO Framework provides eight Points of Focus related to monitoring, all of which are relevant here: (1) utilizing a balance of ongoing and separate evaluations; (2) considering the rate of change in business processes when selecting evaluations; (3) establishing a baseline for review using the current state of the internal control system; (4) utilizing personnel with sufficient knowledge to understand the evaluations; (5) building the evaluations into the business processes; (6) adjusting the scope and frequency of the reviews; (7) utilizing objective evaluations; and (8) utilizing objective evidence.

107. Principle 17 of the COSO Framework requires an organization to "evaluate[] and communicate[] internal control deficiencies in a timely manner to those parties responsible for taking corrective action, including senior management and the board of directors, as appropriate." Chapter 9 of the COSO Framework provides three Points of Focus, all of which are relevant here: (1) management and the board of directors must assess the results of the

ongoing and separate evaluations; (2) deficiencies are communicated to parties responsible for taking corrective action; and (3) management must "track[] whether deficiencies are remediated on a timely basis."

108. SEC Release No. 33-8238 indicates that organizations are required to conduct an "appropriate" review based on "the evaluation of that component for purposes of a quarterly evaluation of disclosure controls and procedures." Here, Defendants knew, or were deliberately reckless in not knowing, going into the 3Q2018 not only of all the tangentially related internal control deficiencies, but also of the deficiencies throughout the IT department and specifically related to SOX compliance, as detailed below. In keeping with the standards laid out in the SEC's release, Defendants were required to conduct an "appropriate" review based on the circumstances, and not the cursory review they recklessly conducted.

109. Notably, the SEC states: "An assessment of the effectiveness of internal control over financial reporting must be supported by evidential matter, including documentation, regarding both the design of internal controls and the testing process." As shown by the remedial measures announced at the end of the Class Period, Costco lacked documentation related to ITGCs. In lacking that documentation, it was impossible for Defendants to have the "reasonable support" the SEC requires in certifying to the effectiveness of a company's internal controls over financial reporting.

110. ***A material weakness is the most severe form of internal control deficiency.*** As stated in SEC Release No. 33-8810, a material weakness is a deficiency, or a combination of deficiencies, in internal controls, such that it is reasonably possible that a material misstatement of a company's annual or interim financial statements will not be prevented or detected on a timely basis. The term "reasonably possible" means the chance of the future event or events occurring are more than remote but less than likely – thus, "reasonably possible" is a stringent standard in what it requires companies to report. The SEC stated that "the Commission recognizes that . . . ***'reasonableness' is an objective standard***." As discussed below, Costco's management acknowledged a material weakness existed, meaning its internal controls over


BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104 Tel: 206-652-8660

financial reporting were ineffective as of September 2, 2018. The material weakness here stretched all the way back to the start of the fiscal year, or September 2017, as confirmed by an accounting expert.

### H. The Structure of Costco's IT Department

111. For a public company to have the effective internal controls described above, a company must have a robust and fully functioning IT department with IT spending proportionate with the size and complexity of the company. IT departments at a public company are generally structured into different departments or functions, including: (1) development; (2) quality assurance ("QA"); (3) security; (4) internal audit; and (5) management oversight. The five departments and their functions are broken out below:

(a) **The Development Group**: writes and tests software to ensure that software meets the requirements for the program or project.

(b) **QA**: performs independent testing on behalf of management and the business unit to ensure that requirements have been met. QA also performs regression testing as a part of the change management process to ensure that changes to programs have not broken previously working software.

(c) **Security**: ensures that the measures and controls implemented meet the policies, standards, guidelines, and compliance requirements of the organization and are effective in meeting a company's stated control objectives.

(d) **Internal Audit**: ensures that the applications and controls in the IT department are sufficient to maintain the business as a going concern. As noted above, companies must spend and commit resources to the IT department at a level commensurate with their size to maintain those applications and controls. The internal audit group is charged with conducting audits and risk assessments of those applications and controls.

(e) **<u>Management Oversight, or Governance</u>**: provides a company with an additional layer of controls to ensure that all the groups within the IT department are functioning properly and the risks posed by the department's operations are being accurately assessed and addressed. A properly functioning management oversight committee is also designed to give the CFO and CEO confidence when signing a company's quarterly and annual SEC filings, including the certifications required pursuant to SOX. The SOX Certifications are of particular importance to the CEO and CFO as they are required to personally oversee the functioning of a company's internal controls. (*See* Section VI(E)). While the CEO and CFO are able to reasonably delegate the actual design and implementation of the policies and procedures, per the certifications they sign they remain personally responsible for evaluating those controls and are ultimately responsible for the effectiveness of a company's internal controls.

### I. Costco's Other Internal Control Red Flags

112. In addition to the material weakness in internal controls related to financial reporting, Defendants had glaring weaknesses in internal controls in other areas of the Company's operations. While these issues were not directly related to the material weakness in internal control over financial reporting, these red flags represented all the more reason for Defendants to be on heightened alert to the problematic conditions of the IT department and when performing their quarterly reviews on internal controls in any area of the Company.

113. On January 19, 2017, the Department of Justice ("DoJ") announced that it had reached a settlement with Costco related to allegations that Costco "improperly filled prescriptions for controlled substances," specifically opioids. According to the DoJ, Costco: "[(1)] filled prescriptions from practitioners who did not have a valid Drug Enforcement Agency (DEA) number; [(2)] incorrectly recorded the practitioner's DEA number; [(3)] filled prescriptions outside the scope of a practitioner's DEA registration; and [(4)] filled prescriptions


BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104 Tel: 206-652-8660

that did not contain all the required information." Additionally, as relevant here, the DoJ highlighted an issue with Costco's documentation, noting that "pharmacies allegedly failed to maintain accurate dispensing records and failed to maintain records for their central fill locations in Sacramento, CA, and Everett, WA." Notably, U.S. Attorney Eileen Decker of the Central District of California stated that Costco's control deficiencies were "not just administrative or paperwork violations." The settlement, which cost Costco $11.75 million and required it to purchase a new pharmacy management system for about $127 million, would certainly have been known to both Individual Defendants, especially given that it was disclosed in the Company's 2017 10-K, which was signed by both Individual Defendants.

114. On October 5, 2018, the Consumer Product Safety Commission ("CPSC") announced that Costco had agreed to settle charges made against it related to the failure to report issues related to defective garbage cans (capable of causing "serious injury") as was required by regulation. The charges alleged that Costco had received more than 90 consumer complaints, including more than 60 complaints from consumers who were injured by the garbage cans. Importantly, Costco's alleged wrongdoing was not its sale of these defective products—but its failure to promptly report the defects after being told about them by consumers. In addition to requiring Costco to pay $3.85 million, the settlement required Costco to "maintain a compliance program" to prevent future incidents of non-compliance with its reporting obligations. The new compliance program required "senior management participation" and was described by the CPSC's press release regarding the settlement as "a system of internal controls and procedures to ensure that Costco discloses information to the Commission in accordance with applicable law." The need to implement such controls was further confirmation of the deficiencies within Costco.[9]

---

[9] The settlement was executed on September 18, 2018, but Costco and the Individual Defendants would clearly have known about the legal action far earlier than the date of the settlement.

115. Another red flag for Defendants came in the form of a former employee, Robin Cline, who embezzled nearly $300,000 from Costco over a five-year period, from 2011 through 2016.[10] Costco began its investigation into Cline in January 2017, and by January 2018 Cline had been indicted by the Department of Justice for embezzlement. According to Cline's indictment, she entered "false and fraudulent accounting entries in individual Costco customer accounts, such as non-existent refunds, credits, additional charges, and adjustments, and us[ed] these false accounting entries to justify transfer of funds that appeared to be credited to Costco customers." Instead, the funds were diverted by Cline into her own accounts. To carry out her theft, Costco's lax internal controls allowed Cline to access the Company's accounts receivable database to issue refunds that "were fraudulently made to appear to have been credited to Costco customers." Cline was also able to escape detection and fraudulently divert the proceeds from the following to her own account through: (1) refunds she issued for items that customers never actually returned; (2) charging customers a second time for an order the customer had already paid for, and divert the subsequent credit from Costco to her own account; and (3) cash awards for executive memberships.

116. Cline was able to post over 290 fraudulent refunds and credits, and was able to hide those activities for at least five years by "recording in Costco's AR database false and fraudulent accounting entries and other adjustments to the customer accounts to which she posted the unauthorized refunds." In some cases, Cline hid the accounting fraud by adjusting the balances on multiple customer accounts "until either a customer paid an amount they did not owe to Costco or Costco wrote that amount off."

117. According to Costco's Director of Security Steve Dean, Cline's "leave of absence for several months . . . may be the only reason her deception was discovered." This acknowledgement that Costco did not have the necessary controls in place to prevent fraudulent

---

[10] *U.S. v. Cline*, No. 18-cr-5017 (W.D. Wash. 2018)

accounting entries prompted no discernable action on the part of management. In fact, another eight and a half months would pass before Costco would address its deficiencies in user access controls.

118. Defendants have had consistent and repeated issues with internal controls related to disclosing information "in accordance with applicable law."

### J. Costco Failed to Provide IT with Adequate Attention and Resources Causing a Material Weakness in Internal Controls

119. Despite spending less on SG&A as a percent of net sales than its competitors (and by implication on IT spend), and less of its IT budget on security than the industry average, Defendants repeatedly assured the public that it had sufficient internal controls to certify the reliability of its financial reporting. For example, Defendants asserted two main points in their SEC filings during the Class Period. First, Defendants asserted as to the effectiveness of their internal controls. Second, the Form 10-Q also included SOX Certifications from Defendants Jelinek and Galanti. As detailed above, in passing SOX, Congress reinforced the importance not only of internal controls, but also the importance of senior management's involvement in ensuring the adequacy of the Company's internal controls over financial reporting. In those certifications, Defendants Jelinek and Galanti each attested they were "responsible for establishing and maintaining . . . internal control over financial reporting." The Individual Defendants specifically stated that they each "designed . . . or caused such internal control over financial reporting to be designed under [their] supervision." Those controls were designed "to provide reasonable assurance regarding the reliability of financial reporting" and the Individual Defendants attested to the effectiveness of the Company's "disclosure controls and procedures" presented in the Company's quarterly and annual SEC filings. Further, the Individual Defendants also stated they had personally "[e]valuated the effectiveness of the registrant's disclosure controls and procedures" presented in the Company's SEC filings.

120. However, despite Defendants' assurances to the contrary, Costco was not adequately funding or staffing the Company's IT department to ensure that its internal control


BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104 Tel: 206-652-8660

procedures as it relates to its financial controls were effective (as SOX requires). Indeed, former employees of the Company collectively confirm that Costco and the Individual Defendants knowingly (or at least deliberately recklessly) fostered a business-first culture in the IT department to the detriment of security, and deprived the Company's IT department of needed resources and oversight which led to the internal control failures that existed during the Class Period, and which Defendants finally revealed at the end of the Class Period. One former Senior Analyst confirms that Defendants were aware of the internal control deficiencies revealed in October 2018 as early as February or March 2018. Other former employees identify red flags in the form of reports and proposals that alerted Defendants to the deficiencies in internal controls even earlier, as set forth in Section VI(J)(3). Common sense dictates not just that Defendants ***should*** have been aware even earlier of these failures given the accounts of former employees, the decrepit state of the IT department, and the importance of internal controls, but because of the severity of the deficiencies, that they were at the very least deliberately reckless in not knowing.

### 1. Costco's IT Department was Neglected and Deprived of Resources Necessary to Maintain Adequate Internal Control Processes

121. Throughout the Class Period, Defendants failed to provide the IT department with sufficient resources to implement and maintain effective SOX Controls.

#### (a) Defendants Failed to Dedicate Adequate Financial Resources to the IT Department

122. CW 2, a former employee in Costco's IT department, said that the culture of management at Costco was to view IT spending as a "necessary evil." CW 2 compared the Company's approach to buying insurance after the incident occurs and said that management at Costco was always interested in keeping costs down when it came to the IT department. CW 2 said management's big focus was on keeping the business going and security in the IT department was an "afterthought." CW 1, a former Senior Compliance Analyst in Costco's IT

department, also stated that when "tech solutions" were suggested by Costco's counsel, the Company's executive team would question and resist making the investment.

123. CW 6, a former Compliance Analyst within Costco's IT department, also stated the Company had a negative view of the IT department and Costco internally viewed the IT department as "just another cost center" that was "not adding value." CW 6 specifically noted that some of the reasons for that view were that IT had the highest paid employees,[11] major projects were either not getting completed or were over budget, and the IT department had a high turnover rate.[12] CW 6 noted that the underlying theme was money over improvements. CW 6 said the lack of resources dedicated to the department resulted in a lack of effective and positive changes and project completions.

124. According to CW 8, a former architectural employee in Costco's IT department, the overall IT budget had to be approved by CEO Jelinek. The fact that Jelinek was involved with and knew of the IT budget is supported by another CW–CW 6 said he heard about Defendant Jelinek complaining about how much money was spent in the IT department, the number of employees it had, and that it was often over-budget with no major projects ever seemingly getting done. CW 6 said Defendant Jelinek's comments were alluded to in department meetings and that he also heard about them through discussions with colleagues. CW 6 also noted that he heard Defendant Jelinek wanted to fix the problem of over-spending and the IT department had to demonstrate that it was cutting costs.

125. CW 8 cited Forrester[13] to note that the average Fortune 500 company spends approximately 20% of its IT budget on security, but Costco has spent significantly less of its IT

---

[11] Costco does not set the market for IT employees, and they are highly paid despite Costco's hostility towards the IT department and general reluctance to spend in that department. The national average salary for IT workers in 2018 was nearly $70,000.

[12] Notably, under the COSO Framework, a high turnover rate "within . . . internal audit or technology staff" increases the risk of "fraudulent external reporting."

[13] Forrester is a market research company that provides advice primarily related to technology issues, to its clients and the public.

budget on security, a number that has been consistent for 5-6 years. CW 8 said that Costco had trouble executing on IT projects, so there was often excess money in their "extremely limited" general IT budget.[14] Notably, even the little money that Costco did allocate to its IT department would not all get used due to the Company's failure to execute on IT projects.

126. CW 1, also said that from an IT security perspective Costco was "a mess." CW 1 suggested that at Costco, if an employee identified issues related to the Company's IT weaknesses, they were typically shrugged off. CW 1 said that when he provided feedback on the IT needs at Costco, upper management would not listen, and that it took six months to even get someone at Costco to make a decision. CW 1 further explained that VPs and mid-managers below them focused on growing the business side because that was what promotions were based on at Costco.

127. CW 1 said that IT is the biggest risk for an organization such as Costco, but instead the focus at the Company was always on generating more business rather than understanding that IT security should be a huge concern. CW 1 also said that Costco's C-suite should and could have done more to protect their existing customers' information. CW 1 explained that the C-suite's focus was solely on supporting its drive for business growth, and not protecting the Company's existing IT features. CW 1 advised that he did not know how Costco could expand to gain more market share when the Company was not protecting its existing features. CW 1 said that he always felt that Costco would either have to be breached or sued for anyone to do anything about their IT systems.

128. Former employees also provided specific examples of how the underfunding led to problems with software upgrades and implementation which were necessary to keep Costco systems current. According to CW 1, one result of management's unwillingness to invest in the

---

[14] According to Forrester, only 9% of companies in the retail and wholesale industry spent less than 11% of their IT budget on security related costs, while at least 59% of companies, if not more, spent at least 11% of their IT budget on security related costs.

IT department was that the Company ran an "antiquated" I series operating system that caused a lot of "headaches" for IT personnel and there were fewer people that were knowledgeable on Costco's systems, which caused issues with hiring IT personnel.

129. CW 4, a former contractor with Costco, worked on the QA team, which included approximately 30 people divided into three categories; customers, vendors, and articles. CW 4 worked on the vendor team, that also included business analysts and developers, and he was focused on migrating the "master data" to a newer SAP system called SAP S/4HANA, which he described as a "new release." He could not recall the names of the existing systems, except he remembered that Costco had been using another SAP system called ECC. He explained that SAP S/4HANA was a premium SAP product and was supposed to be a consolidated ERP system for Costco that would improve reporting and provide more structure. CW 4 said that Costco needed customized systems and data so their developers would write code for SAP S/4HANA, which was tested by the QA contractors.

130. CW 4 explained that management of these projects was organized around the Agile process and the development of the code was broken into "sprints," which was a two to four week timeframe. CW 4 said that there was "slippage" in projects because work was often slipping from one sprint to the next, and as a result certain projects were months behind schedule – CW 4 estimated three months. CW 4 said the completion of these "sprints" was delayed because the projects were not hitting the needed "velocity," a term of art in the Agile development process.[15] CW 4 said that Costco lacked the proper IT resources and specifically that the Company did not have enough developers to do the work so their timelines were not achieved. CW 4 also noted that several IT employees left either the Company or the department and this contributed to the resources problem. One specific project CW 4 described was the supply chain project, which he said was stalled because at that time Costco cannot execute on

[15] In the context of the Agile system, "velocity" is a metric for tracking the progress of the project by breaking it into phases called "user stories."

one leg without first completing the master data project, since it was the foundation of the other projects.

131. Further, CW 4 said his QA team had only been testing portions of the code being implemented rather than performing testing across the Board, which he thought would have been better. CW 4 said that in a typical system development lifecycle, QA was supposed to be the "last line of defense" before the system went live. He said the development team was lacking resources and project deadlines were often missed, or the data and coding prepared by the developers was frequently incomplete or missing by the time it was supposed to be tested by CW 4's team. CW 4 said due to the incomplete development, his team identified a number of defects in code which were "showstoppers." He said these "showstoppers" were not resolved in a timely manner because of a lack of resources. CW 4 said the SAP S/4HANA project was due to go live in April 2019, but the date to go live was pushed out, possibly to June 2019 or later, because of the lack of resources and missed deadlines.[16] Additionally, CW 4 said that Costco had to spend more on the project because of the missed deadlines and that some of Costco's IT personnel, that were not fully dedicated to that project, had less time to work on their typical day-to-day tasks because they had to assist part-time with the SAP S/4HANA project.

**(b) Defendants Failed to Adequately Staff the IT Department**

132. Numerous former employees also provided information on the lack of employees—both in number in quality—in the IT department, and the specific problems with Risk Management and SOX Compliance staffing.

133. According to CW 1, Costco's IT department was lacking in "personnel, technology, know-how, and focus." As an example, CW 1 said that Costco had 230,000 employees, but only 1,600 were IT focused, and that low a number is insufficient given the size

[16] Even at the original target date within Costco, the product was already more than four years old.

of Costco. CW 1 added that around 200 of the 1,600 worked on fixing employees' computers. CW 1 also said that "under 100" of the 1,600 were focused on IT security, while the rest were focused on the business-operations side of IT. Additionally, CW 1 said that only around 10 of IT security employees were focused on change management.

134. According to CW 1, the IT headcount grew from 1,200 to 1,600 during his tenure. CW 1 explained, however, that while the headcount in the IT department increased, the IT department was not growing proportionally with Costco's business and operational growth. CW 1 said that Costco was adding "more stores, in more regions, and all these new capabilities more so than security." Additionally, CW 1 said that Costco was expanding its e-commerce platform and digital memberships, but that the Company "didn't have the resources to do it."

135. CW 6 said beginning around December 2017, during "department engagement meetings," led by Bowersock and attended by Rutherford, it was communicated that the Board was making it a "mission" for the year to reduce IT contractor headcount to reduce costs. CW 6 said the contractors were "highly specialized" and there were approximately 700 to 900 contractors in the department at that time. He continued that the move to reduce contractor headcount was a "knee jerk reaction" to the IT department running over budget. CW 6 said the IT department had to "demonstrate to the Board" that they were reducing costs by cutting the contractor headcount.

136. Former employees also corroborate that Costco's IT department was staffed with inexperienced employees with little training or oversight. CW 5, a former IT Contract and Vendor Manager in Costco's IT department, said that many of Costco's lower level IT employees had been hired from the warehouse as a reward for many years of work at the Company. However, CW 5 said there was "no oversight" of the training of those employees or how they performed in their jobs. CW 5 said the IT department did whatever they wanted, including taking hour long lunches, hour long breaks, and then staying late to accumulate overtime pay. CW 5 added that these IT employees were also "undeservingly" promoted to IT Manager roles.


BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104 Tel: 206-652-8660

137. CW 3, a former consultant in Costco's IT department, said that Costco prefers employees to be "home grown" and to promote from within the Company, to the extent that if you "made it past 90 days" you will never be fired and are "in like gold." Rather than firing employees, CW 3 said that Costco often moved employees to different positions or departments instead. CW 3 further explained that the Company had an issue with "knowledge transfer" as new workers the Company was hiring in the IT department as part of an effort to cut costs were not qualified and were not capable of handling the work.

138. According to CW 1, there were "questionable promotions" in the IT department that managers made "for their own reasons and internal politics." CW 1 also said that he heard "a lot of people turned over" in the IT department after he left. CW 1 added that Costco "just doesn't let anybody go, so there is no reason to comply with policies." He said that employees in Costco's IT department would either get fed up and leave because no one was listening, or "sit around and get a free paycheck," and that most of the good people got fed up and left. CW 1 also said that Costco tasked people who already had full-time jobs with cleaning up internal controls issues, but those employees lacked the resources to handle the job.

139. CW 7, a former Senior Business Analyst in Costco's IT department, said that Costco's IT personnel were promoted based on length of tenure at the Company rather than ability. CW 7 said he left Costco because he felt he could not get promoted based on the long-tenured employees he worked with who get promoted over him regardless of his IT experience.

140. CW 7 said Costco's philosophy was that workers could learn what they needed to know on the job. CW 7 said that his direct report had no IT background and "certainly wasn't trained" in the area of IT before starting. CW 7 also said that annual training for lower level IT employees consisted of "basic stuff," such as how to lock one's computer and the importance of doing so when the employee was away, for example.

141. Further, CW 7 said the managers, directors, and senior management of Costco did not know how to run an IT project. CW 7 noted that almost all of his projects were cancelled

and the last two were put on hold. CW 7 also said his last project, which he spent two years on before leaving, was put on hold at the time he left.

142. Additionally, CW 1 said projects in PCI-related compliance were run as what CW 1 referred to as "3-4 month fire drills" in which many projects would not actually get finished. He said once the fire drills were complete, the department would go back to minimal staff and unrealistic deadlines. CW 1 said there was a lot of turnover in the IT department and that there were never enough compliance personnel for a company the size of Costco.

143. CW 1 added that staff got burned out because of projects not being completed or cancelled due to a lack of sustained direction and focus from senior management. He said that employees in the IT department would work hard to meet the project deadlines "just to see it fall apart afterwards." He said that senior management would talk about securing controls, and then lose focus on it, and described the situation in the IT department as one of peaks and valleys. CW 1 added that management treated everything related to security as a project rather than an ongoing process. Additionally, CW 1 noted that there were many oversight and governance projects to improve overall compliance in the IT department that were not completed. He said he was pulled from one PCI project to another because his background was in privacy security.

144. According to CW 6, the culture in the IT department was "not healthy" and there was general discontent among the employees who felt that management did not understand the needs of the IT department. CW 6 also said the culture in the IT department was one where nobody knew what direction the department or its projects were going.

145. CW 6 also noted that the IT department lacked direction from management both broadly and as to individual projects. Further, CW 6 said there was seemingly no strategy for IT or its projects and little prioritizing, resulting in a lack of effective and positive changes and project completions. CW 2 said that throughout his tenure, his management team tried to raise concerns about IT security.

146. CW 6 described the results from the IT department of an employee satisfaction survey as "abysmal." He added that the results of this survey prompted Defendant Galanti to



BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104 Tel: 206-652-8660

give a speech to the department about addressing it. CW 6 also said that there was a large exodus of IT employees near the end of his tenure in August 2018, and that he was approximately the 26th employee to leave in the last three months of his employment.

**(c) Costco's Risk Management Team Was Disbanded**

147. Costco's lack of spending on qualified IT personnel negatively affected the risk management and SOX compliance teams as well.

148. CW 1 said that Costco's IT risk management department was disbanded in mid-2017, which he believed was due to lack of qualified managers to lead the team.

149. CW 3 noted specifically that the Governance and Risk Compliance and the internal audit team lacked "the right people for the right team." In the case of the Governance and Risk Compliance department, CW 3 said it lacked the necessary staff and communication to effectively perform its function. As to the internal audit team, CW 3 said the workers lacked a sufficient understanding of the business side of the IT department's applications and internal controls. CW 3 said you cannot have a proper team if they are not communicating with one another.

150. According to CW 8, Costco's IT Risk Management team did not report into Costco's overall Risk Management function. CW 8 said that Costco's IT Risk Management function fell under his organization that was run by Bowersock as well. According to CW 8, part of the problem with the IT Risk Management function at Costco was that they never settled on a specific framework, which he knew because he consulted with them and described them as not well organized. CW 8 said that IT Risk Management was "not well managed" so they ultimately disbanded.

151. Additionally, CW 6 said that around early 2018, the management team charged with oversight of the department's internal risk registry was disbanded and there was a six-month period where the department lacked a centralized team overseeing the registry. According to CW 6, a change management issue affected the registry where most teams in the IT department logged potential security threats.

### (d) Costco's SOX Audits Were Understaffed

152. According to CW 1 there was a single Information Security Analyst responsible for collecting the required evidence for SOX compliance and submitting it to KPMG, an IS Compliance Analyst named Barbara Egner.[17] CW 1 explained that each department had their own manager that was responsible for SOX compliance. CW 1 said Ms. Egner worked closely with KPMG during their audits in providing them with the evidence and access they needed.

153. CW 1 described Ms. Egner as "super frustrated" with the SOX compliance process because "management didn't want to listen." CW 1 also said that Ms. Egner was left "holding the bag" in the compliance department. CW 1 said Ms. Egner raised critical IT compliance issues to management, including lack of access controls and change management procedures, but once the issue would reach Bowersock's level, management would respond by saying "can we get by?" instead of remediating the issue. CW 1 said each audit was a "huge administrative task" for Ms. Egner. When management did take an interest in SOX compliance during KPMG's audits, CW 1 said they would ask for reports within a day, which reports would normally take a week to generate. He said Ms. Egner spent a lot of time helping the compliance teams who were "spread thin" working with different teams. CW 1 noted that one of the issues he recalled discussing with Ms. Egner was that parts of the system were okay, while "many parts of the system were wide open."

154. CW 1 added that when the compliance team was presented with changes to SOX compliance procedures, they would usually just rubber stamp them because they did not have the resources to properly check them. CW 1 explained that part of the problem was that Costco did not repeat oversight and audit of these functions. CW 1 added that the internal audit team performed spot checks in SOX and PCI for controls. CW 1 said the Company would briefly implement governance controls and then stop. He also said there were many oversight and

[17] A commercially available database search indicates that Egner remains employed by Costco as IS Compliance Analyst (11/1999 – Present).

governance projects that Costco would begin in an effort to improve their overall IT compliance, but then the projects would abruptly end.

155. Additionally, CW 1 said that when he was in the e-commerce department, he never saw any compliance materials related to SOX controls, and heard they were just being approved. CW 1 said that when he heard that SOX controls were being approved, his response was "who the heck is doing that?" CW 1 added that this prompted him to talk to employees in other departments about SOX controls, and the large response was people had never seen them, and were "clueless" about it. According to CW 1, it was after the Company's public announcement in October 2018 about its internal controls weakness, the Company finally brought someone, or a team on board to focus on Costco's SOX compliance.

156. CW 3 stated that in reference to security measures in SAP,[18] a lack of good understanding of compliance and auditability and using junior consultants to implement the system can lead to a "real mess." CW 3 said at Costco there is "such a spider web of user access systems" that the Company uses, not just for SAP, but for all applications. He said that in order to do a true compliance check, you need to know what access people have across applications because of potential vulnerabilities. According to CW 3, IT security was an afterthought at the Company. CW 3 said that many companies, including Costco, want to push out SAP as soon as they possibly can and mistakenly think security is not something they have to think of up front.

157. According to CW 1, Costco got "creative with SOX" in order for their audits to pass muster. CW 1 said that many of the junior auditors that came in to audit Costco were surprised that Costco was running on an I-series, which CW 1 described as looking like it was from the 1970s and "ancient."

---

[18] SAP offers a wide range of business and security tools and software, and "[f]inance teams frequently need to query SAP data . . . to create and modify reports." Additionally, according to SAP's website, the company's software is used to "ensure compliance with financial reporting standards." During the Class Period, Costco also utilized SAP's finance specific tools.

158. CW 6 also said it was a "gray area" as to who in Costco's IT department was responsible for internal audits which he further described as "almost an informal process of risk acceptance." Further, CW 6 noted that Costco lacked a clear process for reporting any issues employees found with third party vendors including how to report these issues or who to escalate them to. Additionally, CW 6 said there were no compliance teams responsible for overseeing any remediation measures that were supposed to be implemented when an issue was discovered. As a result, CW 6 said some issues with vendors would get resolved while others were "left on the table."

159. CW 1 explained that management did not give SOX compliance the attention it deserved. CW 1 recalled reading 4-5 emails sent out by CEO Jelinek starting in early 2017, stating that everyone at Costco had to do better at being SOX compliant in their job. CW 1 said that Jelinek was letting the company know they needed to "button up" their internal controls. CW 1 described the results of the emails as being sent out, and then Jelinek's office "going quiet," and then "everybody went about their business." According to CW 1, the deficiencies related to Costco's SOX audits represented a "complete and utter failure at middle management," and a "complete and utter breakdown" on everybody's part, including upper management.

**2. The Deficiencies in IT Led to a Material Weakness in Costco's Internal Controls, In Particular with Regard to Change and Access Management**

160. As noted above, the Company failed to provide the department with adequate resources, which led to unauthorized user access and change control management deficiencies. Access controls are physical and electronic controls that prevent unauthorized users from viewing or editing sensitive financial information. This includes securing locations, implementing effective password controls, and the monitoring of access that has been granted to make sure that individuals who have the ability to access certain files are the individuals who should be accessing those files. Change management procedures consist of the process for adding or modifying users and devices, as well as installing or updating IT programs and changing personnel. This process ensures that those individuals who can make changes to

financial or other sensitive information are the individuals who should be able to make those changes. Additionally, these important procedures involve monitoring changes to financial information such as when a change occurred and who made the change

**(a) User Access and Change Management Deficiencies**

161. CW 1 specifically recalled that issues related to processes, access management, and governance controls were identified as having deficiencies throughout the whole IT department. CW 1 said that the access controls were related to "internal" problems–people having improper access controls in relation to their jobs with the Company. He said these issues were routinely brought up with management but said management just did not listen.

162. CW 5 said that everything about the onboarding and offboarding process was manual and nothing about it was automated. For example, it was up to the directors whose projects IT contractors were working on to have the contractor's access revoked, but that "almost never happened" and many contractors were never offboarded. Additionally, CW 5 said the change management issues led to user access issues in that some third party IT contractors were left with access to Costco's IT systems long after their tenure ended. CW 5 said his colleague was left with access to "everything," including "a lot of sensitive stuff" and "his logins all worked" for "at least a month" after he left Costco. CW 5 said there were a "baffling" number of former contractors who were still listed as employees who should have access. CW 5 said he witnessed a lack of oversight, lack of change control process, vendors unnecessarily having unlimited access to IT systems and databases, and former employees still having access to Costco's IT systems throughout his entire tenure with the Company.

163. CW 5 also said the Company did not have good IT governance controls in place and the IT environment at Costco was the worst he had experienced and that was why he left the Company. According to CW 5, Costco had "no oversight" when it came to the Company's IT systems and who had access to them. CW 3 also stated the Company had "no true path on change management." According to CW 8, user administration and access control at Costco were "not well thought through." He explained that these issues could have been fixed, but he



BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104 Tel: 206-652-8660

was told there was "never any business justification" to fix them until it became a "big deal" with the Company's external auditors.

164. Further, CW 8 said that Costco's user access differed from other companies. CW 8 said that Costco manages their user accounts in an "active directory," and that generally when companies set up active directories, they set up rights based on the roles of an employee and then allocate rights based on those roles. He explained that most companies hire a person with a certain job title and that person gets permissions and rights associated with that job. However, according to CW 8, Costco did not do that. CW 8 explained that Costco's HR Department would submit a form when a new employee was hired or an existing employee was moved to another role. CW 8 said that in that form, instead of personalizing the person's profile, they would look to see who was "similar" and then "copy" that person. According to CW 8, at Costco, there were so many "groups within groups," that it was a "crap shoot" on granting permissions for the employees. CW 8 also noted that this method of granting access meant employees could end up with more or less access than they needed, and often times it was more.

165. CW 8 further explained that a Local Area Network ("LAN") profile would be created, which was a form the manager fills out when they need to change an employee's rights, and then that LAN profile needed to be altered or updated if the employee moved in or out of a specific role. As an example, CW 8 said that when a person changed departments and no longer needed access to Costco's iSeries (mainframe), the process should have been automated but at Costco it was not because they did not have the proper tools in place.

166. Additionally, CW 8 said that in a typical organization, rights and permissions are associated with specific groups within the organization and then those rights are associated with certain individuals. CW 8 said that at most companies, individuals typically are associated with 40-50 groups (*e.g.*, all employees, all US employees, all employees at headquarters, etc.), but at Costco, typically users were associated with 350-450 groups. CW 8 used the phrase "geometrically greater" to describe the "order of magnitude" of Costco's group associations.



BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104 Tel: 206-652-8660

167. According to CW 3, the Company's lack of processes in the IT department led to workers being granted "way more access" than they should have been. CW 3 said the Company was then left to "scramble" to try to address any issues before the auditors came in. CW 3 said there were "a lot of gaps" in the Company's change management, including incomplete testing and missing approvals. Additionally, as also noted by CWs 1, 2 and 5, CW 3 indicated that the Company's failure to establish adequate change management processes led to unauthorized user access to Costco's IT systems. CW 3 said it was unusual for a mature company like Costco to lack change management processes, particularly related to SAP. CW 3 said that during his time with the Company, Costco was developing a change management system called ChaRM, which is a change management system for SAP that validates transport requests and houses test documents and approval workflow, among other capabilities. CW 3 said that a colleague that remains with Costco informed him that ChaRM had still not been implemented as of March 2019 as a result of pushback from management.

168. According to CW 5, Costco had "no process" for handing off responsibilities when one IT employee would replace another. Additionally, CW 5 said the Company's lack of formal processes led to certain third party contractors in the department having access to "everything" in Costco's system. For example, CW 5 said contractors from ServiceNow had access to a database where they could see their competitors' bids and contracts with Costco. CW 5 also noted that Oracle's IT contractors had "no restrictions" regarding their system access and that "a lot of vendors," including Oracle, had "full badge access" to Costco's IT facilities, rather than having access limited to the scope of their particular project. CW 5 said this was consistent with the Company's culture in the IT department of letting IT contractors go wherever and do whatever they wanted.

169. According to CW 2, there was "room for improvement" in change management and access deficiencies were a common occurrence in Costco's IT department. Specifically, CW 2 mentioned access deficiencies occurred in certain areas of SAP due to a lack of controls set up

in those environments.[19] He explained that if the systems are not locked down appropriately, anyone can go in and find what they're looking for.

170. CW 1 detailed a specific user access and change management issue. He said he retained access to Costco's eCommerce system long after he transferred to compliance. CW 1 said he had to request his access to the eCommerce be revoked after he left the department. He then had to "track down" management and "fight like hell" to finally get his access revoked.

171. CW 1 said another user access issue related to emails on personal cell phones. CW 1 said that Costco did not have a Bring Your Own Device ("BYOD") policy, nor did the Company have any policy in place to revoke access to email on personal cell phones when employees would leave the Company. CW 1 said that while he no longer gets new emails, he still has access to all of his old emails even though he left in September 2018. He compared this to another former employer where his emails were wiped from his phone as soon as his employment was finished.

172. CW 1 said that Costco's eCommerce business also suffered from the lack of change management and access controls. As an example, CW 1 said that Costco had a closet organizing system where the price was changed to $1, and another time the price of laptops got changed to $2. CW 1 also recalled custom closets accidentally being priced at $0.01 each, and contractors buying those custom closets ten at a time for a cent each. CW 1 attributed these changes to Costco's lack of well-trained personnel and proper change management. Additionally, CW 1 said that in 2018, Costco ran a promotion on golf balls that caused the entire system to freeze because there were no redundancy checks. According to CW 1, the price changes were handled by Costco internally, and explained that if problems or mistakes appeared with the listing price of an item, then a default price appeared. CW 1 added that many times the default pricing for items, such as tires as an example, would appear at $2.00 each, and customers

---

[19] As previously noted, SAP's software plays an integral role in the integrity of the Company's financial reporting.

would buy up many $2.00 tires because Costco was very good at honoring their pricing, even if it was a mistake.

173. CW 1 said that he worked on a data center migration at Costco from their headquarters in Issaquah to Wenatchee, Washington in 2017 into 2018. According to CW 1, Costco did not know during that migration if half the people still were employed by Costco in IT, but they continued to have access to Costco's system. According to CW 1, as a part of a data center migration there were about 3,000 or 4,000 eCommerce business users. CW 1 explained that these employee users were buyers who would post items the website, along with a lot of temps. CW 1 said that the number of temps would increase around the holidays, especially between October and February.

174. According to CW 6, a change management issue affected the registry where most teams in the IT department logged potential security threats. CW 6 said that around early 2018, the management team charged with oversight of the department's internal risk registry was disbanded and there was a six month period where the department lacked a centralized team overseeing the registry.

175. Additionally, CW 6 said he had heard KPMG, who had their offices right next to Costco's internal audit department, had problems with Costco's controls and modules that held sensitive financial information after his tenure with the Company. CW 6 said he believed that the affected modules were for employee payroll and vendor payment, which would have exposed the bank account information of employees and vendors.

#### (b) Costco's Use of Unsecure Spreadsheets to Track Important Access

176. Costco's business-first culture and conscious neglect and disregard for its IT department led to the material weakness in internal controls. One glaring deficiency in Defendants' processes related to user access and change management was the use of spreadsheets for important functions that should have been handled by automated tools.


BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104 Tel: 206-652-8660

177. CW 5 said that Costco used Google spreadsheets "for pretty much everything," including the onboarding and offboarding of IT department employees and who should have access to given programs.[20] CW 5 said the spreadsheets were "used as a repository for information about employees" and the use of spreadsheets made it too easy for someone to change the information.

178. CW 1 recalled that there was a Google form that could be used to submit information when someone was transferred within Costco, and that the forms should have been added to a Google sheet,[21] and that a user administrator is then supposed to make the transfer change. CW 1 added that since it was being done in a Google spreadsheet rather than a work flow tool, there was no way to tell if the work was ever actually done.

179. CW 1 said that the Google spreadsheets tracking employee access was updated monthly or quarterly to reflect "all the folks" that had transferred in and out of Costco. CW 1 said that corporate does not know what they are doing and who went where. CW 1 also said that an employee could have left Costco four weeks prior but they continued to have access to Costco's IT, and referred to it as "not having good account hygiene."

180. Similarly, CW 6 said that Costco handled onboarding and offboarding of contractors and tracking their access to Costco's system was done through Google spreadsheets. He said he submitted a Google form that would then be input into the Google spreadsheet as part of the onboarding process and it was up to the contractor's supervisor to "manually submit a form" to the offboarding team to terminate the contractor's access, otherwise they would stay in the system.

---

[20] Notably, in the context of SOX compliance, a security analyst described manual spreadsheets as "a source of both inadvertent error and deliberate manipulation."

[21] Google Sheets is a part of the Google suite of online applications—other applications include the email platform "gmail" and the word processor "Google Docs." With Google Sheets anyone with access can log into a document from anywhere. It is similar to using a spreadsheet on a program such as Microsoft Excel, except that it is cloud-based and online, such that it is readily accessible and editable to anyone with authorization.

181. According to CW 1, most companies the size of Costco have an exit procedure checklist, and that Costco does not have one, but instead has reports that are supposed to track personnel transferred from one department to another. CW 1 recalled that names on the reports were highlighted, but no additional action was taken such as discontinuing their ability to access systems under their previous responsibilities. CW 1 explained that the manager of each department, including his own manager, would have to highlight names in an Excel spreadsheet and then email that spreadsheet to another individual to have access revoked, but he was unsure if that access was ever revoked. CW 1 recalled that Costco had a list of lesser things that they focused on instead, such as denying access to a transferred employee's desktop computer, but not denying them access to systems that they no longer required access to. He added that the failure to maintain user access for Gmail accounts was also an issue, and that "VPN access was more so neglected" in terms of personnel retaining unnecessary access.

**(c) Costco's Was Aware of the Need for Remediation**

182. According to CW 8, the user administration issues could have been fixed, and that he knew of a proposal to do so in 2014. He said the proposal explained that the way to fix the issue was to bring in a tool that managed groups and permission and that tool would then assign people to those groups and permissions. CW 8 said that then Costco should have "re-provisioned" their entire enterprise directory, cleaned it out, and set it up better going forward. CW 8 said that he knew of a strategy on authentication and authorization written in 2014, which recommended that Costco install a real enterprise directory to remediate the user administration and access control issues.

183. CW 8 stated that the strategy was received and approved by CIO Paul Moulton, and received by all of the VPs and SVPs that were a part of the office of the CIO, including Bowersock. CW 8 said that he knew Moulton approved the strategy because the strategy write-up included a "table of approvals" that noted who approved it and the date they approved it. In addition to CIO Moulton, CW 8 said that this strategy was also approved by Costco's Center of Excellence and the VPs and AVPs that reported into the Office of the CIO.



BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104 Tel: 206-652-8660

184. However, when it came to implementing the recommended remediation plan (which included installing a new real enterprise directory), CW 8 said an IT director said that there was no budget, that it was not a priority, and that there were more important things to work on. According to CW 8, that recommended remediation plan likely would have cost the Company about $10 million to implement, but ultimately Costco saw a significant impact on the Company's share price because they failed their SOX audit. CW 8 said that had Costco implemented his strategy, the SOX findings would have come back clean. Additionally, CW 8 said that no one at Costco consulted with him or his team on the remediation. According to CW 8, there were no efforts to get the budget to implement his remediation recommendations until right before Costco's announcement of a material weakness with their internal controls related to user access.

185. Further, another Security Architect on CW 8's team tried to bring in a tool to address the user administration issues in 2015 but it never came to fruition because he was told at the time that there was no "business justification" for that tool. According to CW 8, had they brought in that tool, Costco would have been able to "untangle the spaghetti mess" related to Costco's user administration and access controls. CW 8 said that had Costco implemented this tool in 2015, Costco could have avoided the ultimate announcement of a material weakness in their internal controls. CW 8 said that the tool would have sufficiently maintained the company's internal controls related to user administration. CW 8 also explained that user administration would still have needed to be audited but the tool would have helped with the "peer attestation" process and automated it in a way that Costco lacked, and described Costco's process as manual. As an example, CW 8 said that when an Administrator for SAP changed roles to a Network Administrator within Costco, those permissions related to SAP should have been immediately eliminated but they were not because of Costco's group memberships and lack of automation when it came to internal controls.

186. In regards to the Company saying it will take a year to remediate the weaknesses in internal controls, CW 1 said that it might not have been a big job for some companies, but for



BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104 Tel: 206-652-8660

Costco their impediments are their culture and lack of qualified personnel. CW 6 noted that Costco was seeking to add SOX-related IT personnel, such as a SOX Tactical Team Member, since the revelations by the Company regarding their internal controls at the end of the Class Period.

### 3. The Negative Information Concerning Poor IT Controls and a Weak Risk Environment Flowed Up and Was Available to Defendants; Defendants' Message Back was to Downplay IT Security And Focus on Business and Growth Instead

187. Information from top executives in the IT department flowed up to the Defendants who themselves were intimately involved in the management and funding of the IT department.

#### (a) The Management in the IT Department and Office of the CIO Had Access to Information and Communicated with Defendants

188. According to CW 1, the management in the IT department took its "direction from the top" and that the culture in the IT department was "business over protection." CW 1 added that the business push came from Defendant Galanti, CIO Moulton, and the VPs in the IT department. According to CW 1, Costco's focus was to "grow, grow, grow" to make revenue numbers. This is consistent with numerous CWs who describe Costco's management as hostile to spending in the IT department, with one CW saying management saw it as a "necessary evil." Costco spent significantly less of its IT budget on security than the industry average for retailers, despite IT being the biggest risk for a company like Costco. Costco also failed to adequately test the new SAP project the Company was implementing due to a lack of adequate resources. Further, the Company dedicated only a tiny portion of its employees to IT and IT security, and only had a single employee to gather the evidence required for the Company's periodic SOX audits.

189. According to CW 1, "everything IT-wise went to [CIO] Moulton." CW 1 also said that Moulton met with Galanti on almost a weekly basis, and on the topic of IT issues, CW 1 said that between Moulton and Galanti that "there was definitely communication there." CW 1 also said that Galanti reported to CEO Jelinek.

190. According to CW 8, the overall IT budget had to be approved by CEO Jelinek, and that CW 8's boss, Bowersock, met with Jelinek monthly.

191. CW 1 also said that Bowersock attended Audit Committee meetings. CW 8 also stated that Bowersock attended the Board's Audit Committee meetings on a quarterly basis, and for the majority of CW 8's tenure, the IT director that reported directly to Bowersock attended those meetings. CW 8 said the IT director stopped attending the meetings when Mark Mattis became an AVP, Information Systems and began attending with Bowersock.[22]

192. According to CWs, Bowersock knew that the IT Risk Management team had been disbanded, that the Board was making it a "mission" to cut headcount and costs in the IT department in 2018, the employee charged with collecting evidence for SOX audits identified deficiencies in internal controls, and that a strategy addressing deficiencies in change management and user access had been proposed to and approved by CIO Moulton, but was not implemented. Moreover, the Board's Audit Committee was charged with meeting both quarterly and annually with management and Costco's auditors to discuss the audits and the release financial statements in the Company's 10-Ks and 10-Qs, and reported about "significant matters arising from the Committee's work" to the full Board; Defendants Galanti and Jelinek were members of the full Board.[23]

193. That Bowersock took his marching orders from the Board is further supported by CW 6 who stated that beginning around December 2017, during "department engagement meetings," led by Bowersock and attended by Rutherford, it was communicated that the Board was making it a "mission" for the year to reduce IT contractor headcount to reduce costs.

194. Information about the state of the department and user access and change controls clearly was communicated up the chain of command to the VPs – who had a direct line to the

---

[22] According to a commercially available database, Mattis assumed the role of AVP, Information Systems in March 2018.

[23] Defendant Jelinek has been a member of Costco's Board since 2010, and Defendant Jelinek has been a member since 1995.

Board. CW 5 said he attended meetings once a month with VPs from the IT department and raised concerns regarding user access and change management process issues but nothing was ever done. He said he was "shocked" by the lack of oversight and that "nobody cared." CW 5 described the response from the VPs as indifference and said that no changes were made, and Costco cared more about maintaining vendor relationships than addressing the issues.

**(b) Implementation of GDPR Provided Defendants With Knowledge that Their Internal Controls Were Not Compliant with SOX**

195. GDPR became enforceable in May 2018, though preparations for compliance with the law started much earlier with its passage in 2016. For Costco, the preparations for compliance with GDPR alerted the Board and Defendants to deficiencies in Costco's internal controls. This focus alerted Defendants to the material weakness in internal control over financial reporting at least by February or March 2018, and not October 2018 as Defendants told the market.

196. CW 1 dealt primarily with the Company's efforts to get its IT security in compliance with the impending implementation of GDPR and the potential fine of 4% of global revenues the regulation carries with it. CW 1 added that he attended one or two meetings a week with Bowersock and PWC, who was brought in specifically to address GDPR, where internal control issues were discussed. He said they discussed issues such as how easy it was for anyone to log into a particular system, and that the same kind of weaknesses were found throughout Costco's IT ecosystem. CW 1 recalled issues coming up with the GDPR compliance review but senior management said security and remediation measures were "too costly" or required "too much headcount." CW 1 assumed management was assessing what they viewed as risk versus reward. He continued that he believed it would unfortunately take an IT security breach before Costco management took access controls seriously.

197. CW 1 stated that SOX controls at Costco sprawled across their entire IT ecosystem and that issues with GDPR compliance "drew light to a lot of weaker areas" in the IT department. CW 1 said that in the build-up to the implementation of GDPR, Costco's weak


BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104 Tel: 206-652-8660

internal controls "got Board attention," including Defendants Jelinek and Galanti, because of the concerns over weak internal controls, GDPR compliance, and potential SOX compliance issues. CW 1 said that because of GDPR in particular, the Board was "highly engaged" on internal control problems leading into the implementation. CW 1 said Defendant Jelinek would have had to have kept the Board aware of the control weaknesses because the Board would have to approve any spending to improve the IT situation.

198. Additionally, CW 1 said he recalled noticing more focus and emphasis on improving SOX controls starting around late 2016/early 2017, and suggested this was due to the results of audits conducted by VP of Global Internal Audit Joe Grachek. CW 1 described Grachek as being very well-liked, respected, and a no-nonsense long-time employee at Costco, and said that the SOX audit was a concern of Grachek's and that Grachek was "very close to financial-style controls" even before he officially took the role as the head of internal audit at the end of 2017. CW 1 said that Grachek wanted to do the right thing, but that it was "too little, too late" by the time he took on the role of VP of Global Internal Audit.

199. Further, CW 1 said he was aware of several conversations at the Board level about concerns related to Costco's internal controls. He stated the Board met regarding the status of GDPR about once a quarter, but that the Board was meeting with monthly frequency with full implementation of GDPR coming up. CW 1 noted the meetings increased to monthly, occurring on the third or fourth Thursday in February, March, and April of 2018. He said that Defendants Jelinek and Galanti regularly attended the GDPR meetings. CW 1 did not attend any Board meetings, but he did prepare materials for his management team to present at some meetings and was briefed on the meetings afterwards.

200. CW 1 said he provided data to management on GDPR and SOX compliance, and management in turn created PowerPoint presentations based off of the data CW 1 provided to present to the Board at those February, March, and April 2018 Board meetings. CW 1 said he heard about these meetings in March 2018 from Krishnan and Milroy, who most likely heard about it from Bowersock, who attended the meetings only occasionally. CW 1 said he believed

that Defendants Jelinek and Galanti were in these meetings discussing internal control problems with the Board. CW 1 also stated that Defendants Jelinek and Galanti were involved in conversations related to a material weakness in Costco's IT department beginning in February/March 2018.

201. According to CW 8, when concerns about GDPR were brought up in a meeting, from the time it was ratified until the time it was implemented (2 years), "we were assured it was under control" by executives in Costco's IT organization. Meanwhile, however, the Audit Committee was telling them "we need to prepare." The compliance team, under Bowersock's supervision, initiated a project with a consulting company prior to GDPR being implemented. CW 8 said that the logical assumption was that the Board, given their roles on boards at other companies that had to deal with GDPR, asked about concerns specifically related to change management and access control in reference to GDPR or other data privacy laws being implemented, and that they were told that his organization along with the General Counsel's team were handling it.

**(c) Defendants Had Access to Reports and Data**

202. In addition to being intimately involved with the IT department, being provided updates through Bowersock's communications with the Board, and being on notice of the change and access controls though their work on GDPR, Defendants also had easy access to reports that would alert them to the serious issues in the control environment in the IT department.

203. As detailed above, according to CW 8, CIO Moulton approved a strategy on authentication and authorization in 2014 that would have remediated Costco's internal control deficiencies related to change management and access control. In addition to CIO Moulton, all of the VPs and SVPs that reported into the office of the CIO, including Bowersock (who attended audit committee meetings), received this proposal. Despite being approved by CIO Moulton, the strategy was never implemented, and the deficiencies were eventually disclosed as a material weakness. Defendants also failed to implement a tool proposed by a security architect

in the IT department that would have addressed the Company's deficiencies that led to the material weakness in internal controls due to a purported lack of business justification.

204. CW 3 said that during his time at Costco in mid-2017, he created a 50-page report detailing the assessments and interviews that CW 3 and his colleague performed. He said that in preparing this report, he interviewed members of nine different teams within the IT department. CW3 said that through those interviews, it became evident to him that, from an IT security perspective, many people were not properly communicating with each other. He said that the remediation measures Costco identified in their 2018 Form 10-K sounded very similar to his recommendations in the report he submitted in May of 2017. CW 3 stated the report was delivered to his supervisors, including the Director of Global SAP Platform Services. Thus the flaws in Costco's security environment and the remediation measures needed to correct them were known to the Company in May 2017, over a year before the start of the Class Period. While CW 3 was not at the Company during the Class Period, his information establishes that this report existed prior to the Class period starting—meaning, this information was available, and Defendants could have easily accessed it.

205. CW 3 also noted that the remediation measures identified by Defendants in their 2018 Form 10-K were just the "tip" of what was necessary for Costco to remediate the issues in the IT department and that the Company should have known about the issues given his findings over a year prior to October of 2018. CW 3 also stated he thought it was unusual that a company would take a year to remediate. Further, CW 3 noted he was not aware of any internal follow-up on the recommendations detailed in his report nor was he aware of a third party being brought in to remediate the issues. CW 3 also said that his colleague who still worked in change management at Costco told him in October 2018 about the material weakness and the two agreed that Costco should have known about the issues given CW 3's findings more than a year prior.



BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104 Tel: 206-652-8660

206. CW 1 said that Costco used a system called Archer[24] to manage governance issues, including SOX, but that most governance issues discovered through Archer got "squashed at the VP level." CW 1 said he felt that Costco created "their own worst enemy" with Archer because most IT people did not know it existed, despite it being the locale of most of the information relevant for SOX compliance, and the information that was supposed to be entered into Archer was not being entered. He further explained that governance issues were entered into either Archer or ServiceNow but that Archer was the correct system and that many employees did not use it. As an example, CW 1 said that he had been entering his project information into the ServiceNow system for the first 18 months of his employment because nobody told him that Archer existed at Costco and that he was supposed to be using it. CW 1 described the confusion surrounding Archer as a "circle of hell" as management was supposed to handle transfers.

207. CW 1 also advised that there were 4-5 employees doing risk reports, and they would go through Costco's 10-Ks and CW 1 could see, through comparing his research versus the 10-K, that the Company was not actually doing what they reported they were doing. CW 1 said his response was that Costco was "not doing any of this." CW 1 said he informed management of the steps they needed to do what the Company attested to in its SEC filings, but was eventually asked to stop.

208. According to CW 1, prior to the IT risk management team being disbanded, his manager returned the risk management's risk reports to him, wanting him to tone down or remove the warnings that the report contained before it was passed up to Bowersock. CW 1 said he refused, and insisted that it be taken to Bowersock as written. CW 1 said that he believed that

[24] RSA Archer GRC Platform is a software that supports business-level management of governance, risk management, and compliance ("GRC"). The Platform allows users to adapt solutions to their requirements, build new applications, and integrate with external systems without touching a single line of code.

the Company's breakdown of internal controls was everyone's fault at Costco, not just Bowersock's, but that Bowersock knew there were a lot of issues but did nothing about it.

209. As detailed by CWs, the IT department suffered a litany of consequences from the lack of oversight and resources provided, or in this case not provided, by management, including the Individual Defendants. The Individual Defendants had actual knowledge of these deficiencies at least by February or March 2018, if not earlier. Further, Defendants should have known of these deficiencies much earlier than that as they could not have reasonably expected the IT department to implement and maintain adequate internal controls related to financial reporting given the lack of oversight, lack of resources, and ongoing deficiencies in many different areas of the department.

### K. Defendants Mislead the Market About the Adequacy of Costco's Internal Controls Over Financial Reporting

210. Despite these deficiencies, Defendants continued to mislead the market about their internal controls. Defendants made false and misleading statements in the Company's 3Q2018 Form 10-Q SOX Certifications that they designed and implemented internal controls and that those internal controls worked. These statements were false and misleading when made because (1) Defendants deprived the IT department of the resources Costco needed to effectively detect risks and implement controls, and (2) as a result, the Company's access control and change management procedures were ineffective, leading to a material weakness in internal controls related to financial reporting.

### L. Defendants Begin to Reveal the Truth About The Material Weakness in Internal Controls

211. On October 4, 2018, the Company was finally forced to reckon with the consequences of deliberately neglecting its IT department. On that date, in a press release filed with the SEC, Defendant Galanti informed the market that Costco was unable to ascertain the "effectiveness of its internal control over financial reporting as of September 2, 2018." The Company revealed issues related to "user access and program change-management over certain information technology systems that support the Company's financial reporting processes." The

"access issues relate to the extent of privileges afforded users authorized to access company systems."

212. Costco revealed that it expected to report a material weakness in its internal controls related to financial reporting in its upcoming Form 10-K. However, in reporting this expected material weakness, the Company only vaguely mentioned remediation measures, instead saying only that "efforts have begun" without providing any specifics. Further, the Company stated "the material weakness will not be considered remediated until the applicable controls operate for a sufficient period of time" and management can conclude the controls are working effectively. The Company estimated the material weakness would not be remediated until the end of FY 2019.

213. On October 4, 2018, the Company also held a conference call. In response to an analyst's question about the material weakness, Defendant Galanti noted the issues related to granting access to "people within IT or contractors" and that "once they should have had that access relieved, it took a little long to do so." Simply put, ***"the controls weren't in place."*** Additionally, Defendant Galanti stated that "[i]n some of the newer systems, there was no look back ability for certain things." Finally, Defendant Galanti conceded that as of the time of the call, the material weakness "***should have been fixed***" but was not.

214. The market reacted accordingly to the uncertainty regarding Costco's financial controls and reporting as shares declined by $12.86 (as of close on October 5), a drop of approximately 5.55%, on high trading volume.

215. On October 4, 2018, Bloomberg reported that Costco's "information-technology problem, which roiled its bookkeeping and sent the stock tumbling on [that day], was tied to workers getting access to financial data after they should have been cut off." Bloomberg also noted that "a company official, [Defendant Galanti], was cryptic on [his] call with analysts." Other reports on October 4, 2018, echoed the message. For example, Investor Business Daily explained that Costco "posted strong Q4 earnings after the close but warned of deficiencies in its information technology related to access to financial reporting systems." And


BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104 Tel: 206-652-8660

MarketWatch reported that Costco's total sales numbers "surpassed Wall Street expectations" but that its shares fell "after the retailer said it expects to find 'material weakness' in internal controls over financial reporting when it releases its annual report." The popular investment website "Seeking Alpha" ran an article with the headline, "Costco lower after earnings, material weakness disclosure."

216. The publication Zacks Investment Research, a leading service tracking analyst estimates, reported that Costco beat estimates on both per share earnings and revenue, indicating that Costco had outperformed expectations—and despite this its share price fell. The following chart shows the expected and actual results:

| | Zacks Analyst Consensus | Costco's 4Q 2018 Results |
|---|---|---|
| Earnings Per Share | $2.34 | $2.36 |
| Revenue | $44.40 billion | $44.41 billion |

217. Reports on October 5, 2018, were similar. Yahoo Finance reported that "despite an in-line bottom-line result and the top-line narrowly beating the consensus, the warehouse club raised concerns with its disclosure that it will report material weakness in its internal controls." An article in Chain Store Today, a leading retail industry publication, was headlined, "Costco Q4 profit surges; reports flaw in financial controls." The popular investment website Motley Fool ran an article titled "Why Costco Stock Fell Today" which stated that investors were "rattled by a potential accounting issue that the company disclosed." The article went on to explain that Costco met analyst expectations for revenue and beat analyst expectations for profit per share, but stated that it had reported a "'material weakness in internal control' that spooked investors." The San Francisco Chronicle wrote that '[d]espite a strong earnings report, Costco shares dropped 5.5 percent after the warehouse club said it will review past financial reports because of possible deficiencies." Chanele2e,[25] published an article entitled "Costco Investigates

[25] Chanele2e is an online publication focused on research for MSPs, cloud services providers, strategic IT service providers, resellers, VARs, integrators & channel partners.

Access Control Issues Involving Financial systems." The article, written by Joe Panettieri, commented on the statements made by Defendants in their October 4, 2018 earnings call and stated "[i]n a vague statement, the warehouse indicated that the access issue involved both internal employees and contractors."

**M. Defendants' Final Revelation of the Truth About Their Internal Controls Deficiencies**

218. On the morning of October 26, 2018, Costco finally confirmed the material weakness and revealed the true extent; the Company's internal controls over financial reporting were ineffective for financial results reported as of September 2, 2018, which meant the material weakness stretched all the way back to the end of the previous fiscal year. In its Form 10-K for FY 2018 ("FY 2018 10-K"), signed by Defendants Jelinek and Galanti, Defendants revealed that they had "identified a material weakness in internal control related to ineffective information technology general controls (ITGCs) in the areas of user access and program change-management over certain information technology (IT) systems that support the Company's financial reporting processes." The Company further revealed that the internal weakness had far-reaching effects as the "business process controls (automated and manual) that are dependent on the affected ITGCs were also deemed ineffective because they could have been adversely impacted."

219. Defendants blamed the material weakness in its financial reporting on three primary sources. First, Defendants stated they lacked sufficient documentation to maintain an effective change management and knowledge transfer program. This lack of documentation meant the Company "was overly dependent upon knowledge and actions of certain individuals with IT expertise, which led to failures resulting from changes in IT personnel." Second, Defendants admitted they failed to properly train IT personnel on the importance of IT internal controls. Third, Defendants informed the market that the Company's risk assessment processes were "inadequate to identify and assess changes in IT environments that could impact internal controls over financial reporting." The lack of documentation and efficient risk assessment


BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104 Tel: 206-652-8660

procedures was a violation under the Individual Defendants' SOX duties as they are required to have sufficient documentation to support their assessment.

220. Costco further described the severity of this misstatement by warning of its potential repercussions. Costco disclosed that there was uncertainty regarding when and if the Company would be able to adequately remediate the issue—stating "if not remediated appropriately or timely" that certain bad results would occur—namely, a "loss of investor confidence" and an "advers[e] impact on [its] stock price." Costco continued: "We are implementing remedial measures and, ***while there can be no assurance that our efforts will be successful***, we plan to remediate the material weakness prior to the end of fiscal 2019." Despite its matter of fact tone, this statement is astounding—Costco was informing the market that its IT department was in such disarray that it could not be sure that it would even be able to remediate the problem. Similarly, Costco warned of the dire consequences of failing to remediate, stating:

> If we are unable to remediate the material weakness, or are otherwise unable to maintain effective internal control over financial reporting or disclosure controls and procedures, our ability to record, process and report financial information accurately, and to prepare financial statements within required time periods, could be adversely affected, which could subject us to litigation or investigations requiring management resources and payment of legal and other expenses, negatively affect investor confidence in our financial statements and adversely impact our stock price.

221. Costco's Auditor, KPMG, also provided an explanation of this situation as part of Costco's FY 2018 10-K. They stated that "because of the effect of the material weakness," Costco had not "maintained effective internal control over financial reporting as of September 2, 2018 based on the COSO Framework. KPMG also wrote that the "***Company's management is responsible for maintaining effective internal control over financial reporting and for its assessment of the effectiveness of internal control over financial reporting***." This echoed the Company's recognition in that same Form 10-K that "management is responsible for establishing and maintaining adequate internal control over financial reporting." KPMG also explained the meaning of a "material" weakness, stating:

> A material weakness is a deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis. The following material weakness has been identified and included in management's assessment:
>
> There were ineffective information technology general controls (ITGCs) in the areas of user access and program change-management over certain information technology (IT) systems that support the Company's financial reporting processes. As a result, business process automated and manual controls that were dependent on the affected ITGCs were ineffective because they could have been adversely impacted. These control deficiencies were a result of: IT control processes lacked sufficient documentation; insufficient knowledge and training of certain individuals with IT expertise; and risk-assessment processes inadequate to identify and assess changes in IT environments and personnel that could impact internal control over financial reporting.

222. KPMG also explained some of the reasons why internal controls are of such importance. It noted generally that "a company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles." Implicit in this statement is that a lack of internal controls means the Company cannot provide "reasonable assurance" regarding the reliability of their financial reporting. It also explained that internal controls:

> (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.[26]

---

[26] A similar statement appears in the section of Costco's Form 10-K for FY 2018 titled "Management's Annual Report on Internal Control Over Financial Reporting."


BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104 Tel: 206-652-8660

223. Defendants also laid out some of the measures that would be necessary to remediate the material weakness in the Company's internal controls related to financial reporting. It warned that this remediation would "result in additional technology and other expenses." The remediation actions, which are discussed in greater depth in Section VI(N), include: (i) creating and filling an IT Compliance Oversight function; (ii) developing a training program addressing ITGCs and policies, including educating control owners concerning the principles and requirements of each control, with a focus on those related to user access and change-management over IT systems impacting financial reporting; (iii) developing and maintaining documentation related to underlying ITGCs to promote knowledge transfer upon personnel and function changes; (iv) developing enhanced risk assessment procedures and controls related to changes in IT systems; (v) implementing an IT management review and testing plan to monitor ITGCs with a specific focus on systems supporting financial reporting processes; and (vi) enhanced quarterly reporting on the remediation measures to the Audit Committee of the Board of Directors.

224. Investors reacted to the news of the Company providing additional details of the severity of the material weakness in its internal controls and the many remediation steps needed to fix the material problem related to financial reporting by doubling their trading volume and driving down Costco's share price by $8.21, a drop of approximately 3.63%.

225. Even months later, on December 10, 2018, Forbes posted an article entitled "What To Expect From Costco's Q1 Earnings," that commented on the net earnings announced in the 2018 Form 10-K (issued on October 25, 2018). The article stated "The retailer reported net earnings of $2.36 per share, up 13% y-o-y. However, the stock traded down, as gross margins narrowed despite higher sales and the Company disclosed a material weakness in its internal controls."

**N. Remediation Measures Show the Severity of the Material Weakness in Internal Controls and the Falsity of the Class Period Statements**

226. In its Form 10-K for FY 2018, filed on October 26, 2018, Costco provided a description of the expensive and widespread remediation measures it was planning to undertake. These remediation measures further revealed the severity of the failings within Costco.

227. ***First***, the revelation that Costco needed to create and fill an IT Compliance Oversight function revealed that such a function was previously missing (*i.e.*, did not exist during the Class Period). Under the COSO Framework, the Company needed to have a "Control Environment" comprised of structures that provide the basis for carrying out internal controls across the organization. The third principle supporting the requirement of a Control Environment is management's responsibility to establish appropriate structures and authorities to achieve effective internal controls. As explained by KPMG's public guidance on internal controls, to support this function means management must assign competent authorities across the organization to oversee functional areas such as IT. Here, Costco neglected to involve personnel with adequate competence related to IT risks, despite the fact that IT was a core component of Costco's business and necessary for a functioning Control Environment. The failure to implement an IT Compliance Oversight function prior to the end of the Class Period left Costco vulnerable to the risks associated with IT control failures and also rendered the SOX Certifications signed by the Individual Defendants during the Class Period false and misleading.

228. ***Second***, Costco's revelation that it would need to "develop" a training program addressing internal controls and policies revealed that it lacked such a training program during the Class Period. The absence of such a training program in earlier periods was a failure at the most basic of levels. An effective Control Environment relies on the principle of the organization's "commitment to competence." A Point of Focus associated with this principle is the organization's provision of training to attract and develop sufficient competent personnel. The KPMG Reference Guide on internal controls asks, "Does the entity have programs in place (*e.g.*, mentoring, training, etc.) that demonstrate management's commitment to attract, develop,

and retain competent personnel?" The answer here, prior to the remediation effort, was no. In failing to establish a training program, the Individual Defendants failed to satisfy the duty to create an IT department to adequately protect internal controls imposed by SOX and thus their certifications during the Class Period were false and misleading. Additionally, because Costco management failed to develop any training related to internal controls, IT personnel were allowed to engage in activities that created a reasonable possibility that a material misstatement would occur.

229. ***Third***, Costco's revelation that it would be "developing and maintaining documentation underlying ITGCs to promote knowledge transfer upon personnel and function changes," revealed that it previously lacked such documentation. Chapter 4 of the COSO Framework states, "[e]ffective documentation assists in capturing the design of internal control and communicating the who, what, when, where, and why of internal control execution and creates standards and expectations of performance and conduct." KPMG's public guidance uses even stronger language, stating: "Management's documentation plays a critical role in supporting management's assertion about internal control over financial reporting. Sufficient, appropriate documentation is a requirement in the COSO Framework and specifically discussed in the SEC Staff guidance." Furthermore, SEC Release No. 33-8810, stated that "Management is responsible for maintaining evidential matter, including documentation, to provide reasonable support for its assessment [of internal controls]." In fact, this same SEC release identifies management's documentation of controls as an "integral part" of the basis to support management's assertions regarding the effectiveness of controls. Yet, Costco's remediation necessitated the ***creation*** of documentation related to internal controls to meet this most basic requirement of effective SOX controls, thus rendering the certifications signed by the Individual Defendants during the Class Period false and misleading. This remediation evidenced a massive gap in Costco's practices, which would have affected other forms of compliance as well. That is, Costco management could not have offered appropriate training related to internal controls prior to the time that it created documentation of those internal controls. Nor could Costco's

management adequately assess the risk related to changes in IT systems without documentation. Similarly, the Individual Defendants and the Audit Committee could not effectively oversee Costco's internal controls when the core internal controls did not exist or had not been documented.

230. ***Fourth***, Costco's need to "develop enhanced risk assessment procedures and controls related to changes in IT systems" reveals the insufficiency of their prior risk assessment procedures. KPMG's guidance states that identifying relevant risks to financial reporting is "an essential component of [internal control over financial reporting] because failure to understand the likely sources of misstatements increases the possibility of a material misstatement in the financial statements." In fact, one of the principles underlying the Risk Assessment component of the COSO Framework is: "The organization identifies and assesses changes that could significantly impact the system of internal control." According to KPMG, this principle is "required to be met in order [for management] to conclude that [internal control over financial reporting] is effective." Yet, here again, despite the fact that Costco was in the process of making significant changes to its IT systems, Costco's internal controls were inadequate to assess the risk associated with such changes. Moreover, because Costco management could not have an adequate ability to assess the risks caused by such changes, Costco failed to have adequate controls in place to respond to those risks. Costco's failure to have basic controls in place meant the Individual Defendants' SOX Certifications were false and misleading because the Individual Defendants could not sufficiently assess the effectiveness of the Company's controls without adequate risk assessment procedures.

231. ***Fifth***, Costco's need to implement an "IT management review and testing plan to monitor ITGCs with a specific focus on systems supporting [its] financial reporting processes" reveals that it lacked such management review and testing prior to this remediation. This remediation expands on the actions described above to highlight that Costco management also failed to have appropriate review controls in place to monitor its ITGCs. Here again, the absence of such controls prior to the commencement of remediation was a basic lapse by Costco – and


BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104 Tel: 206-652-8660

rendered its SOX Certifications false. For example, KPMG's guidance states that "[m]anagement should pay particular attention to documenting the…design and operating effectiveness of management review controls." Similarly, KPMG summarizes the SEC's guidance on this issue as requiring management to "identify the risks to reliable financial reporting prior to identifying controls and monitoring them for effectiveness." Thus, while the overall shortcomings in Costco's internal controls and procedures were glaring, the specific technical weaknesses were obscured by the decision to not satisfy its duty to implement a review or testing plan prior to the remediation.

**O. Post-Class Period Revelations**

232. Even a full quarter after revealing the material weakness in the Company's internal controls, Defendants were still scrambling to correct the issue leaving investors to guess as to the effectiveness of the Company's internal control and subsequent financial reporting. Defendants also discussed the financial impact on Costco's IT spend.

233. On December 13, 2018, Defendants held a conference call to discuss its first quarter 2019 results. In response to a question from an analyst about Costco's expenses, Defendant Galanti admitted that "on the IT side, we've got a heck of a lot going on."

234. Additionally, on December 20, 2018, Costco filed with the SEC its first quarter results in a Form 10-Q. The Form 10-Q again informed investors that Costco's "disclosure controls and procedures were not effective . . . due to a material weakness in internal control over financial reporting," and that the remediation of the weakness was still not completed.

235. Analysts took note of the continued weakness in Costco's internal controls related to financial reporting. On December 24, 2018, Argus published a research report highlighting this risk. Under a section titled "Management & Risks," Argus noted that Costco "reported a material weakness in internal control in its annual report because of insufficient controls over user access and management of program changes." The report further noted that Costco would need to remediate deficiencies in its controls related to "access to certain financial and reporting systems."


BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104 Tel: 206-652-8660

236. Additionally, on March 13, 2019, Costco filed with the SEC its second quarter results in a Form 10-Q, and on June 5, 2019, Defendants filed with the SEC its third quarter results in a Form 10-Q. In each of those Form 10-Qs, Defendants again informed investors that Costco's "disclosure controls and procedures were not effective . . . due to a material weakness in internal control over financial reporting," and that the remediation of the weakness was still not completed.

237. On October 11, 2019, Costco filed its 2018 Form 10-K and Defendants disclosed that they had finally "completed the remediation measures related to the material weakness and concluded that our internal control over financial reporting was effective as of September 1, 2019." However, Defendants also stated that:

> Completion of remediation does not provide assurance that our remediation or other controls will continue to operate properly. If we are unable to maintain effective internal control over financial reporting or disclosure controls and procedures, our ability to record, process and report financial information accurately, and to prepare financial statements within required time periods could be adversely affected, which could subject us to litigation or investigations requiring management resources and payment of legal and other expenses, negatively affect investor confidence in our financial statements and adversely impact our stock price.

## VII. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

238. During the Class Period, Defendants made numerous materially false and misleading statements and omissions.[27]

239. The gravity of the misstatements detailed in this Section is partially demonstrated by the substantial market reactions to the revelation of the truth. This reaction was sensible, *inter alia*, because the fraud concealed: (a) that Costco would need to undertake a vast effort and expend significant resources to transform its IT department into one that would be capable of supporting the necessary internal controls; (b) that there was significant risk that Costco's

[27] The statements that are ***bolded and italicized*** in this section are statements alleged to be false or misleading.

reporting data would be inaccurate, especially until the issue was fully remediated, which risk could reasonably cause investors to discount their valuation of the Company; (c) that Costco could be subject to governmental or regulatory action regarding its internal controls and treatment of data, especially in an environment where inadequate data security can result in massive fines, such as fines up to 4% of revenue under the GDPR; and (d) it revealed a serious risk that Costco's low cost operating model was a house of cards—*e.g.*, that it was able to maintain SG&A spend of only 10% of net sales (whereas its competitors were in the range of 15-20%) only because it cut corners in critical functions and that its fast-paced growth was not accompanied by a sustainable investment in critical controls.[28]

240. Costco made each of the statements described in this Section because they were filed by or on Costco's behalf with the SEC. Each of the Individual Defendants had ultimate control of the SEC filings described in this Section and this control is demonstrated, among other ways, because: (1) the Individual Defendants signed each of the SEC filings; (2) as Costco's CEO and CFO, Defendants Jelinek and Galanti had direct control over what Costco said in public filings—especially in filings requiring their direct knowledge and involvement and as important as those described in this Section; (3) as Costco's CEO and CFO, Defendants Jelinek and Galanti were required to have direct knowledge of and involvement in the SOX Certifications they each signed; (4) the Individual Defendants are members of the Board, and therefore were in control of Costco's statements in formal public filings—especially in filings as important as those described in this Section; and (5) the ultimate control of the Individual Defendants is further established by their involvement in the very activity described in these statements.

---

[28] To the extent that any false statement in this section is representing a matter of opinion or is qualified as expressing a fact as to the speakers present understanding, that statement is false because defendants knew, or were reckless in not knowing, of the internal control deficiencies by no later than March 2018, and because any such statement could not be supported by a credible factual basis, given the condition of Costco's IT department.


BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104 Tel: 206-652-8660

241. Despite the Company's knowledge (by at least March 2018) of the material weaknesses in internal controls that affected their financial reporting, Defendants made false and misleading statements and omissions in the 3Q2018 Form 10-Q published after the market closed on June 6, 2018, about their compliance with SOX and the effectiveness of their internal controls. The 3Q2018 Form 10-Q was signed by Defendants Jelinek and Galanti.

242. The 3Q2108 Form 10-Q stated the following:

> Item 4—Controls and Procedures
>
> ***As of the end of the period covered by this Quarterly Report on Form 10-Q, we performed an evaluation under the supervision and with the participation of management, including our Chief Executive Officer and Chief Financial Officer, of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities and Exchange Act of 1934 (the Exchange Act)). Based upon that evaluation, our Chief Executive Officer and Chief Financial Officer concluded that, as of the end of the period covered by this Quarterly Report, our disclosure controls and procedures are effective.***
>
> ***There have been no changes in our internal control over financial reporting (as defined in Rules 13a-15(f) or 15d-15(f) of the Exchange Act) during our most recently completed fiscal quarter that have materially affected or are reasonably likely to materially affect our internal control over financial reporting.***

243. This statement was false and misleading because, as discussed more fully in Section VI(L, M) and later admitted by Defendants themselves (*See* Sections VI(J)), Defendants' internal controls and procedures were **not** effective as of this date of this statement. In fact, at the time this statement was made, Costco had a material weakness in internal controls over financial reporting (with a "material weakness" being the most severe form of internal control deficiency). As explained herein, that material weakness included ineffective ITGCs in the areas of user access and program change-management over certain IT systems that support the Company's financial reporting processes. As a result, business process controls that were dependent on the affected ITGCs were ineffective because they could have been adversely impacted. These control deficiencies were a result of the fact that: (1) Defendants consciously failed to adequately supervise and fund the IT department to ensure that sufficient internal

controls were both established and evaluated; (2) IT control processes lacked sufficient documentation; (3) IT personnel lacked sufficient knowledge and training; and (4) risk-assessment processes were inadequate to identify and assess risks related to changes in IT environments and personnel that could impact internal controls over financial reporting. As discussed in Section VII(A)(5), Defendants knew (or were deliberately reckless in not knowing) by no later than March 2018 of the material deficiencies in internal controls as they related to financial reporting.

244. The 3Q2018 Form 10-Q also included two SOX Certifications. Defendants Jelinek and Galanti each signed their respective SOX Certifications and certified the following statement:[29]

> I [●] certify that:
>
> I have reviewed this Quarterly Report on Form 10-Q of Costco Wholesale Corporation ("the registrant");
>
> 2) Based on my knowledge, ***this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report***;
>
> 3) ***Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;***
>
> 4) The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

---

[29] This qualifies as two separate statements – one made by Defendant Jelinek and one made by Defendant Galanti.

> ***Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;***
>
> ***Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;***
>
> ***Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and***
>
> ***Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and***
>
> 5) ***The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):***
>
> ***All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and***
>
> ***Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.***

245. These statements were false and misleading because the Form 10-Q contained untrue statements of material fact as it relates to internal controls over financial reporting,


BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104 Tel: 206-652-8660

Defendants failed to design sufficient internal controls over financial reporting, and Defendants failed to evaluate the effectiveness of these controls. As discussed more fully in Section VI(J), and later admitted by Defendants themselves (*See* Sections VI(L, M)), Defendants' internal controls and procedures were **not** effective as of this date of this statement. In fact, at the time this statement was made, Costco had a material weakness in internal controls over financial reporting (with a "material weakness" being the most severe form of internal control deficiency). As explained herein, that material weakness included ineffective ITGCs in the areas of user access and program change-management over certain IT systems that support the Company's financial reporting processes. As a result, business process controls that were dependent on the affected ITGCs were ineffective because they could have been adversely impacted. These control deficiencies were a result of the fact that: (1) Defendants consciously failed to adequately supervise and fund the IT department to ensure that sufficient internal controls were both established and evaluated; (2) IT control processes lacked sufficient documentation; (3) IT personnel lacked sufficient knowledge and training; and (4) risk-assessment processes were inadequate to identify and assess risks related to changes in IT environments and personnel that could impact internal control over financial reporting. Moreover, despite knowing by no later than March 2018 about these deficiencies in internal controls (or being deliberately reckless in not knowing), Defendants failed to disclose all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting. (*See* Section VIII).

246. The 3Q2018 Form 10-Q also included two Certifications Pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002. Defendants Jelinek and Galanti each signed these respective certifications and certified the following statement:[30]

> In connection with the Quarterly Report of Costco Wholesale Corporation (the Company) on Form 10-Q for the quarter ended

---

[30] This qualifies as two separate statements – one made by Defendant Jelinek and one made by Defendant Galanti.


BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104 Tel: 206-652-8660

> May 13, 2018, as filed with the Securities and Exchange Commission (the Report), I, [] certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that:
>
> (1) The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and
>
> (2) ***The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.***

247. This statement was false and misleading because it did not present "in all material respects the financial condition" of the Company. As discussed more fully in Section VI(J), and later admitted by Defendants themselves (*See* Sections VI(L, M)), Defendants' disclosure controls and procedures over financial reporting (which necessarily affects the "financial condition" of the Company) were **not** effective as of this date. In fact, at the time this statement was made, Costco had a material weakness in internal controls over financial reporting (with a "material weakness" being the most severe form of internal control deficiency). As explained herein, that material weakness included ineffective ITGCs in the areas of user access and program change-management over certain IT systems that support the Company's financial reporting processes. As a result, business process controls that were dependent on the affected ITGCs were ineffective because they could have been adversely impacted. These control deficiencies were a result of the fact that: (1) Defendants consciously failed to adequately supervise and fund the IT department to ensure that sufficient internal controls were both established and evaluated; (2) IT control processes lacked sufficient documentation; (3) IT personnel lacked sufficient knowledge and training; and (4) risk-assessment processes were inadequate to identify and assess risks related to changes in IT environments and personnel that could impact internal controls over financial reporting. Defendants knew (or were deliberately reckless in not knowing) by no later than March 2018 of the material deficiencies in internal controls as they relate to financial reporting.

248. On October 4, 2018, Defendants began to reveal the truth about the material weakness in internal controls, making partial disclosures in a press release attached to a Form 8-K and on a conference call regarding the material weakness in internal control over financial reporting. However, Defendants withheld the full extent of the Company's deficiencies and the remediation measures necessary to correct the material weakness. Then, on October 26, 2018, in their Form 10-K, Defendants finally revealed the true extent of the problem and the significant remediation efforts required to fix them. *See* Section VI(M). On this news, the stock dropped from a closing price of $226.40 on October 25, 2018, to $218.19 on October 26, 2018—a 3.63% drop on heavy volume of 3,995,362 shares.

## VIII. ADDITIONAL ALLEGATIONS SUPPORTING SCIENTER

249. As described below, the Individual Defendants had actual knowledge that the statements and omissions made by them were false and misleading, or acted with deliberately reckless disregard for the truth or falsity of those statements and omissions. The Individual Defendants' knowledge of, or deliberately reckless disregard for the truth, is demonstrated by admissions and substantial direct and circumstantial evidence supporting a strong inference of scienter.

### A. Knowledge and Duties to Investigate

250. Defendants had various duties to inquire into the condition of Costco's IT department, including through the sort of investigation required by the COSO Framework, and through accessing available information about the status of the IT department. This section focuses on highlighting the many facts indicating that Defendants either did conduct a thorough review of the IT department (as they were required to do), or were at least deliberately reckless in failing to do so. The following section, Section VIII(B), highlights the reasons why a thorough review of the IT department did and/or would have revealed that Costco had a material weakness in its internal controls, such that Defendants' public statements were untrue.

**1. The Individual Defendants Had Oversight Duties Imposed by COSO**

251. The Company's chosen framework for complying with SOX was the COSO Framework. The COSO Framework imposed significant and very specific oversight obligations upon Costco's Board. Defendants Galanti and Jelinek were both members of the Board and thus, were under duties to comply with the oversight obligations imposed by the COSO Framework.

252. Pursuant to the COSO Framework, the Individual Defendants as members of the Board were required to closely monitor the control activities of not only senior management, but the entire organization. Below is a table detailing the extent of the oversight required by the Individual Defendants as members of the Board:

| # | Internal Control Requirement | Required Oversight Activities of the Board (including the Individual Defendants) |
|---|---|---|
| 1 | Control Environment | • define and apply standards of conduct<br>• establish expectations and evaluate the performance and integrity of the CEO<br>• establish appropriate oversight structures and processes<br>• commission Board oversight effectiveness reviews and improvements<br>• exercise fiduciary care to shareholders and due care in oversight<br>• challenge senior management by questioning the organization's plans and procedures, and requiring follow-up and corrective actions where necessary |
| 2 | Risk Assessment | • **consider internal and external risk factors**<br>• **identify issues and trends**<br>• **challenge management's assessment of risk, including related to change management**<br>• evaluate the organization's response to assessing risks relating to innovations and changes triggered by new technology |
| 3 | Control Activities | • **make specific inquiries of management regarding control activities in significant risk areas and remediation, as necessary**<br>• **oversee senior management in their performance of control activities** |
| 4 | Information and Communication | • **communicate direction and "tone at the top"**<br>• **obtain, review, and discuss information relating the organization's internal control objectives**<br>• scrutinize information provided and present alternative views |


BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104 Tel: 206-652-8660

| | | |
|---|---|---|
| | | • review disclosures to external stakeholders<br>• allow for and address upward communication of information |
| 5 | Monitoring Activities | • **assess and oversee monitoring activities and management's evaluation and remediation of deficiencies**<br>• **engagement with management, and internal and external auditors to evaluate the level of awareness of objectives, risks, and control implications associated with evolving business, infrastructure, and regulations** |

253. Confidential witnesses, and common sense, establish that Defendants did, in fact, engage with these requirements as they pertain to the IT control environment. Defendant Jelinek approved the full IT budget and was fully apprised of IT spending. At the same time, Defendant Jelinek complained of the level of IT spending, and pushed the department to do more with less. As former employees explained—management focused on business and growth, with security and controls being an "afterthought" and seen as a "necessary evil." The message was pervasive and felt through all areas of the internal control environment. While the COSO Framework requirements mandate that the "tone at the top" stress the importance of maintaining effective internal controls, the true attitude, or "tone at the top," of Costco and the Individual Defendants resulted in: (1) competent personnel ***not*** being hired or retained; (2) the Risk Management team being disbanded in mid-2017 (a fact that Defendants must have known if they were overseeing the control environment as required); and (3) that SOX compliance was woefully understaffed and underserved, resulting in multiple problems in that control environment.

254. Pursuant to the COSO Framework, the Individual Defendants were required to challenge management's assessment of risk, ***specifically including risk related to change management***. Change management (and user access control) were so vital to the control environment that they are specifically called out in the COSO Framework. Thus, the Individual Defendants themselves were under a heightened duty to pay attention to these important internal controls and make sure they were in place. However, Costco's IT department was severely lacking in fundamental areas, specifically related to user access and change management.


BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104 Tel: 206-652-8660

### 2. Defendants' Conscious Neglect of the IT Department Supports a Strong Inference of Scienter

255. Costco's conscious and deliberate neglect of its IT department further supports an inference of Defendants' scienter. As corroboration of the former employees who stated that Defendants did not want to spend the necessary funds on the IT department, the Individual Defendants allocated significantly less of their spending on IT than did their competitors. A review of Costco's SG&A budget and known or readily estimable expenses, indicates that its spending on IT was alarmingly lower than its peers. Additionally, Costco spent a significantly lower amount of its "extremely limited" overall IT budget on security than the industry average.

256. The Individual Defendants were undeniably aware of the lack of resources being allocated to the IT department, due to their roles managing Costco's budgets as CEO and CFO. The Individual Defendants, and in particular Defendant Jelinek, controlled and approved IT spending. Thus, he and the Board, including Defendant Galanti, were in a position to remedy this bleak environment but chose not to. Either Defendants Jelinek and Galanti were aware of the problems with the risks posed by the lamentable state of the IT department, or they turned a blind eye to these issues.

257. In other words, this low funding not only deprived Costco of the necessary resources to operate properly, but it also was a red flag indicating the need to take special interest in the state of the IT department, because it carried with it substantial risks. Of course, Costco was not prohibited from trying to minimize IT spending, but this highly risky decision inherently functioned as a red flag obligating the Individual Defendants to pay careful attention to whether this risky strategy was causing operational problems.

### 3. Heightened Attention was Required Upon Disbanding the Risk Management Department

258. Beyond generally starving the IT department of the resources it needed, Defendants also made specific decisions regarding the IT department that obviously imposed heightened obligations to be attentive to the condition of that department.


BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104 Tel: 206-652-8660

259. In mid-2017, Costco disbanded its IT risk management department. This alone was a dramatic "red flag" requiring the Individual Defendants to pay special attention to the state of the department.

260. The Individual Defendants were undeniably aware of these decisions due to their significance as well as the Individual Defendants' roles managing Costco's IT department and its budgets as CEO and CFO. In other words, Defendants were clearly on notice that it was not "business as usual" within the IT department, but that the very group responsible for managing risk had been disbanded, and this obviously meant that special attention to the state of the IT department would be required.

**4. Red Flags Due to Legal and Regulatory Issues**

261. First, in early 2017 Costco announced a major settlement related to failed controls regarding its pharmacy products. The Individual Defendants were aware of this settlement, which was disclosed in its annual report and required Costco to pay almost $12 million and spend approximately $127 million on a new pharmacy management system.

262. Second, also in 2017, Costco began its investigation into an employee embezzling hundreds of thousands of dollars from Costco using fraudulent accounting entries. This misconduct would not have been possible had Costco had adequate internal controls. By January 2018, the employee was indicted by the Department of Justice. The Individual Defendants must have been aware of this criminal activity within Costco, which was substantially covered by the press and has been prosecuted following an internal investigation by Costco, and with the assistance of Costco executives.

263. Third, in October of 2018, Costco concluded a regulatory action by the Consumer Product Safety Commission ("CPSC"), related to the sale of defective products in 2015, with a settlement requiring Costco to implement "a system of internal controls and procedures," which was a nod to the lax controls that led to the alleged violations. Individual Defendants obviously would have been aware of this regulatory action far earlier than the announcement of the settlement.

264. These events were obvious red flags indicating general problems within Costco's internal control environment, requiring careful and heightened attention to that area, and to the specific deficiencies in internal control over financial reporting that caused Costco to disclose its material weakness.

### 5. Implementation of GDPR Alerted Defendants to Problems with Change Management and User Access Controls

265. As part of their monitoring requirements under the COSO Framework and otherwise, the Individual Defendants were required to engage with management to evaluate the level of awareness of objectives, risks, and control implications associated with evolving business and infrastructure needs, and regulations. One such regulation that significantly affected Costco and other publicly traded companies worldwide was GDPR.

266. According to CW 1, the implementation of GDPR drew the attention of the Board, including the Individual Defendants, to the previously neglected area of internal controls, and specifically in the area of SOX compliance. In their role as Board members, the Individual Defendants would have had to approve any spending to improve the IT deficiencies, were presented with materials on internal controls in meetings, and began attending meetings with increased frequency as a result of the implementation of GDPR. Also in their role as Board members, the Individual Defendants were involved in conversations related to material weaknesses in the IT department, and that Defendant Jelinek specifically was involved in several conversations related to Costco's internal controls months before the start of the Class Period.

267. That the Individual Defendants had Board materials detailing weaknesses in the IT department, regularly attended Board meetings where weaknesses in the Company's internal controls were discussed, and discussed material weaknesses in the IT department as early as February or March 2018 shows that the Individual Defendants knew, or were at least deliberately reckless in not knowing, that they could not reasonably certify as to the effectiveness of Costco's internal controls on June 6, 2018.


BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104 Tel: 206-652-8660

### 6. Defendants Recognized SOX Deficiencies in Internal Emails

268. According to CW 1, Costco got "creative with SOX" in order for their audits to pass muster. CW 1 recalled reading 4-5 emails sent out by Defendant Jelinek starting in early 2017, stating that everyone at Costco had to do better at being SOX compliant in their job. CW 1 said that Jelinek was letting the company know they needed to "button up" their internal controls. CW 1 described the results of the emails as being sent out, and then Jelinek's office "going quiet," and then "everybody went about their business." Despite these bare efforts (and probably because they were so shockingly minimal), nothing was done to remedy the problem.

### 7. Costco's Expansion Into E-Commerce Imposed Heightened Duties

269. Costco's e-commerce expansion was an additional red flag for Defendants as the Company expanded into a new area and put additional strain on an already underfunded and understaffed IT department, without making a "significant investment" in the expansion. The Individual Defendants undeniably knew about this massive expansion in Costco's online business and therefore were aware of the need to pay extra attention to its IT department, which would have been strained by this expansion.

### 8. Quarterly Review Obligations

270. As noted above in Section VI(G), the SEC has indicated that companies are required to conduct a review of internal controls each quarter that is appropriate under the circumstances. Here, Defendants were aware of many reasons why their reviews required heightened attention, including the low level of IT spending, the issues that were discussed due to the GDPR implementation, the e-commerce expansion, and the past legal and regulatory issues. In any event, even a limited review would have exposed the glaring problems within the IT department. Defendants were on notice that a fulsome quarterly review for 3Q2018 (which would have revealed the material weakness) was required under the circumstances.

### 9. The Individual Defendants Admitted to Evaluating Costco's Disclosure Controls and Internal Controls over Financial Reporting

271. As set forth in their SOX Certifications, the Individual Defendants evaluated the effectiveness of the registrant's disclosure controls and procedures, and Costco's internal controls over financial reporting.

272. While the CEO and CFO are allowed to delegate the actual implementation and daily oversight of the internal controls under SOX, they are not allowed to delegate the evaluation of those controls. Additionally, CIO Moulton and key members of his office routinely communicated with the Individual Defendants, and both the Individual Defendants and the Office of the CIO were aware that Defendants could not reasonably certify as to the effectiveness of Costco's internal control over financial reporting.

273. Additionally, in fulfilling their duty to evaluate the Company's internal controls and sign certifications attesting to the adequacy of those controls quarterly and annually, the Individual Defendants would have required some form of regular reports, and/or a review of the controls put in place over financial reporting. If the Individual Defendants were receiving regular reports on the state of the controls that existed in the IT department, or reviewing the controls put in place for financial reporting, they would have known, or were deliberately reckless in not knowing, of the department-wide deficiencies and the material weaknesses in access control and change management control functions. If the Individual Defendants were not receiving some form of regular reports and/or not conducting a review of the controls put in place over financial reporting, then they knowingly, or at the very least deliberately recklessly, misled the market in claiming that they designed and implemented internal controls over financial reporting under SOX, and personally reviewed those controls.

274. In certifying as to the effectiveness of Costco's internal controls under SOX, Defendants were tasked with conducting or at least overseeing a review of the Company's internal controls over financial reporting. While the SOX Certifications alone may not be sufficient to support a strong inference of scienter, they do support a strong inference that


BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104 Tel: 206-652-8660

Defendants actually did what they attested to be doing in those Certifications—*i.e.*, that they actually conducted an evaluation of the disclosure controls and procedures and Costco's internal controls over financial reporting.

### B. Available Information Regarding the Impermissible Condition of Costco's IT Department

275. Even a brief review of the condition of the IT department would have alerted Defendants to the serious problems detailed herein. The prior section (Section VII(A)) highlighted[31] that the Individual Defendants did, and/or were deliberately reckless in not paying close attention to the IT department; this section details how upon paying any attention to the IT department, the Individual Defendants would have known of the material problems. Given the state of the Company's IT department, any level of involvement or evaluation of the IT department by the Individual Defendants would have revealed the glaring deficiencies in internal controls. As a result, the Defendants knew or were deliberately reckless in not knowing of the access control and change management issues in the IT department prior to June 6, 2018, when Defendants assured the market that their internal controls were adequate and there had been no material changes to risks identified in their 2017 Form 10-K.

#### 1. The Obviously Problematic State of the IT Department

276. As explained in Section VI(J), the accounts of the former employees paint a picture of an IT department in complete shambles as a result of being systematically deprived of funding, attention, and resources. For example, Costco used Google spreadsheets "for pretty much everything," including the onboarding and offboarding of IT department employees, and who should have access to given programs. A previously noted though, user access controls also include the adequacy of ongoing review of user authority levels, and require that information about who has the ability to access certain information be maintained in a secure way. Easily

---

[31] The prior section also described specific information that Defendants should have known regarding the inadequacy of the controls situation, including the issues discussed during GDPR implementation and that the deficiencies actually lead to regulatory problems and a brazen embezzlement scheme.


BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104 Tel: 206-652-8660

editable spreadsheets obviously do not pass muster. This is such an obviously impermissible approach to user access controls (especially at a company with over $100 billion in revenue) that anyone viewing the system would have immediately recognized the deeply troubled status of the department. Both employees and a "baffling" number of contractors would retain access to Costco's systems long after leaving the Company, or transferring departments or job functions within the Company. This was due at least in part to the fact that Costco lacked an automated procedure for offboarding employees and contractors, and lacked a process for granting access on the front end. Additionally, employees and contractors were often granted far more access than was required for their roles, and Costco employees were associated with exponentially more groups than an average company. Further, CWs confirmed that Costco completely lacked a Bring Your Own Device Policy, leading to unauthorized user access, and that Costco used unsecure spreadsheets for a variety of functions within the IT department adversely affecting both user access and change management. Many other facts suggest that the IT department was badly failing to function as it should. For example, in mid-2017, Costco disbanded the IT department's risk management department due to lack of qualified managers. The technology used by Costco, including for important operations such as audits, was described as looking like it was from the 1970s and "ancient."

277. The magnitude of the types of deficiencies were such that anyone paying meaningful attention to the IT department would have immediately understood that it was not functioning properly.

**2. The Remediation Measures Showcase the Obvious Deficiencies**

278. That Costco's internal controls required such drastic remediation measures further shows Defendants knew, or were at least deliberately reckless in not knowing, of the material weakness in their internal controls related to financial reporting. Rather than personally ensuring the implementation and maintenance of effective internal controls (as they were required to do), the Individual Defendants oversaw an underfunded and understaffed IT department rife with access control and change management problems. Defendant Galanti even went so far as

admitting in Costco's 4Q2018 earnings call on October 4, 2018, that the material weakness "should have been fixed" prior to the date of the call and explained: "[T]he controls weren't in place. . . . We should have done a better job."

279. On October 25, 2018, Defendants disclosed to the market the extensive measures that would be required to remediate the material weakness in their internal controls related to financial reporting. Defendants revealed that Costco's IT department: (1) lacked a compliance oversight function; (2) lacked a training program to educate employees on ITGCs, (3) lacked a sufficient documentation program for ITGCs; (4) lacked sufficient risk assessment procedures and controls related to IT systems; and (5) lacked a sufficient ITGC review and testing plan. The fact that the IT department lacked these basic and important safeguards supports that Defendants acted with knowledge (or were deliberately reckless) when they signed their SOX Certifications and made other statements concerning the efficacy of these internal controls.

280. The fact that these controls were lacking is a *prima facie* showing that Defendants made false and misleading statements or omissions with scienter. Notably, Defendants did not merely need to improve Costco's training program or compliance oversight function—it lacked those programs completely. The Individual Defendants could not have possibly designed and evaluated effective internal controls, and then certified as to the effectiveness of those same controls during the Class Period, when these controls never existed in the first place. Defendants admitted that these controls only came into being at the end of the Class Period, after the material weakness was announced. Further supporting the strong inference of scienter is the fact that, as detailed above in Section VI(G), the control activities component of the COSO Framework is focused almost entirely on ITGCs, which were also the primary focus for several of the remediation measures.

### 3. Access to Information and Reports about the Deficiencies

281. In addition to those materials prepared for Board meetings discussed in Section VI(J)(3), the Defendants had access to reports and data detailing the weaknesses in Costco's internal controls. As detailed below, each of the Defendants had easy access to those reports and


BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104 Tel: 206-652-8660

that information, and upon accessing that available information (as they were required to do before signing SOX Certifications), Defendants could not reasonably have been assured that the Company's internal controls were effective. It is not merely that Defendants had access to information regarding the material weakness, it is that these reports revealed, or would have revealed, that the IT department was lacking fundamental ITGCs.

282. As detailed by CWs, the Defendants were presented with at least three reports detailing deficiencies related to the remediation measures disclosed at the end of the Class Period: (1) a strategy on authentication and authorization in 2014 that was approved by CIO Moulton (but shot down by senior management, due to a lack of budget); (2) a tool that would have remedied the Company's user access and change management deficiencies in 2015; and (3) a report in mid-2017 that detailed user access and change management issues throughout the IT department. Defendants also had access to risk reports prepared by the IT Risk Management team prior to it being disbanded. Additionally, by early 2017, Defendant Jelinek, clearly had access to information pertaining to the weakness regarding SOX compliance, insofar as he sent out emails about the problematic situation. Additionally, Defendants had easy access to information related to the Company's internal control deficiencies from at least two databases; Archer and ServiceNow. Defendants routinely had access to risk reports detailing concerns regarding internal controls. Further, Defendants had access to information insofar as many of the inadequate practices were plainly visible to anyone within the Company and because as CEO and CFO—and due to their obligations under COSO—they clearly had authority to request additional information about these practices. For example, had either Defendant asked the question—what is our training program to educate employees on ITGCs?—as was required to as part of their COSO obligations, they would have immediately uncovered that a training program did not exist.

283. In addition to the reports and databases, Defendants also had access to information through regular meetings between employees, the Office of the CIO, and the Board, including the Individual Defendants. According to CWs, Bowersock and Rutherford routinely


BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104 Tel: 206-652-8660

attended meetings with IT employees. Additionally, Bowersock and at least one of his direct reports met quarterly with the Board's Audit Committee and Moulton met almost weekly with Defendant Jelinek to discuss the IT department.

**C. Additional Allegations Related to Corporate Scienter**

284. Costco identified CIO Moulton, and two of his direct reports, as Executive Officers in its annual report. As CIO, Moulton, and his direct reports, were necessarily involved in the internal audit process, including the quarterly SOX audits. In this role, CIO Moulton and his direct reports were in a position to prevent Costco from making false statements regarding the effectiveness of its internal control over financial reporting in the Company's 3Q2018 Form 10-Q. According to CWs, CIO Moulton and his direct reports had knowledge of the deficiencies in Costco's internal controls. Under the COSO Framework, senior management has an obligation to communicate with the Board, which included the Individual Defendants. As detailed by CWs, "everything IT-wise" ran through CIO Moulton, and Moulton and the members of his office met routinely with employees and the Board to discuss internal control deficiencies.

285. As senior executives of Defendant Costco, Defendant Costco is credited with the knowledge of CIO Moulton, Rutherford, and Bowersock. Since the members of the Office of the CIO, including Moulton himself, were involved in the internal audit process, they could have prevented the Individual Defendants from certifying to the effectiveness of the Company's internal controls over financial reporting while the Company had a material weakness. While not required by law to sign SOX Certifications, as CIO, Moulton would have necessarily been directly involved in the review for those certifications. Additionally, the information and communication component of the COSO Framework further supports a strong inference of scienter in that management was required to facilitate the flow of information "up, down, and across the entity," including the flow of information between Defendant Galanti and his direct report, CIO Moulton, and between CIO Moulton and his direct reports.


BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104 Tel: 206-652-8660

286. In addition, Bowersock and Defendant Galanti[32] attended Costco Audit Committee meetings where Costco's SEC filings and reports were reviewed before they were filed and published.

287. Costco also has the knowledge of its audit committee members (Charles T. Munger, Kenneth D. Denman, Susan L. Decker). The Audit Committee's responsibilities included: (a) providing direct communication between the Board and the Company's internal and external auditors; (b) monitoring the design and maintenance of the Company's system of internal accounting controls; (c) selecting, evaluating, and, if necessary, replacing the external auditors; (d) reviewing the results of internal and external audits as to the reliability and integrity of financial and operating information; and (e) maintaining procedures for receipt, retention, and treatment of any complaints received by the Company about its accounting.

288. Costco also has the knowledge of its Board members, who (according to Costco's proxy) had the following responsibilities related to overseeing the way Costco deals with risk:

> The Board seeks to ensure that management has processes for dealing appropriately with risk. It is the responsibility of the Company's senior management to develop and implement the Company's short- and long-term objectives and to identify, evaluate, manage and mitigate the risks inherent in seeking to achieve those objectives. Management is responsible for identifying risk and risk controls related to significant business activities and Company objectives, and developing programs to determine the sufficiency of risk identification, the balance of potential risk to potential reward, the appropriate manner in which to control risk, and the support of the risk-controlling behavior and the risk to Company strategy. The Board implements its risk oversight responsibilities primarily through the Audit Committee, which receives management reports on the potentially significant risks, including (without limitation) cybersecurity matters, that the Company faces and how the Company is seeking to control risk where appropriate and oversees internal control over financial reporting. The Audit Committee reports to the full board on its risk-management tasks, including the enterprise risk management review. In more limited cases, such as with risks of significant new business concepts and substantial entry into new markets, risk

[32] Costco's bylaws state that the "Chief Financial Officer shall perform other duties commonly incident to his or her office," which duties would include regularly meeting with the audit committee.

> oversight is addressed as part of the full Board's engagement with the Chief Executive Officer and management. Board members also often discuss risk as a part of their review of the ongoing business, financial, and other activities of the Company..

## IX. LOSS CAUSATION

289. During the Class Period, as detailed herein, Defendants engaged in a knowingly, or deliberately reckless course of conduct that artificially inflated the price of Costco's securities and operated as a fraud or deceit on Class Period purchasers of Costco's securities by failing to reveal and misrepresenting the adverse facts detailed herein. Later, when Defendants' prior misrepresentations and fraudulently reckless course of conduct were revealed to the market, the price of Costco's securities declined significantly as the prior artificial inflation was released from the Company's share price.

290. As a result of their purchases of Costco's securities during the Class Period, Lead Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws. Defendants' false and misleading statements had the intended effect and caused Costco's common stock to trade at artificially inflated levels throughout the Class Period, closing at $202.57 per share on June 7, 2018 (the first day of the Class Period), closing at a Class Period high of $244.21 per share on September 11, 2018, and then falling to $218.19 per share at closing on October 26, 2018.

291. By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of Costco's business and internal controls. As Defendants began to reveal these adverse facts to the market, the price of Costco's securities fell dramatically. From the day of the partial revelation of the truth, on October 4, 2018, to close the following day, Costco's stock dropped from a closing price of $231.68 to $218.82—a 5.55% drop on heavy volume of 7,379,026 shares. On the date of the second revelation, October 26, 2018, Costco's stock dropped from a closing price of $226.40 on the prior day to $218.19—a 3.62% drop on heavy volume of 3,995,362 shares. This decline removed the artificial inflation from the price of


BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104 Tel: 206-652-8660

Costco's stock, causing economic loss to investors who had purchased or otherwise acquired Costco's securities during the Class Period.

292. The decline in the price of Costco's securities following these revelations was a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market. The timing and magnitude of the price declines in Costco's securities and market reactions to the news negate any inference that the loss suffered by Lead Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

293. The economic loss, *i.e.*, damages, suffered by Lead Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme and course of conduct to artificially inflate the price of Costco's securities and the subsequent material decline in the value of Costco's securities when Defendants' prior misrepresentations and omissions and other fraudulent conduct were revealed.

## X. APPLICATION OF PRESUMPTION OF RELIANCE

294. To the extent that reliance is an element of their claims, Lead Plaintiff and the Class members are entitled to a presumption of reliance under *Affiliated Ute Citizens of Utah* v. *United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact where there was a duty to reveal material information.

295. To the extent that reliance is an element of their claims, Lead Plaintiff and the Class members are also entitled to a presumption of reliance on Defendants' material misrepresentations and omissions pursuant to the fraud-on-the-market theory:

(a) Costco common stock was actively traded on the NASDAQ, an informationally efficient market, throughout the Class Period;

(b) Costco stock traded at high volumes during the Class Period;

(c) Costco filed an annual report and quarterly financial reports with the SEC;


BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104 Tel: 206-652-8660

(d) Costco communicated with public investors by means of established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public revelations, such as communications with the financial press, securities analysts, and other similar reporting services;

(e) the market reacted promptly to public information disseminated by Costco, for example, the market price of Costco stock decreased by 5.5% on October 5, 2018, when the material weakness in the Company's internal controls related to financial reporting was announced, and again decreased by 3.63% on October 26, 2018, when Costco finally revealed the extent of the material weakness in internal controls;

(f) Costco stock was covered by numerous securities analysts employed by major brokerage firms who wrote reports that were publicly available and entered the public marketplace;

(g) the material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to misjudge the value of Costco's securities;

(h) without knowledge of the misrepresented or omitted material facts alleged herein, Lead Plaintiff and other Class members purchased or otherwise acquired Costco's securities between the time Defendants misrepresented or failed to reveal material facts and the time the true facts began to be revealed; and

(i) Options in Costco's stock were actively traded in an informationally efficient market based on the value of Costco and the price of its common stock, which traded on the NASDAQ, an informationally efficient market, throughout the Class Period.


BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104 Tel: 206-652-8660

## XI. NO SAFE HARBOR

296. The statutory safe harbor provided by the PSLRA for forward-looking statements under certain circumstances does not apply to any of the materially false and misleading statements and omissions alleged herein.

297. ***First***, Defendants' statements and omissions alleged to be false and misleading relate to historical facts or existing conditions, and omissions are not protected by the statutory safe harbor. Defendants' false and misleading statements and omissions alleged herein are not forward-looking because such statements: (1) relate to historical or current fact; (2) implicate existing conditions; and (3) do not contain projections of future performance or future objective. To the extent that any of the alleged false and misleading statements and omissions might be construed to touch on future intent, they are mixed statements of present facts and future intent and are not entitled to safe harbor protection with respect to the part of the statement that refers to the present.

298. ***Second***, any purported forward-looking statements were not accompanied by meaningful cautionary language because any risks that Defendants warned of had already come to pass, and any cautionary language did not mention important factors of similar significance to those actually realized. Additionally, to the extent Defendants included any cautionary language, such language was not meaningful because any potential risks identified by Defendants had already manifested. To the extent Defendants included any cautionary language, it was not precise and did not relate directly to any forward-looking statements at issue. Defendants' cautionary language was boilerplate and did not change during the Class Period, despite the fact that conditions had materially changed.

299. ***Third***, to the extent that there were any forward-looking statements that were identified as such, Defendants are liable because, at the time each of those forward-looking statements were made, the speaker knew the statement was false when made.


BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104 Tel: 206-652-8660

## XII. CLASS ACTION ALLEGATIONS

300. Lead Plaintiff brings this federal securities class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and all persons and entities that purchased Costco securities during the period from June 7, 2018 through October 25, 2018, inclusive (the "Class Period") and were damaged thereby, except as excluded below (the "Class").

301. Excluded from the Class are: (i) Defendants; (ii) members of the immediate family of any Individual Defendant; (iii) any person who was an officer or director of Costco during the Class Period; (iv) any firm, trust, corporation, or other entity in which Defendants have, has, or had a controlling interest; and (v) the legal representatives, affiliates, heirs, successor-in-interest, or assignees of any such excluded person, including Costco's employee retirement and/or benefit plan(s) and their participants or beneficiaries, to the extent they made purchases through such plan(s).

302. The Class members are so numerous that joinder of all members is impracticable. During the Class Period, Costco had more than 435 million common shares outstanding, which shares were actively traded on the NASDAQ.

303. While the exact number of Class members is unknown to Lead Plaintiff at this time, and can only be ascertained through appropriate discovery, it is likely that the proposed Class numbers in the thousands and is geographically widely dispersed. Record owners and other Class members may be identified from records maintained by Costco and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

304. Lead Plaintiff's claims are typical of the claims of the Class members. All the Class members were similarly affected by Defendants' conduct in violation of the Exchange Act as alleged herein.

305. Lead Plaintiff will fairly and adequately protect the interests of the Class members. Lead Plaintiff has retained counsel competent and experienced in class and securities litigation.


BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104 Tel: 206-652-8660

306. There is a well-defined community of interest in the questions of law and fact involved in this case. Common questions of law and fact exist as to all Class members, and predominate over any questions solely affecting individual Class members. The questions of law and fact common to the Class include, without limit:

(a) whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period contained material misrepresentations;

(c) whether the Defendants' statements omitted material facts that Defendants had a duty to reveal;

(d) whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(e) whether Defendants acted knowingly or deliberately recklessly in issuing false and misleading financial statements;

(f) whether the price of Costco securities during the Class Period was artificially inflated because of Defendants' conduct complained of herein;

(g) whether reliance may be presumed pursuant to the fraud-on-the-market doctrine and/or the presumption of reliance afforded by *Affiliated Ute Citizens of Utah* v. *United States*, 406 U.S. 128 (1972);

(h) whether the individuals were controlling persons of Costco; and

(i) whether and to what extent the Class members suffered losses due to Defendants' fraudulent conduct.

307. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because, among other things, joinder of all Class members is impracticable. Furthermore, because the damages suffered by the individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for



BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104 Tel: 206-652-8660

members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### Violation of § 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants for Violations of Section 10(b) and Rule 10b-5 Promulgated Thereunder

308. Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

309. This Count is asserted against all Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

310. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or deliberately recklessly engaged in acts, transactions, practices, and courses of business which operated as a fraud and deceit upon Lead Plaintiff and the other Class members; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Costco securities; and (iii) cause Lead Plaintiff and other Class members to purchase or otherwise acquire Costco securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

311. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Costco securities. Such reports, filings, releases and statements were



BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104 Tel: 206-652-8660

materially false and misleading in that they failed to reveal material adverse information and misrepresented the truth about Costco.

312. By virtue of their positions at Costco, the Individual Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Lead Plaintiff and the other Class members, or, in the alternative, the Individual Defendants acted with deliberately reckless disregard for the truth in that they failed or refused to ascertain and reveal such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to the Individual Defendants. Said acts and omissions of the Defendants were committed willfully or with reckless disregard for the truth. In addition, each Individual Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above. Costco has the scienter of its management level employees, including the Individual Defendants, CIO Moulton, Executive Officers Rutherford, and Bowersock, and the members of its Audit Committee.

313. Additional information showing that Defendants acted knowingly or with deliberately reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Costco, the Individual Defendants had knowledge of the details of Costco's internal affairs.

314. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Costco. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Costco's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Costco securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Costco which were concealed by Defendants, Lead


BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104 Tel: 206-652-8660

Plaintiff and the other Class members purchased or otherwise acquired Costco securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

315. During the Class Period, Costco securities were traded on an active and efficient market. Lead Plaintiff and the other Class members, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired Costco securities at prices artificially inflated by Defendants' wrongful conduct. Had Lead Plaintiff and the other Class members known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Costco securities was substantially lower than the prices paid by Plaintiff and the other Class members. The market price of Costco securities declined sharply upon public revelation of the facts alleged herein to the injury of Lead Plaintiff and Class members.

316. By reason of the conduct alleged herein, Defendants knowingly or deliberately recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

317. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other Class members suffered damages in connection with their respective purchases, acquisitions and sales of Costco securities during the Class Period, upon the revelation that Costco had been disseminating misrepresented financial statements to the investing public.


BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104 Tel: 206-652-8660

**COUNT II**

**Against the Individual Defendants**
**<u>for Violations of Section 20(a) of the Exchange Act</u>**

318. Lead Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

319. During the Class Period, the Individual Defendants participated in the operation and management of Costco, and conducted and participated, directly and indirectly, in the conduct of the Costco's business affairs. The Individual Defendants knew the adverse non-public information about Costco's misstatements because of their senior positions at the Company.

320. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information, and to correct promptly any public statements issued by Costco which had become materially false or misleading.

321. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Costco disseminated in the marketplace during the Class Period concerning the misrepresentations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Costco to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Costco within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Costco securities.

322. Each of the Individual Defendants, therefore, acted as a controlling person of Costco. By reason of their senior management positions and/or being directors of Costco, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Costco to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Costco and possessed the


BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104 Tel: 206-652-8660

power to control the specific activities which comprise the primary violations about which Plaintiff and the other Class members complain.

323. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## XIII. PRAYER FOR RELIEF

**WHEREFORE**, Lead Plaintiff respectfully prays for judgment against the Defendants as follows:

A. Determining that this action is a proper class action maintained under Rule 23 of the Federal Rules of Civil Procedure, certifying Lead Plaintiff as Class representative, and appointing Levi & Korsinsky, LLP as Class counsel pursuant to Rule 23(g);

B. Determining and declaring that Defendants violated the Exchange Act by reason of the acts and omissions alleged herein;

C. Awarding Lead Plaintiff and the Class compensatory damages against all Defendants, jointly and severally, in an amount to be proven at trial together with interest thereon;

D. Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including but not limited to attorneys' fees and costs incurred by consulting and testifying expert witnesses; and

E. Granting such other and further relief as this Court may deem just and proper.

## XIV. DEMAND FOR TRIAL BY JURY

Lead Plaintiff hereby demands a trial by jury of all issues so triable.


BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104 Tel: 206-652-8660

Dated: March 9, 2020

Respectfully submitted,

BRESKIN JOHNSON TOWNSEND PLLC

By: /s/ Roger Townsend

Roger Townsend, WSBA #25525
1000 Second Avenue, Suite 3670
Seattle, WA 98104
Tel: (206) 652-8660
rtownsend@bjtlegal.com

*Local Counsel*

LEVI & KORSINSKY, LLP (Trial Counsel)
Eduard Korsinsky*
55 Broadway, 10th Floor
New York, NY 10006
Tel: (212) 363-7500
Fax: (212) 363-7171
Email:ek@zlk.com

Nicholas I. Porritt (admitted *pro hac vice)*
Adam M. Apton*
Alexander A. Krot III*
Adam C. McCall*
1101 30th St. NW, Suite 115
Washington, D.C. 20007
Tel: (202) 524-4290
Fax: (212) 363-7171
Email: nporritt@zlk.com
Email: aapton@zlk.com
Email: akrot@zlk.com
Email: amccall@zlk.com
**Pro hac vice* applications forthcoming

*Attorneys for Plaintiff and Lead Counsel for the Class*

By: /s/ Carol C. Villegas

LABATON SUCHAROW LLP
Carol C. Villegas (admitted *pro hac vice)*
Jake Bissell-Linsk (admitted *pro hac vice)*
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile: (212) 818-0477
Email: cvillegas@labaton.com
Email: jbissell-linsk@labaton.com

*Additional Attorneys for Lead Plaintiff and the Class*

**CERTIFICATE OF SERVICE**

I certify that, on the date stamped above, I caused this document to be filed with the Clerk of the Court using the CM/ECF system, which will serve all parties by emailing notice of filing to their counsel of record.

/s/ *Carol C. Villegas*
Carol C. Villegas



BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104 Tel: 206-652-8660